IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| James Morales, <br><br> Plaintiff, <br><br> --- against --- <br><br> Kavulich & Associates, P.C., <br> Gary Kavulich, <br> Rosewall Gardens Associates, LP f/k/a <br>     Rosewall Gardens Associates,  and <br> Rosewall, Inc. <br>         Defendants. | § <br> § <br> §   Case No._____ <br> § <br> § <br> § <br> § |

## ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiff James Morales brings suit against a debt collection law firm and its principal (the Kavulich Defendants) for violating the Fair Debt Collections Practices Act, 15 U.S.C § 1692 *et seq.*, and committing conversion by executing on Mr. Morales' bank account for a non-existent judgment. As the Kavulich Defendants acting as the agent for the judgment creditor, Plaintiff also brings suit for conversion against the judgement creditor and its general partner (the Rosewall Defendants).

## JURISDICTION AND VENUE

1.  The Court has federal question jurisdiction over the lawsuit because the action arises under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.*, ("FDCPA").  Jurisdiction of the Court arises under 15 U.S.C. § 1692k (d) and 28 U.S.C. § 1331 because this dispute involves predominant issues of federal law under

1

the FDCPA. The Court has supplemental jurisdiction under 28 U.S.C. §1367 over Plaintiff's state law claims because said claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the United States Constitution.

2. Venue is properly laid within the Southern District of New York because the defendant transacts business in that district and the conduct complained of occurred within that district.

## PARTIES

3. Plaintiff, James Morales, is an individual who resides in Bronx County, New York. He is a "consumer" as defined by 15 U.S.C. §1692 (a)(3) because Mr. Morales was alleged to owe rent, which constitutes a "debt" under 15 U.S.C. § 1692(5).

4. Defendant Kavulich & Associates, P.C. is a New York Law Firm that has its principal place of business in Port Chester, NY 10573.

5. Defendant Gary Kavulich is an individual, who on information and belief, resides in the State of New York. He may be served at his place of employment, Kavulich & Associates, P.C. or wherever he may be found.

6. Defendant Rosewall Gardens Associates, LP f/k/a Rosewall Gardens Associates ("Rosewall LP") is a domestic limited partnership. It may be served through its registered agent Jeffrey Moskin, 565 West End Ave, New York, NY 10024.

7. Rosewall, Inc. is a domestic corporation with its principal executive office located at 141-50 85th Rd., Briarwood, NY 11435. Rosewall Inc. is the general partner

of Rosewall LP, and thus is jointly and severally liable for all of the acts and omissions of Rosewall LP committed in the course and scope of the partnership. As such Rosewall, Inc. and Rosewall LP will be identified jointly as "Rosewall."

8.     Defendants Kavulich & Associates, P.C. and Gary Kavulich (collectively "Kavulich") are "debt collector[s]" as defined in 15 U.S.C. §1692 (a)(6) as they regularly collect or attempt to collect, directly or indirectly, debts owed, or due or asserted to be due another. Specifically, Kavulich files thousands of collection lawsuits in civil court, primarily for rent, and seeks to enforce putative debts obtained by others, primarily for rent.

## FACTUAL ALLEGATIONS

9.     This case originates with an act of charity taken by the plaintiff, James Morales in 2007 when he agreed to help his best friend's girlfriend, Clara Potter, secure an apartment by co-signing a lease. After he helped Ms. Potter get the apartment, he believes he had no further contact with her.

10.    On October 5, 2007 the law firm of Gutman, Mintz, Baker and Sonnenfeldt ("Gutman and Mintz") filed a petition in Bronx Housing Court captioned *Rosewall Gardens Associates v. James Morales and Clara Potter*, Index number 67049/07 (the "LT Action"). *See* **Exhibit A**. The petition alleged Ms. Potter and Mr. Morales had defaulted on their rental agreement for property 2300 Sedgwick Ave, Apt. 4k Bronx NY 10468 and were residing in the apartment in violation of the lease. The petition stated that Mr. Morales and Ms. Potter owed Rosewall back rent in the amount of $2,550.00.

11.     Mr. Morales was never served a copy of the LT Action, and did not know of the LT Action until his bank account was restrained in 2015.

12.     On October 17, 2012, Ms. Potter filed an answer disputing the allegations. Mr. Morales did not receive notice of the lawsuit and did not file an answer or appear in court.

13.     On January 29, 2008 Ms. Potter entered into a stipulation with Gutman and Mintz in the LT Action in which Ms. Potter agreed to make a one-time payment of $2,601.16 to Gutman and Mintz, and pay all future rent on time. Gutman and Mintz agreed to inspect her home and make certain repairs. *See* **Exhibit B.**

14.     On the same date, as per the stipulation, a judgment for possession of the apartment and a money judgment for $2,601.16 were awarded against Ms. Potter. *See* **Exhibit C.**

15.     Mr. Morales did not appear in court January 29, 2008 because he had no knowledge of the ongoing proceedings, but no judgment was awarded against him.

16.     On March 13, 2008 Ms. Potter entered into a second stipulation in the LT Action in which she agreed to pay $4,352.74 to Gutman and Mintz. Gutman and Mintz agreed to make certain repairs. *See* **Exhibit D.**

17.     On the same date, as per the stipulation, a judgment for possession of the apartment and a money judgment was again entered against for $4,352.74 . Ms. Potter. *See* **Exhibit E.**

18.     Mr. Morales did not appear in court for the March 13, 2008 hearing.

19.     Critically, ***no money judgment was entered against Mr. Morales at the March***

4

*13, 2008 hearing*, or at any other time. Rather, the Court issued only a judgment against Mr. Morales for possession of the apartment. *See* **Exhibit F** (zero dollar judgment against Mr. Morales).

20. As stated above, Mr. Morales was never served with the petition in the LT Action, nor was he ever aware of the action until he learned his bank account was restrained in April 2015.

21. On July 11, 2008, Kavulich & Associates, P.C. filed (and Gary Kavulich personally signed) a summons and complaint in Bronx *Civil Court* captioned *Rosewall Gardens Associates v. James Morales and Clara Potter*, Index number CV-060346-08/BX ("CC Action"). *See* **Exhibit G.** Mr. Kavulich, on behalf of his firm, signed all of the pleadings and executions at issue in this case. As such Mr. Kavulich and his firm are jointly and severally liable and as such will be referred to jointly as "Kavulich."

22. In the CC Action, Kavulich sought to recover damages in the amount of $6,104.32 plus $500.00 in attorney's fees and additional interest, for the putative breach of a lease agreement. The complaint specifically alleged that Ms. Potter and Mr. Morales owed rental arrears for the months of November, 2007, through and including May, 2008 for the premises known as 2300 Sedgwick Ave, Apt. 4K Bronx NY 10463, the same premises about which the initial housing court case had been based.

23. The complaint in the CC Action made no mention of the fact that a judge in housing court had already issued a money judgment against Ms. Potter

24. No judgment was ever issued in CC Action against either Mr. Morales or Ms.

5

Potter. There are affidavits of service in the CC Action, court file, but in fact Mr. Morales was never served suit and did not learn of it until years later when his bank account was restrained in the caption of the LT Action, as discussed below.

25. Kavulich never served Mr. Morales with the CC Action complaint. The first time Mr. Morales learned of the CC Action was when he began searching court records after his bank account was restrained in April or May, 2015.

26. On or about March 18, 2015 Kavulich sought to collect on a non-existing judgment by signing and later issuing an Information Subpoena and Restraining Notice ("Restraining Notice") on TD Bank, where Mr. Morales had accounts. *See* **Exhibit H.**

27. On or about April 2, 2015 Kavulich served the Restraining Notice on TD Bank, where Mr. Morales had accounts. *See* **Exhibit L.** (Kavulich objection to exemption claim, ¶ 8).

28. Kavulich used the index number from the LT Action in the Restraining Notice.

29. The Restraining Notice falsely stated there was a judgment against Mr. Morales in the LT Action for $4,352.47, with interest accruing since 3/13/2008. The 3/13/2008 date is that of the agreed money judgment against Ms. Potter. The possessory judgment against Mr. Morales was issued the day before, on 3/12/2008.

30. On or about April 27, 2015 Kavulich issued an Execution With Notice to Garnishee against TD Bank. The date and amount of the (non-existent judgment) was the same as in the Restraining Notice. *See* **Exhibit I.**

31. On or about April 27, 2015 New York City Marshal Stephen W. Biegel ("the

Marshal") issued a Levy and Demand on TD Bank seeking to collect an amount of principal and interest consistent with the amounts Kavulich listed in his Restraining Notice, plus additional fees. *See* **Exhibit J.**

32. In issuing the Restraining Notice and Execution Kavulich knew and intended that those documents would ultimately be delivered to Mr. Morales, which they were. In signing and serving the Restraining Notice and Execution, Kavulich impliedly represented to Mr. Morales, the least sophisticated consumer, that there was a valid, existing judgment against him for amounts claimed. However, Kavulich did not perform a meaningful attorney review prior to signing and serving those documents. If he had, Kavulich would have reviewed the LT Action and noted that there no money judgment against against Mr. Morales. In the alternative, Kavulich knew there was no money judgment but issued the Restraining Notice and Execution to intentionally seize money to which Kavulich knew he had no right.

33. On or about April 16, 2015, in response to the executions of Kavulich, TD Bank froze Mr. Morales' bank accounts.  Mr. Morales promptly went to the bank to attempt to find out what was going on.

34. TD charged Mr. Morales a $125 bank fee on multiple occasions because of the restraint, and transferred $1,081.19 from his account to pay the non-existent judgment. At the time of these deductions, there was $1,486.32 in the savings account. After the deductions only $280.13 remained.

35. On April 23, 2015, Mr. Morales sought out the free limited scope legal assistance of Civil Legal Advice and Referral Office ("CLARO"). The volunteers at

7

CLARO advised him on how to access his exempt funds from his frozen bank account, and suggested he request the underlying housing court file which seemed to form the basis of the lien on his bank account. Mr. Morales went back and forth to CLARO on numerous occasions after that, as he continued to try and gather information to shed light on why his account had been frozen.

36. On April 30, 2015 Mr. Morales executed an exemption claim form and promptly delivered and caused the same to be promptly delivered to Kavulich. The form indicated the funds in the restrained account were exempt because they were earned income from within the prior 60 days. *See* **Exhibit K.**

37. During the months of April and May 2015, Mr. Morales requested the underlying housing court file and went back and forth to his bank attempting to access his funds. In housing court he was told it would take weeks for the file to be obtained from archives and there was nothing he could do to speed up the process.

38. On May 5, 2015 Kavulich purportedly filed a Notice of Motion [for] Post-Possession Money Enforcement objection (the "Objection") to Mr. Morales' April 30, 2015 exemption claim form (the "Exemption Claim"). *See* **Exhibit L.**

39. Kavulich "affirmed under the penalty of perjury" certain facts.

40. The Objection contended the on or about April 2, 2015 Kavulich served the Restraining Notice on TD Bank and on May 5, 2015 received the Exemption Claim. *See* **Exhibit L** (¶¶ 8, 13).

41. The Objection constitutes a series of material false, deceptive, misleading, and unconscionable representations and means.

42.     Most obviously, Kavulich sought to challenge a claim exemption for a non-existent judgment.

43.     This is not the first FDCPA action against Kavulich for intentionally executing on a known non-existent judgment.  *See* ¶ 20 in **Exhibit M** (Complaint in *Ormsby v. Gary Kavulich et al*, Case No. 1:10-cv-03400-SJ-JO, ED NY. )("[D]efendants violated the FDCPA in seeking to collect on a non-existent judgment against plaintiff for a debt plaintiff has never owed.")

44.     The Objection (¶ 4) contends it attaches as Exhibit 1 a copy of a putative March 13, 2008 money judgment against Mr. Morales. However, the document is not in fact a judgment, but rather just the March 13, 2008 stipulation by Ms. Potter.

45.     Had Kavulich actually attached (or even looked at) the March 12, 2008 judgment as to Mr. Morales it would show that the judgment awarded for possession of the property and a zero dollar money judgment.

46.     On information and belief, Kavulich actually knew that there was no judgment against Mr. Morales, but executed on his bank account anyway because Kavulich was unable to satisfy the judgment against the actual judgment debt, Ms. Potter.

47.     For example, in its Objection, Kavulich states that the last monies received was over four years ago, December 28, 2011, and further states that Ms. Potter had been previously garnished, but there is still a balance remaining of $1,811.08. *See* **Exhibit L** (¶¶ 6, 7).

48.     Even if there was a judgment against Mr. Morales – which there was not – in its Objection (¶ 6) admits that the balance of the judgment would be only $1,811.08.

Last saved:  3/22/2016 2:31 PM

However, in its Restraint Notice and Execution did not disclose that most of the judgment was satisfied, and instead falsely stated that the amount of "$4,353.74…remains due and unpaid."

49.     The Objection was purported faxed to TD Bank on May 5, 2015, and mailed to Mr. Morales the same say. *See* **Exhibit L** (fax cover sheets to TD Bank and certificate of service).

50.     In May, 2015 Mr. Morales received a notice of a motion that had been filed by Kavulich and (purportedly) to be heard on May 18, 2015 in Bronx Civil Court.

51.     On May 18, 2015 Mr. Morales appeared on that date in Bronx Civil Court but was told that the case had not been calendared and that he could go home.

52.     The Objection listed the index number of the LT Action, but the address for the hearing at the courthouse what the CC Action was pending.

53.     Sometime in late April, early May, 2015, Mr. Morales finally received the housing court file. Due to a clerical error on the part of the clerk, however, the wrong file had been requested and Mr. Morales had to request the file again. Weeks later, Mr. Morales finally received the correct file, only to see that there was in fact no money judgment against him. Frustrated and confused by the paperwork, Mr. Morales again went to CLARO. It was at this meeting in early July 2015 that CLARO approached Community Development Project ("CDP") at the Urban Justice Center and asked if CDP was able to take his case.

54.     On July 16, 2015 attorneys, Lauren Elfant and Nasoan Sheftel-Gomes, from the Urban Justice Center, and Matt Schedler from CAMBA Legal Services, Inc., met

with Mr. Morales to review the housing court file. After a review of the housing court file it became immediately evident that there was no money judgment against Mr. Morales from housing court, but that it was also necessary to get a copy of the civil court file to ensure that no judgment had been issued against Mr. Morales in civil court.

55.    After a review of the file in the CC Action, on or about July 17, 2015 Mr. Morales sent a letter to Kavulich demanding that they immediately release the unlawful restraint of his bank account. A true copy of this demand letter (absent the enclosures) is attached as **Exhibit N.**

56.    Mr. Morales is precisely the type of vulnerable consumer the FDCPA was designed to protect. In the time since the defendants restrained Mr. Morales' bank account without a valid judgment Mr. Morales' life has been turned upside down. Mr. Morales' blood pressure, (which is already prone to abnormal elevation due to Mr. Morales' stressful work) was skyrocketing due to the stress of defendant's bank restraint.

57.    The defendants' conduct caused Mr. Morales to sustain actual damages including monies improperly frozen, bank fees, out-of-pocket expenses to investigate his case and the loss of countless days of work shuffling back and forth to CLARO, Bronx Civil and Housing Courts, TD Bank, and meetings and consultation with attorneys.

58.    Defendants' conduct has also caused Mr. Morales to experience severe emotional and mental pain and anguish, embarrassment and humiliation. The

defendants' unlawful conduct came at an especially vulnerable time for Mr. Morales. At the time his account was frozen Mr. Morales was working as a mover. He was making approximately $1,200 a month plus tips and was just managing to pay his bills and at various times save a little bit each month. With monthly expenses equaling approximately $1,400 a month, there were months he was able to save a little bit of money and months where he just managed to break even or had to dip into his savings.

59.     Mr. Morales had been saving money in his savings account to visit his parents in Puerto Rico, who he had not seen since 1990. He was extremely excited to take this trip as he had not had a vacation in many years and was looking forward to seeing his parents. However, when his account was frozen, he was unable to buy a plane ticket.

60.     The months after Mr. Morales' account was frozen were difficult for him. He fell behind on his rent and other bills. Because he frequently had to miss work during this period to deal with the aftermath of the bank restraint, it proved challenging to catch up on his bills even after his account was released. This caused him great embarrassment and humiliation.

61.     As the stress mounted, Mr. Morales felt ill. He often couldn't sleep and he felt extremely stressed. Given how physically stressful his work was, this made his job almost unbearable and he felt extreme exhaustion.

62.      As the pressure rose, Mr. Morales ended up in the emergency room at Montefiore Medical Center in the Bronx, where they prescribed him medication for his high blood pressure.

63.     The stress and anxiety that Mr. Morales has felt has caused him irreparable harm. The severe emotional damage manifests itself physically in Mr. Morales' body. He is mentally exhausted and is still experiencing exacerbated pains in his body resulting from lack of sleep and loss of appetite. Although Mr. Morales was ultimately able to get all of his funds returned, minus various fees incurred along the way, he is just starting to get his life back together and get back on track with his bills and various other commitments.

64.     Plaintiff also claims as actual damages the reasonable value of his attorney's time and labor to investigate the circumstances surrounding the levy on his account and obtain a favorable resolution for Mr. Morales.

65.     Kavulich was acting as the agent of Rosewall in seeking to collect the non-existent judgment and in filing an additional collection suit for the same putative debt. Kavulich was acting within the course and scope of his agency.  Therefore Rosewall is jointly and severally liable for the conduct of Kavulich.

## FIRST CLAIM FOR RELIEF
## VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT
## (AS TO KAVULICH ONLY)

66.     Plaintiff repeats and realleges each and every allegation set forth in the above paragraphs of this complaint as if fully set forth herein.

67.     The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that debt collectors who refrain from using abusive debt

collection practices are not competitively disadvantages, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692 (e); *see also Hamilton v. United Healthcare of La., Inc.* 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

68. Congress designed the FDCPA to be enforced primarily through private parties-such as plaintiff-acting as "private attorneys general." See S. Rep. No. 382, 95th Con,. 1st Sess. 5, ("[t]he committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance"); and *Jacobson v. Healthcare Fin. Servs.*, 516 F.3d 85, 91 (2d Cir. 2008) ("[i]n this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated Counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought by others.").

69. The actions of Kavulich enumerated above constitute an attempt to collect a debt or were taken in connection with an attempt to collect a debt within the meaning of the FDCPA.

70. Kavulich violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e and 1692f.  By way of example and not limitation Defendant violated the FDCPA by

taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; misrepresenting the services rendered or compensation which may be lawfully received; the false representation or implication that any individual is an attorney or that any communication is from an attorney; threatening to take and actually taking an action prohibited by law; communicating or threatening to communicate to any person credit information which is known or which should be known to be false; using any false, deceptive or misleading representations or means; using unfair or unconscionable means; and collecting or seeking to collect any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

**SECOND CLAIM FOR RELIEF**
**CONVERSION**
**(AS TO ALL DEFENDANTS)**

71. Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

72. The elements of conversion in New York State include: 1) having a possessory interest in property; and 2) having the possessory interest taken or interfered with by another in a manner that is contrary to the possessor's rights.

73. Property subject to conversion includes readily identifiable funds from a bank

account.

74. Defendants intentionally and without authority, assumed and exercised control over Mr. Morales' money, interfering with his right to possession of the same, by: a) causing Mr. Morales's bank account to be restraint; b) by causing money to be withdrawn from Mr. Morales's bank account for garnishment and for bank fees.

75. Defendants' improper restraint of Mr. Morales's money, which harmfully interfered with Mr. Morales's rights to control his own property, constitutes conversion.

76. For the reasons stated in the statement of facts, and under the aforementioned Counts, Defendants' conduct is gross, wanton or deliberate and demonstrates a high degree of moral culpability. The conduct demonstrates malice, insult, and/or willful or reckless disregard of Mr. Morales's rights, or other aggravated acts. Defendants' conduct evidences a high degree of moral culpability, or is so flagrant as to transcend mere carelessness, or constitutes willful or wanton negligence or recklessness to justify a punitive damage award.

77. For these reasons, Plaintiff is entitled to exemplary and punitive damages, in addition to actual damages. Actual damages are outlined in the above statement of facts, and incorporated by reference.

### JURY DEMAND.

Last saved:  3/22/2016 2:31 PM

54. Plaintiff demands a trial by jury.

## PRAYER

55. WHEREFORE, Plaintiff requests the following relief:

a. A declaration that Defendants have committed the violations of law alleged in this action;

c. Actual damages, treble, exemplary, and punitive damages;

d. Statutory damages under 15 U.S.C. § 1692k;

e. An order awarding disbursements, costs, and attorneys' fees under 15 U.S.C. § 1692k;

f. Prejudgment and post judgment interest as allowed by law;

g. All other relief, in law and in equity, both special and general, to which Plaintiff may be justly entitled.

DATED: New York, New York
March 16, 2016

> Respectfully submitted,
>
> By: *Nasoan Sheftel-Gomes*
>
> Harvey Epstein, Esq.
> URBAN JUSTICE CENTER One of
> Plaintiffs' Attorneys
> By: Nasoan Sheftel-Gomes, of counsel (NS-3482)
> 123 William Street, 16th Floor
> New York, NY 10038
> Phone: (646) 459-3013

Fax: (212) 533-4598
E-mail: nsheftel-gomes@urbanjustice.org


By: *Matthew Schedler*

CAMBA LEGAL SERVICES, INC.
Matthew Schedler, Of Counsel (MS-3774)
Kathleen A. Masters, Executive Director
885 Flatbush Ave.  2nd Fl.
Brooklyn, NY  11226
Phone: (718) 940-6311
MatthewSc@camba.org

By: *Ahmad Keshavarz*

Ahmad Keshavarz
One of Plaintiffs' Attorneys
The Law Office of Ahmad Keshavarz
16 Court St., 26th Floor
Brooklyn, NY 11241-1026
Phone: (718) 522-7900
Fax:     (877) 496-7809
Email: ahmad@NewYorkConsumerAttorney.com