1

2     UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
3     ----------------------------------------X
      JAMES MORALES,
4
                                   PLAINTIFF,
5
              -against-           Case No.:
6                                 1:16-CV-02134

7     KAVULICH & ASSOCIATES, P.C., GARY KAVULICH,
      ROSEWALL GARDENS ASSOCIATES, LP f/k/a
8     ROSEWALL GARDENS ASSOCIATES and ROSEWALL,
      INC.,
9
                                   DEFENDANTS.
10    ----------------------------------------X

11

12                    DATE:  December 6, 2016

13                    TIME:  11:48 A.M.

14

15             CONTINUED DEPOSITION of the

16    Defendant, GARY KAVULICH, taken by the

17    Plaintiff, pursuant to a Court Order and to

18    the Federal Rules of Civil Procedure, held

19    at the offices of Diamond Reporting, Inc.,

20    16 Court Street, Brooklyn, New York 11241,

21    before Jamie Willis, a Notary Public of the

22    State of New York.

23

24

25

```
 1

 2    A P P E A R A N C E S:

 3

 4    AHMAD KESHAVARZ, ESQ.
         Attorney for the Plaintiff
 5       JAMES MORALES
         16 Court Street, 26th Floor
 6       Brooklyn, New York  11241
         BY:  AHMAD KESHAVARZ
 7

 8    CAMBA LEGAL SERVICES
         Attorneys for the Plaintiff
 9       JAMES MORALES
         885 Flatbush Avenue
10       Brooklyn, New York  11226
         BY:  MELISSA KOVEN, ESQ.
11

12
      MITCHELL L. PASHKIN, ESQ.
13       Attorney for the Defendants
         KAVULICH & ASSOCIATES, P.C.,
14       GARY KAVULICH, ROSEWALL GARDENS
         ASSOCIATES, LP f/k/a ROSEWALL GARDENS
15       ASSOCIATES and ROSEWALL, INC.
         775 Park Avenue, Suite 255
16       Huntington, New York  11743

17

18    ALSO PRESENT:

19       JESSICA MOODY, Observing

20

21

22               *          *          *

23

24

25
```

1

2      F E D E R A L   S T I P U L A T I O N S

3

4

5      IT IS HEREBY STIPULATED AND AGREED by and

6   between the counsel for the respective

7   parties herein that the sealing, filing and

8   certification of the within deposition be

9   waived; that the original of the deposition

10   may be signed and sworn to by the witness

11   before anyone authorized to administer an

12   oath, with the same effect as if signed

13   before a Judge of the Court; that an

14   unsigned copy of the deposition may be used

15   with the same force and effect as if signed

16   by the witness, 30 days after service of

17   the original & 1 copy of same upon counsel

18   for the witness.

19

20      IT IS FURTHER STIPULATED AND AGREED that

21   all objections except as to form, are

22   reserved to the time of trial.

23

24                  *      *      *      *

25

```
 1                    G. KAVULICH
 2              (Whereupon, documents were
 3         premarked as Plaintiff's Exhibits 9
 4         and 10 for identification as of this
 5         date by the Reporter.)
 6    G A R Y   K A V U L I C H, called as a
 7    witness, having been first duly sworn by a
 8    Notary Public of the State of New York, was
 9    examined and testified as follows:
10    EXAMINATION BY
11    MR. KESHAVARZ:
12         Q.    Please state your name for the
13    record.
14         A.    Gary Kavulich.
15         Q.    What is your address?
16         A.    181 Westchester Avenue, Suite
17    500C, Port Chester, New York 10573.
18         Q.    Thanks for coming back.
19              What steps, if any, do you take
20    to determine whether a judgment you're
21    executing upon is valid, that is if it
22    hasn't been vacated or satisfied?
23         A.    We look at the notes and the
24    scanned documents.
25         Q.    Anything else?
```

1                    G. KAVULICH

2          A.    No.   That's all we have.

3     There's nothing else to look at.

4          Q.    The notes, are those your own

5     inhouse notes?

6          A.    Yes.

7          Q.    You don't mean notes from

8     someone else?

9          A.    What do you mean by someone

10    else?

11         Q.    Are there notes from another

12    company that go to you or do you mean your

13    inhouse notes?

14         A.    No, our inhouse notes.

15         Q.    Other than Mr. Morales, have

16    you ever executed on a judgment that either

17    was never entered or vacated or satisfied,

18    has that ever happened before?

19         A.    Not to my recollection.

20         Q.    If you were sued for that

21    before, you'd remember that?

22         A.    Yes, I believe so.

23         Q.    There was, in the document

24    production by the marshall -- and we can

25    pull up the documents in a few minutes --

```
 1                    G. KAVULICH
 2    indication of executing against someone who
 3    did not have a judgement against them, a
 4    person named Soto, does that ring a bell to
 5    you?
 6         A.    No.
 7         Q.    Okay.  So, we'll pull up those
 8    documents in a little bit.
 9              Now, one of the issues in this
10    case is that Mr. Morales' bank account was
11    restrained even though he didn't have a
12    judgment and it was ultimately released,
13    correct?
14         A.    Which one?  You made two
15    statements.
16         Q.    You executed on the bank
17    account when there was no judgment,
18    correct?
19         A.    Correct.
20         Q.    And ultimately you released the
21    restraint from the bank account?
22         A.    Correct.
23         Q.    Did you release it by informing
24    the marshall to release it or did you do it
25    by informing the bank to release it?
```

1                        G. KAVULICH

2           A.      I don't recall.

3           Q.      Is it your normal practice to

4    do one or the other?

5           A.      Usually to do both, if the

6    marshall is involved.

7           Q.      Why would you do both?

8           A.      Just to cover all our bases.

9           Q.      Has it ever come to pass that

10   you've only given the notice to one, either

11   the bank and not the marshall or only the

12   marshall and not the bank?

13          A.      I'm only aware of or recollect

14   one case.

15          Q.      And when was that?

16          A.      The other case that you're

17   suing me for.

18          Q.      That's Mr. Prage's case?

19          A.      Yes.

20          Q.      And not to get into that case,

21   just a couple of sentences.

22                  In that case, the discovery

23   apparently showed that when there was an

24   order vacating a judgment against my

25   client -- excuse me, let me rephrase that.

```
 1                    G. KAVULICH
 2              In Prage, there was an order
 3    holding that a restrained bank account
 4    contained entirely exempt funds, correct?
 5         A.    I don't recall the exact
 6    reason.  I recall that that was the exact
 7    reason, but the court denied our motion
 8    objecting to Mr. Prage's exemption claim
 9    and, therefore, ordered the account
10    released.  But I don't know or recall the
11    absolute specifics as to the four corners
12    of that.
13         Q.    And in that instance, you
14    contend that you sent the notice to the
15    bank but not to the marshall?
16         A.    Actually, we sent it to both.
17    We sent it to the bank contemporaneously
18    upon receipt of the decision, but we sent
19    it to the marshall, I think the time is a
20    bit tenuated.
21         Q.    The order, was it May and you
22    sent it to the marshall in August?
23         A.    July, I think.
24         Q.    End of July?
25         A.    Sometime in July, I believe.
```

```
 1                    G. KAVULICH
 2        Q.    What steps did you take to make
 3   sure that your office sent it to both?
 4        A.    I do them all now.  I don't
 5   rely on anyone else in the office to do it.
 6        Q.    And I take it that's a change?
 7        A.    Yes.
 8        Q.    And when did that change occur,
 9   approximately?
10        A.    Around this time.  When this
11   happened.
12        Q.    After the time that you were
13   sued in this FDCPA action?
14        A.    No.  Around the time that --
15   the tenuated time period when the Prage
16   matter came up.  Before I was sued.
17        Q.    The Prage matter, was that an
18   impetus for changing the fact that you were
19   doing the reviews or was it something else?
20        A.    No, it was that.  I don't
21   generally purposely contravene a court
22   order.
23        Q.    And the other reason was that
24   you had a staff member that normally
25   handled that that moved to Laos; is that
```

```
 1                    G. KAVULICH
 2    right?
 3         A.    That was much later after that.
 4         Q.    What was his name again?
 5         A.    Collin.
 6         Q.    Now, when you send a notice to
 7    the bank, do you provide a copy of that
 8    notice to the consumer?
 9         A.    Sure.
10         Q.    And that's your office policy?
11         A.    Yes.
12         Q.    Do you have any proof of that
13    happening either in Prage or in this case?
14         A.    They go out regular mail, so
15    no.
16         Q.    Would there be a notation in
17    the collection notes if the copy of the
18    letter to the bank was, in fact, sent to
19    the consumer?
20         A.    No, because that's all part of
21    one.
22         Q.    Would the letter to the bank
23    have a CC to the consumer, would it say CC
24    consumer?
25         A.    No, nor does the letter to the
```

1                    G. KAVULICH
2    consumer say CC bank.
3         Q.    If the consumer testified that
4    they'd never gotten a notice from your
5    office or from anyone that a bank account
6    had been released, do you have any reason
7    to believe that --
8         A.    Rephrase that again.
9         Q.    After you contend that you sent
10   a notice to a bank to remove a restraint --
11        A.    I misunderstood.  Then I have
12   to restate my last answer.
13        Q.    Go ahead.
14        A.    When we send a release to the
15   bank, no, we don't send anything to the
16   judgment debtor or to the defendant.
17        Q.    Why not?
18        A.    Because they get it in court.
19        Q.    How are they supposed to know
20   that the bank actually releases the money?
21        A.    When they have access to their
22   account.
23        Q.    Any other way?
24        A.    They could call us.
25        Q.    Any other way?

```
 1                    G. KAVULICH
 2        A.    They could check their account.
 3        Q.    Any other way?
 4        A.    Not that comes to mind right
 5   now.
 6        Q.    Now, if the marshall is not
 7   notified of the order removing the
 8   restraint, then why wouldn't the marshall
 9   just re-execute on the same restraint?
10        A.    Say that again.
11        Q.    If you don't tell the marshall
12   that the restraint has been lifted, all the
13   marshall knows is maybe there's an order to
14   show cause to stop collection until there's
15   an order vacating a judgment or deeming
16   funds exempt, right?
17        A.    I'm not being purposely obtuse,
18   but I don't understand your question.
19             MR. PASHKIN:  I'm going to
20          object.  He can't know what the
21          marshall would know or not know.
22             MR. KESHAVARZ:  Fine.
23        Q.    I'm just asking -- the standard
24   way this works, and correct me if I'm
25   wrong, is that you give a restraint -- when
```

1                    G. KAVULICH

2    you send a restraint to both the bank and

3    the marshall, correct?

4         A.    No.   After all of this, you

5    still don't know this.   Both of you guys, I

6    just can't believe this.

7                    We send a restraining notice to

8    the bank.   If the circumstances are such

9    that there are moneys above the exemption

10   then we send a property execution to the

11   marshall.   We never send a restraint to the

12   marshall.

13        Q.    But isn't the marshall supposed

14   to notify the consumer that there is an

15   information subpoena and bank restraint or

16   does that come from the bank?

17        A.    You have to ask the marshall.

18   I know we send a restraint to the bank.   If

19   there's sufficient funds, we send it to the

20   marshall.   I've answered this like ten

21   times.   Really.

22        Q.    Let me show you what's been

23   marked as Plaintiff's Exhibit 9.   This was

24   produced by the judgment creditor in this

25   case, the landlord.   It was their ledger

```
 1                    G. KAVULICH
 2    about payments as to Mr. Morales.
 3                 Can you review that and let me
 4    know when you're done, please.
 5         A.    I'm done.
 6         Q.    So, according to the landlord's
 7    ledger, the account that you were executing
 8    upon against Mr. Morales had, in fact, been
 9    paid entirely, right?
10         A.    I've never seen this before and
11    not according to what I know about it.
12         Q.    So, let's drill down to that.
13                 When you receive a payment
14    either from Mr. Morales or here --
15         A.    Clara Potter.
16         Q.    Thank you.
17                 So, in this case, there are two
18    judgement debtors.  One was Clara Potter,
19    who actually had a judgment, and then there
20    was Mr. Morales, who actually did not have
21    a judgement against him, correct?
22         A.    Right.  There was a debtor and
23    a judgment debtor, correct.
24         Q.    And your office was receiving
25    payments from Clara Potter, correct?
```

```
 1                      G. KAVULICH
 2           A.    Correct.
 3           Q.    And do you forward those
 4   payments on to the judgment creditor, the
 5   Rosewall Gardens?
 6           A.    Yes.
 7           Q.    And how often do you forward
 8   payments that you receive from judgment
 9   debtors or alleged judgment debtors in this
10   case, how often do you forward that to
11   Rosewall?
12           A.    Monthly.
13           Q.    Do you provide a single check
14   with -- how does the payment system work?
15           A.    We send it out a month later,
16   the middle of the following month, with a
17   remittence check, an escrow check, with an
18   outline of the name of the case, or at
19   least the relevant information about -- in
20   this type of a debt, who the landlord was,
21   the address, the apartment number, the
22   defendant or defendants, how much we
23   collected, what the client's share is and
24   what our share is.
25           Q.    And who's in charge of keeping
```

1                    G. KAVULICH
2     track of how much is due on the punitive
3     judgment, your office or the landlord?
4          A.    Our office, once they give it
5     to us.  If there's any change, they would
6     seemingly let us know.
7          Q.    So, are there ledger statements
8     to the landlord that would govern the
9     payments received from Clara Potter?
10         A.    What we gave them is what I
11    just mentioned.  As we collect a payment,
12    then we give them the identifier
13    information and what we collected that
14    month.
15         Q.    You do separate payments for
16    each account or do you do one?
17         A.    Let's just say for argument's
18    sake we had five cases for 2300 Sedgwick,
19    we'd break that down.  Five different
20    payments that may be in one physical check.
21         Q.    But for each index number, do
22    you give a single check or -- I mean
23    because you're collecting on 5,000
24    judgements, so --
25         A.    No.  I have 5,000 judgments.

```
 1                    G. KAVULICH
 2    I'm collecting on maybe 500 of them.
 3         Q.    Fair enough.  I'm just
 4    wondering.
 5               So, are you saying the payments
 6    you receive in a month in a particular
 7    index number, you give one check for that
 8    index number per month if you collect
 9    money, is that what you're saying?
10         A.    No.  What I'm saying is -- I
11    don't know -- so, let's just say we have
12    five cases from this address, 2300
13    Sedgwick.  We have these folks, then we
14    have John Doe, then we have Jane Doe and
15    then we have John Smith, whatever.
16               We have a remittance sheet that
17    shows those five identifiers, the parties,
18    apartments, et cetera, how much we
19    collected for each, how much the client's
20    share is for each and what our share is.
21    That then is -- there's a total or subtotal
22    and then there's one check for all five.
23         Q.    And is that a physical ledger
24    that goes with each check?
25         A.    Yeah, it's a piece of paper.
```

1                    G. KAVULICH

2        Q.    Is that piece of paper

3   generated by your computer system?

4        A.    Yes.

5        Q.    Where on your collection notes

6   would those ledgers be reflected?

7        A.    They're not.  They print.  That

8   goes with the check.  It's not in the

9   system.

10        Q.    So, when you give the check and

11   it says how much goes to Rosewall, how much

12   goes to you for fees, do you also print in

13   the ledger what the balance due is?

14        A.    No.

15        Q.    If I understand correctly from

16   your prior testimony, you don't calculate

17   the balance due, you rely on the marshall

18   to do that, correct?

19        A.    On income executions or

20   property executions, yes.

21        Q.    So, when you make a remittence

22   to Rosewall, are you saying that you don't

23   know what the current balance is on those

24   accounts?

25        A.    No.  I'm saying we can

```
 1                    G. KAVULICH
 2   ascertain it, but that's not the purpose
 3   when we remit the check.  We're just
 4   remitting money for that particular month
 5   or period.
 6         Q.    But that balance left is not
 7   stated on the remittances?
 8         A.    Correct.
 9         Q.    When you said you can calculate
10   the balance due --
11         A.    No, I didn't say that.  I said
12   I can get it.
13         Q.    How can you get it?
14         A.    I would call the marshall.
15         Q.    Any other way?
16         A.    I could sit there and do the
17   math, but the marshall's system and the
18   calculation of interest, I trust their
19   numbers.
20         Q.    But if I understand correctly,
21   your computer system isn't set up to both
22   calculate the interest and apply the
23   payments and determine the balance on a
24   judgment account; is that right?
25         A.    Correct.
```

```
 1                    G. KAVULICH
 2         Q.    So, any payments that were made
 3    on this index number that went to Rosewall
 4    would be reflected on Exhibit 9, correct?
 5         A.    Again, I don't know.  I've
 6    never seen this in all the years that I've
 7    done work for them.
 8         Q.    Because you don't see it from
 9    Rosewall's accounting, you see it from your
10    own accounting?
11         A.    See what, the payments?
12         Q.    The ledger, right.
13         A.    Yeah, I can see the payments
14    that we received from our account.  I don't
15    know -- cash receipts seems somewhat
16    self-explanatory, but I don't even know.
17         Q.    That was the next question I
18    was going to ask.
19              In the ledger, Exhibit 9, page
20    two, it talks about cash receipt and legal.
21    I guess I was going to ask you if you knew
22    what legal meant?
23         A.    No.
24         Q.    What is the split between you
25    and Rosewall for each payment that you get
```

```
 1                    G. KAVULICH
 2    on a judgment account?
 3              MR. PASHKIN:  Objection as to
 4          relevance.
 5         A.    One-third, two-thirds.
 6         Q.    One-third to you, two-thirds to
 7    them?
 8         A.    Yeah.  I wish it was the other
 9    way.
10         Q.    And do expenses come off the
11    top before you divide it?
12              MR. PASHKIN:  Objection as to
13          relevance.
14         A.    No, they come out of his share.
15         Q.    So, it's one-third to
16    two-thirds, and from that two-thirds the
17    expenses come out?
18         A.    Correct.
19              MR. KESHAVARZ:  Mitchell, can
20          we stipulate that this is the
21          documents from Rosewall, that this is
22          the ledger produced by Rosewall?
23              MR. PASHKIN:  I don't have it
24          in front of me.  You can identify it
25          as what you believe was produced, but
```

```
 1                   G. KAVULICH
 2          he can't testify as to its contents,
 3          though.
 4               MR. KESHAVARZ:  And you can't
 5          stipulate to it?
 6               MR. PASHKIN:  No.
 7          Q.    Now, do you know why it says
 8     the current balance due is negative $402?
 9               MR. PASHKIN:  Objection.  He
10          can't testify as to what is on
11          someone else's document.
12               MR. KESHAVARZ:  Maybe he can.
13          It depends --
14          A.    No.
15               MR. PASHKIN:  That's my
16          objection.  So, we're not arguing.
17          I'm putting my objection on the
18          record.
19               MR. KESHAVARZ:  I know you're
20          not intending to do this, but you can
21          make an objection as to form, because
22          there's a concern, and even though --
23               MR. PASHKIN:  I'm making an
24          objection that he's not competent to
25          testify as to a document another
```

```
 1                    G. KAVULICH
 2         entity created.
 3              MR. KESHAVARZ:  And that's
 4         preserved by an objection to form.
 5         And I ask that you limit the
 6         objection as to form or if you want
 7         to talk about preserving a privilege.
 8              MR. PASHKIN:  I'm going to put
 9         a specific objection on the record.
10         That's what I'm going to do.
11              MR. KESHAVARZ:  I don't believe
12         that's appropriate.
13         A.    Look, I've always answered your
14    questions to the best of my ability.  I've
15    never seen it and I don't know.
16         Q.    So, this is Rosewall's end.
17              Are these payments matching up
18    to your payments?
19              Let me rephrase that.
20              If I had the collection notes,
21    are you saying the payment history, in
22    terms of the amount that gets forwarded to
23    the client, the amount that gets kept as a
24    collection fee, are you saying that that
25    payment history would not be reflected on
```

1                     G. KAVULICH
2    the collection notes?
3         A.    Say it again.
4         Q.    Basically what I'm trying to do
5    is compare Exhibit 9, which is Rosewall's
6    ledger, with your records and try to put
7    them side by side to see if those payments
8    match.
9              So, I guess I'm asking, where
10   in your documents or where in your system
11   would that ledger exist, if anywhere, so
12   that I could match up the payment dates and
13   the amounts?
14        A.    Then I think what you're asking
15   for are copies of the remittances.  Right?
16   Because that shows the breakdown of what
17   was collected and what was given to the
18   client by month.
19        Q.    So, are you able to generate a
20   report with all the remittances?
21        A.    I would have to make copies of
22   those copies that we had already sent.
23        Q.    So, it's a physical piece of
24   paper, the remittances?
25        A.    Yeah, sure.  How else are you

```
 1                    G. KAVULICH
 2   going to do it?
 3        Q.    Well, the computer generates
 4   it.  I'm just asking.  Nothing
 5   argumentative.
 6             But the computer generates the
 7   remittances, right?
 8        A.    Yes.
 9        Q.    So, I'm just wondering, the
10   computer system can't just generate a
11   ledger of all the payments, you have to
12   keep the hardcopy?
13        A.    You mean like a screen shot of
14   it?  Yeah.
15        Q.    Your system can do that?
16        A.    Yeah.
17        Q.    That's not in the collection
18   notes, it's somewhere else?
19        A.    No, that wouldn't be in there.
20   That's there (indicating).  This here, how
21   much we collect.
22             MR. KESHAVARZ:  Let's mark this
23          as an exhibit.
24        A.    I can give you a breakdown.  I
25   think that's what you're asking for, right?
```

```
 1                      G. KAVULICH
 2   I can provide you with that.
 3          Q.    Would you have to go to the
 4   physical pieces of paper, or how would you
 5   do that?
 6               Would you go to the physical
 7   pieces of paper that were the remittances
 8   or would you obtain that by some other
 9   manner?
10          A.    No, I think we have a screen
11   like that.
12          Q.    All right.
13          A.    As part of the accounting.
14          Q.    Do you know if that screen has
15   been produced?  Because I don't recall
16   seeing such a screen, but I could be
17   mistaken.
18          A.    I don't remember everything
19   that was --
20               MR. PASHKIN:  I don't have my
21          file.
22               MR. KESHAVARZ:  What was that?
23               MR. PASHKIN:  I don't have my
24          file.
25          Q.    So, it's a separate screen on
```

1                    G. KAVULICH
2    your computer system that would list the
3    payments that are made to the landlord and
4    the amount that goes to them and the amount
5    that goes to the collection fee?
6         A.    Correct.
7         Q.    Now, showing you Exhibit 10.
8    This is your collection notes for the index
9    number that is for both Clara Potter and
10   James Morales, correct?
11        A.    Correct.
12        Q.    Now, you pointed before to the
13   first page on the bottom that has a list of
14   payments?
15        A.    Correct.
16        Q.    Is that different than the
17   ledger that you're talking about in terms
18   of payments to landlord?
19        A.    Yes.
20        Q.    That's different?
21        A.    Yes.
22        Q.    Because what I'm trying to ask
23   you is to try to match up the landlord's
24   records with yours and we've had a motion
25   to compel to try to get those documents.

```
 1                    G. KAVULICH
 2              My question is this --
 3      A.      From the landlord.
 4      Q.      From your records.
 5      A.      Okay.
 6      Q.      Let me just ask you:  Are you
 7  able to get that ledger generated and
 8  either e-mail or faxed so that we can just
 9  compare it to the landlord's letter?
10      A.      I can at some point later on
11  today, but not until after 2:30.  Because
12  the person who does that is --
13              MR. PASHKIN:  This has to end
14         at 2:45.
15              MR. KESHAVARZ:  Off the record.
16              (Whereupon, an off-the-record
17         discussion was held at this time.)
18      Q.      You can have that e-mailed to
19  me by the end of the day?
20      A.      Sure.
21              MR. KESHAVARZ:  Can we have an
22         agreement if he gets it, that will be
23         forwarded to me?
24              MR. PASHKIN:  I have to talk to
25         my client, actually.  So, no.  I
```

```
 1                        G. KAVULICH
 2            haven't seen the document.  I'm going
 3            to reserve the right to examine the
 4            document for privilege and relevance.
 5            So, I'm not agreeing to produce
 6            something I haven't seen.
 7       Q.    Does that screen have a name?
 8       A.    I don't think so.
 9       Q.    Is it called the collection
10   notes screen or --
11       A.    No.  I think just the
12   accounting.  There's no name for it.
13       Q.    It's an accounting screen?
14       A.    We call it that informally, I
15   guess.  I don't know if we've ever referred
16   to it.
17       Q.    How does that work, do you see
18   different tabs in the software where you
19   just click on one tab or the other?
20       A.    No.  It's just one page with --
21   like we just described.  It's not a
22   spreadsheet with tabs.
23       Q.    No.
24            I mean the collection notes
25   that are Exhibit 10, is that like one tab
```

```
 1                    G. KAVULICH
 2    in the notes and you click on another tab
 3    and you see this accounting screen?
 4         A.    No, you'd have to go to
 5    accounting, to just accounting.
 6         Q.    Okay.
 7              What other screens can you get,
 8    other than Exhibit 10 and let's just call
 9    it the accounting history, what other
10    screens are there?
11         A.    If they came up on a queue for
12    a summons or things like that.  These are
13    the only substantive informational
14    depositories or places where you get
15    information.
16         Q.    When you say if it comes up in
17    a queue --
18         A.    Right.  We had spoken about
19    this before.  It's like a tickler.
20         Q.    So, is that a list of tickled
21    items to come and that have passed, is it
22    set up that way?
23         A.    Yeah.  It would be like today's
24    the 6th.  It will come up what summons are
25    due today.
```

```
 1                    G. KAVULICH
 2        Q.    Would it give you an historical
 3   list of the prior deadlines and the future
 4   deadlines?
 5        A.    Historical list?  It's the
 6   cases that are tickled today.  That's all.
 7   Or if they were on from yesterday and you
 8   didn't do anything with them.
 9        Q.    Now, are you able to tell from
10   your collection notes the date that you
11   sent the information subpoena and bank
12   restraint as to Mr. Morales' account?
13        A.    Per these notes, it says
14   April 2nd.
15        Q.    Of what year?
16        A.    2015.
17             MR. KESHAVARZ:  Let's go off
18         the record.
19             (Whereupon, an off-the-record
20         discussion was held at this time.)
21        Q.    Are you looking at the entry of
22   4/21/2015?
23        A.    No, I was looking at April 2nd,
24   but not 4/21.
25        Q.    So, April 2nd says that the
```

```
 1                    G. KAVULICH
 2    information subpoena and bank restraint was
 3    sent to JP Morgan Chase?
 4         A.    Yes.
 5         Q.    I'm interested in TD Bank, when
 6    was the information subpoena and bank
 7    restraint sent to TD Bank?
 8         A.    It looks like April 10th -- no,
 9    sorry.  I don't know.  I'm not sure.
10         Q.    Does a listing for 4/27/2015
11    help?
12         A.    No.
13         Q.    Before we mark these, can you
14    identify what Morales 51, 52 and 53 are and
15    tell me if the documents go together or if
16    they're separate?
17         A.    This is, this page
18    (indicating).
19         Q.    Morales 51.
20         A.    Morales 51 is a copy of a
21    portion of what was sent as a bank
22    restraint to TD Bank.  And that's dated
23    March 18th, 2015.
24         Q.    And when you say it's a
25    portion, what else --
```

```
 1                  G. KAVULICH
 2        A.    There are more pages to it.
 3        Q.    That one says 3/18/2015, is
 4   that the date it's actually mailed or do
 5   you know if there's a lag between the two?
 6        A.    Usually they go out on the same
 7   day.
 8        Q.    And would that be the date that
 9   the bank account was restrained or do you
10   know?
11        A.    No, that's the date that it was
12   sent.
13        Q.    What is Morales 52?
14        A.    That is a property execution.
15        Q.    And you're going to yell at us
16   for not knowing this after all this time,
17   but what's the difference between 51 and
18   52?
19        A.    You guys are spending tens of
20   thousands of dollars to sue me and to
21   protect your client and you can't take the
22   time to remember what these things mean?
23        Q.    Go ahead.
24              You said you guys, you mean me
25   and your client?
```

```
 1                      G. KAVULICH
 2          A.    Now, it's directed towards you.
 3  I mean common.  This isn't rocket science.
 4  This is the property execution that we sent
 5  to Marshall Biegel, I believe.
 6          Q.    And that's Morales 52, correct?
 7          A.    Correct.
 8          Q.    And that's sent on 4/27.  Why
 9  are there difference in times?
10              Do you get the information
11  subpoena back and then send it to the
12  marshall for execution?
13          A.    Yes.
14          Q.    So, the consumer wouldn't
15  know -- there actually wouldn't be a bank
16  restraint until Morales 52 is issued?
17          A.    No.
18              THE WITNESS:  Can I go have a
19        cigarette, please?
20              MR. KESHAVARZ:  Please.
21              Off the record.
22              (Whereupon, an off-the-record
23        discussion was held at this time.)
24              MR. KESHAVARZ:  Since we
25        referenced Morales 51 and 52, let's
```

1                    G. KAVULICH

2          go ahead and formally mark them as

3          exhibits.

4                    (Whereupon, the aforementioned

5          documents were marked as Plaintiff's

6          Exhibits 11 and 12 for identification

7          as of this date by the Reporter.)

8          Q.    Now, just one last question on

9    Exhibit 11, Morales 51.

10                    You forward this to TD Bank,

11   right?

12         A.    Yes.

13         Q.    And you know and you intend for

14   TD Bank to forward this to the consumer,

15   Mr. Morales, correct?

16         A.    Yes.

17         Q.    Going back to Plaintiff's

18   Exhibit 10, the collection notes.  If you

19   go to the entry on the second page of

20   4/30/2015, please.  And is that an entry

21   that you put in?

22         A.    No.

23         Q.    Even though it says G. Kavulich

24   as the user?

25         A.    For 4/30 it doesn't say G.

```
 1                    G. KAVULICH
 2   Kavulich.
 3             Well, there are two.
 4        Q.    The higher one?  Excuse me.
 5        A.    Yes, that was mine.
 6        Q.    Can you read that into the
 7   record?
 8        A.    "Patrick Castellan, attorney
 9   with Claro, called office and stated we
10   don't a judgement.  Explained L&T judgment.
11   Kind of set him back on his heels."
12        Q.    Now, Claro is the volunteer
13   legal services clinic; is that right?
14        A.    Yes.
15        Q.    Why didn't you go and check to
16   see if, in fact, there was a judgment
17   against Mr. Morales when the attorney from
18   Claro told you there, in fact, was no
19   judgement?
20        A.    Because my recollection is that
21   Mr. Castellan called and gave me the index
22   number of the civil case that had been
23   discontinued that we discussed last time.
24        Q.    Now, having gone through all
25   the court papers now and before, do you
```

```
 1                    G. KAVULICH
 2    know where Mr. Morales would have obtained
 3    a copy of the landlord/tenant -- the civil
 4    court index number?
 5         A.    Can I --
 6         Q.    Let me rephrase that.
 7               Did you forward to Mr. Morales
 8    any document with the civil court index
 9    number?
10         A.    Well, he was served with the
11    summons.  The mailing would have been sent
12    to him and the notice of discontinuance
13    would have been.  And they all would have
14    contained the civil index number.
15         Q.    Anything else that you would
16    have sent to Mr. Morales that would have
17    had the index number for the Civil Court
18    proceeding?
19         A.    No.
20         Q.    Now, go to the entry of
21    5/7/2016.  I can't really read that.
22         A.    What's the --
23         Q.    "Received another call" --
24         A.    Yes.
25         Q.    Can you read that into the
```

```
 1                    G. KAVULICH
 2    record, please.
 3         A.    "Received another call from a
 4    Legal Aid attorney insisting that our
 5    restraint is bad.  She looked up the L&T
 6    index number on e-courts and saw a
 7    different caption.  I explained to her that
 8    the L&T index numbers aren't on e-courts
 9    and that what she is seeing is indeed a
10    different case with a similar index, but
11    it's not the same."
12         Q.    And do your notes indicate who
13    put that into the system?
14         A.    Matthew Casper.
15         Q.    And what were Matthew Casper's
16    main responsibilities there at the time?
17         A.    He was our associate at the
18    time.
19         Q.    What were his main
20    responsibilities?
21         A.    Draft papers, speak to clients.
22    Attorney work.
23         Q.    And given the two calls by the
24    Legal Aid attorneys, particularly in
25    retrospect, should your office have checked
```

```
1                    G. KAVULICH
2    to see if, in fact, there was a judgment
3    against Mr. Morales?
4         A.    Based on what I believe
5    happened, no.  Solely as to their call,
6    because they were calling as -- my
7    recollection is they were calling about the
8    civil index number.
9         Q.    And so, your recollection is
10   just based on reading these two collection
11   notes, is that right, or do you have an
12   independent recollection?
13        A.    And a vague recollection of at
14   the time.
15        Q.    So, if you had to do it all
16   over again and you got these two phone
17   calls, would you still have continued the
18   execution against Mr. Morales?
19             MR. PASHKIN:  Objection as to
20         relevance.
21        A.    If it happened as it did, that
22   they were calling about a civil index
23   number, I just would have answered that
24   question as to the civil index number.
25             MR. KESHAVARZ:  Okay.  Let me
```

1                    G. KAVULICH

2            mark this as an exhibit.

3                    (Whereupon, a motion was marked

4            as Plaintiff's Exhibit 13 for

5            identification as of this date by the

6            Reporter.)

7            Q.    I'm showing you what's been

8     marked as Plaintiff's Exhibit 12, Morales

9     Bates stamped 57 through 68.  Can you

10    identify that document, sir?

11           A.    It's a motion objecting to a

12    claimed exemption.

13           Q.    And did you file that document?

14           A.    Did I file it?  No.

15           Q.    Did your office send a copy of

16    Exhibit 12 to TD Bank?

17           A.    I would have to look at the

18    notes.

19           Q.    Does anything in the document

20    itself at the end of the document tell you?

21           A.    Yes, it seems to be like we

22    did.

23           Q.    And what makes you say that?

24           A.    Because I signed it.

25           Q.    Just to make it clear for

```
 1                    G. KAVULICH
 2    the --
 3           A.    I signed the affirmation of
 4    service.
 5           Q.    On page Morales --
 6           A.    68.
 7           Q.    Okay.  Thank you.
 8                 MR. KESHAVARZ:  So, just to
 9           clarify the record, there were
10           accidentally two Plaintiff's Exhibits
11           12.  So, to correct the record,
12           Plaintiff's Exhibit 13 is, in fact,
13           Morales pages 57 through 68.
14           Q.    So, we're trying to figure out
15    why Claro's attorney might have called you
16    and said there's a case -- you restrained
17    his account in a civil index number.
18                 And if you take a look at the
19    first page of the caption, where is that
20    captioned in?
21           A.    Bronx.
22           Q.    That's in the Civil Court of
23    the Bronx, correct?
24           A.    Correct.
25           Q.    So, just looking at this top
```

```
 1                    G. KAVULICH
 2      left-hand corner, this would indicate that
 3      there is a motion objecting to an exemption
 4      claim form in Bronx Civil Court, correct?
 5           A.    In Bronx Civil Court in the
 6      housing part of Civil Court.
 7           Q.    And is part 34H the housing
 8      part?
 9           A.    Relevant to these types of
10      cases, yes.
11           Q.    Okay.
12                 Was the motion that's Exhibit
13      13 ever calendared with the court?
14           A.    I think not.
15           Q.    What makes you say that?
16           A.    Because in the exhibit you're
17      showing me it says never calendared.
18           Q.    From your own records or
19      collection notes or from any other source,
20      is that true, was it, in fact, never
21      calendared?
22           A.    It was calendared in our system
23      when we did the motion, I'm assuming.  But
24      I don't believe it ever made it to the
25      actual court calendar.
```

```
 1                        G. KAVULICH
 2          Q.    Do you know why not?
 3          A.    No.
 4          Q.    Do you know if your staff ever
 5    contacted the court to set it for a
 6    calendar?
 7          A.    If my staff ever what?
 8          Q.    Contacted the court to set a
 9    hearing on the motion.
10          A.    If my staff --
11          Q.    Is there any indication that
12    your staff ever actually tried to set a
13    hearing date on the objection to the
14    exemption claim form that's Exhibit 13?
15          A.    It seems at a certain point we
16    did when we drafted the motion.
17          Q.    What makes you say that?
18          A.    Because we drafted the motion.
19          Q.    Okay.
20                Now, did anyone from your firm
21    ever go to the date and time of the
22    hearing, at least that's listed on Exhibit
23    13, May 18th, 2013?
24          A.    It doesn't seem so.
25          Q.    Do you know why?
```

```
 1                    G. KAVULICH
 2          A.    No.  I would have to go back
 3    and look.
 4          Q.    Where would you look?
 5          A.    In my notes.
 6          Q.    In your collection notes?
 7          A.    Yes.
 8          Q.    So, take your time and look at
 9    Exhibit 10, if it helps you.
10          A.    It looks like shortly before
11    that date, that it was determined that the
12    housing, the L&T court judgement, was not
13    against Mr. Morales.
14          Q.    And what entry makes you say
15    that?
16          A.    The May 18th entry.
17          Q.    What does it say?
18          A.    "Advised marshall to vacate
19    property execution versus Morales.  Final
20    judgment not against him."
21          Q.    Do you know from your records,
22    or from any other source, what triggered
23    your office to finally realize there was
24    not judgment against Mr. Morales?
25          A.    No, I don't recall.
```

```
 1                    G. KAVULICH
 2        Q.    Was there anything in your
 3   records, in the collection notes, or any
 4   other document in your possession, custody
 5   or control, that suggests to you why your
 6   office finally realized that there was no
 7   judgment against Mr. Morales?
 8        A.    No.  It must have been through
 9   discussion and review.  But I can't tell
10   you.
11        Q.    In your notice of motion you
12   make reference to a judgment actually being
13   attached to your motion, correct?
14        A.    Yes.
15        Q.    What item is that for the Court
16   Reporter, what page number?
17        A.    Bates stamp 59.
18        Q.    And what line number?
19        A.    Paragraph four.
20        Q.    And what does it say?
21        A.    "Thereafter, petitioner
22   obtained a money judgment on or about March
23   13th, 2008 against the respondent in the
24   sum of $4,352.74."  And next to your 2 is
25   Exhibit 1, a copy of said judgment.
```

1                    G. KAVULICH

2          Q.    And Exhibit 1 is not, in fact,

3     a judgment, correct?

4          A.    It's a judgment stipulation.

5          Q.    Against who?

6          A.    No, it's captioned against both

7     parties, Clara Potter and James Morales.

8     But the judgment was only against

9     Ms. Potter.

10          Q.    And you're looking at Morales

11     62?

12          A.    Yes.

13          Q.    Is Morales 62 even the

14     judgement against Ms. Potter?

15          A.    No, it's the stipulation

16     providing for it.

17          Q.    So, if you had meaningfully

18     reviewed all the facts and circumstances of

19     the motion, should you have noticed that,

20     in fact, when you say that there's a

21     judgment attached, that you didn't actually

22     attach the judgement?

23          A.    Say that again.

24          Q.    If you did a meaningful

25     attorney review of the facts and

1                    G. KAVULICH

2       circumstances of the account for which

3       you're objecting to the exemption claim

4       form, should you have noticed that when you

5       said under oath that the attached, that you

6       didn't, in fact, attach the judgment?

7            A.    Well, there's no judgment

8       attached.  So, there should have been.

9            Q.    Or you should have checked to

10      see if there was a judgment at all against

11      Mr. Morales?

12           A.     I believe that there was a

13      judgment form that the Housing Court issues

14      and this was put mistakenly in place of

15      that.

16           Q.    We can pull out the form if

17      you'd like, but I'll just ask you straight

18      away, since you know this stuff much better

19      than I do:  The judgment against

20      Mr. Morales was only a possessory judgment,

21      it was not a money judgement, correct?

22           A.     Correct.

23           Q.    And a money judgement can't be

24      entered in a landlord/tenant unless the

25      consumer actually shows up at the

```
 1                    G. KAVULICH
 2   landlord/tenant proceeding, correct?
 3         A.    These days.  But not years ago,
 4   no, that's not true.
 5         Q.    At the date that the possessory
 6   judgment against Mr. Morales was entered,
 7   do you know if the rule was still there?
 8         A.    No, it was not.  Oftentimes in
 9   my experience in the 2000s, even though one
10   party didn't show up, there was a money
11   judgment entered against them, because only
12   one of the defendants/respondents appeared.
13         Q.    Do you know if that was proper
14   under the rules at that time or do you not
15   know?
16         A.    I don't know every Housing
17   Court rule, no.
18         Q.    The reason I ask is you say
19   that's the rule now is that they can't get
20   a money judgment unless they're there,
21   right, that's the rule now?
22         A.    That's the practice now, yeah.
23   So, I'm assuming that's the rule.
24         Q.    Was that the practice and the
25   rule back then?
```

```
 1                    G. KAVULICH

 2          A.    I know that it was the

 3     practice.  If somebody gives me a judgment

 4     with somebody's name on it, I assume it's

 5     valid, you know, issued from the court

 6     anyway.

 7          Q.    What I'm trying to nail down

 8     is --

 9          A.    I don't know the rule, the

10     Housing Court rule.  I'm not a Housing

11     Court attorney.

12          Q.    Well, you worked at Gutman &

13     Mintz for years and you were at Housing

14     Court getting stipulations on Housing Court

15     cases every --

16          A.    That's all I did, was write

17     stipulations.  I wasn't in charge, nor did

18     I participate in any other meaningful

19     adjudication of Housing Court law.

20          Q.    But you worked five days a week

21     usually --

22          A.    No.

23          Q.    Most of the time you were

24     actually -- when they make the hearing date

25     for a landlord/tenant case, you would go
```

                        G. KAVULICH

1    there and enter into stipulations at those

2    court dates, correct?

3        A.    Correct.  But I, very rarely

4    would I ever see -- all I would see is

5    this, page 62.  I wouldn't touch or see the

6    judgments, generally, or the judge's order

7    beside this.

8        Q.    And 62, again, is what?

9        A.    Is the stipulation from Housing

10   Court.

11       Q.    That stipulation is just an

12   agreement, it's not a judgment?

13       A.    It's an agreement providing for

14   something.  In this case it was for a

15   judgement.

16       Q.    But the judgment would be

17   entered in the future, not at that time?

18       A.    If you mean by future, within

19   15 minutes, yes.  Or 5 minutes or 20

20   minutes.  The clerk would then write or

21   type a judgment.

22       Q.    Well, let me ask this

23   specifically, and I tried to ask you it

24   before, but maybe I didn't ask it well.

1                    G. KAVULICH

2                    So, this is the question:  If

3    you'd done a meaningful attorney review of

4    the facts and circumstances of

5    Mr. Morales' account, should you have

6    determined whether, in fact, there was a

7    money judgment against him as indicated on

8    paragraph three of your affirmation?

9                    MR. PASHKIN:  Objection to

10           form, calls for a legal conclusion.

11           A.    I don't know.

12           Q.    Would you have done it all over

13   again?

14           A.    Would I do what?

15           Q.    Make the same affirmation.

16           A.    If I knew there wasn't a

17   judgment, no, of course not.

18           Q.    You should have checked to see

19   if there was a judgement prior to --

20           A.    I did.  I checked, but I was

21   mistaken in my checking.

22           Q.    How do you know you checked?

23           A.    Because this would have been

24   with the judgment (indicating).

25           Q.    62?

```
 1                   G. KAVULICH
 2        A.    Yes.
 3              MR. KESHAVARZ:  Mark this.
 4              (Whereupon, an Answer was
 5         marked as Plaintiff's Exhibit 14 for
 6          identification as of this date by the
 7          Reporter.)
 8        Q.    I'm showing what what's been
 9    marked as Plaintiff's Exhibit 14.  This is
10    your Answer in this FDCPA lawsuit; is that
11    right?
12        A.    Yes.
13        Q.    So, one of the things that you
14    were noticed for is on behalf of your firm,
15    the PC, you're to answer the basis from
16    your claims and defenses in the case.
17              So, let me just go through the
18    defenses on page eight, please.
19              The second affirmative defense:
20    What's the basis for the affirmative
21    defense that the action is barred by the
22    expiration of the applicable statute of
23    limitations?
24        A.    You'd have to ask my attorney.
25        Q.    Do you have any factual basis
```

1                    G. KAVULICH
2    sitting here today in support of that?
3         A.    I'm not sure.
4         Q.    And it's going to be the same
5    for these other ones, so let me just go
6    through them one at a time.
7         A.    And so will the answers.
8         Q.    For the record, I just have to
9    do it.
10              For the third affirmative
11   defense that the claims are barred in whole
12   or in part by the doctrine of res judicata,
13   collateral estoppel and/or judicial
14   estoppel, what is the basis of that
15   affirmative defense?
16        A.    You'd have to ask my attorney.
17        Q.    And do you know of any factual
18   basis for that affirmative defense?
19        A.    I would have to refer to -- I
20   would have to discuss it with my attorney.
21        Q.    Is that the same answer for the
22   fourth affirmative defense?
23        A.    As well as the fifth and sixth,
24   yes.
25        Q.    Okay.

```
 1                    G. KAVULICH
 2              Now, when we had the first part
 3    of your deposition in this case -- I
 4    believe it was in this case -- we talked
 5    about the issue about whether money that's
 6    exempt is commingled with money that is not
 7    exempt, whether that means all of the funds
 8    become nonexempt, do you remember that
 9    conversation?
10         A.    Vaguely.
11         Q.    Did you --
12              MR. PASHKIN:  Off the record.
13              (Whereupon, an off-the-record
14          discussion was held at this time.)
15         Q.    Now, in the prior deposition
16    we'd asked if you'd knew of any cases to
17    support the assertion that mingling
18    exemption money with nonexempt money means
19    the entire pot becomes nonexempt, do you
20    remember discussing that before?
21         A.    Vaguely.  But yes.
22         Q.    And so, you indicated
23    previously that you thought that there was
24    a case in Kings County Court that held
25    that, do you remember that?
```

```
1                    G. KAVULICH
2         A.    I'm sorry, I was writing it
3    down to remember to do it.  Go ahead.
4         Q.    Do you remember testifying
5    previously that you believed that there was
6    a case in Kings County that stood for that
7    proposition about commingling?
8         A.    Yes, there surely was, but I
9    don't remember the name of the case.
10        Q.    Do you recall any of the
11   details about the case, in terms of where
12   exactly it was?
13        A.    Brooklyn.
14        Q.    Brooklyn Small Claims Court?
15        A.    Yes, civil.  Small claims, yes.
16        Q.    Is that the same as Civil
17   Court?
18        A.    Well, it's part of it.
19        Q.    What's the jurisdictional
20   limit, do you remember?
21        A.    It's $5,000.  But I think then
22   it might have been 3,500.
23        Q.    Is that the only basis that you
24   have for that belief about the commingling
25   of accounts?
```

1                    G. KAVULICH

2          A.     I would have to check.

3          Q.     Sitting here today, that's all

4    you can recall?

5          A.     Sitting here now, without any

6    further checking, yes.

7          Q.     To your recollection, was that

8    Small Claims Court opinion ever adopted by

9    any other court, to your knowledge?

10         A.     I don't know.

11         Q.     All of the payments that were

12   collected on the index number against

13   Ms. Potter and Mr. Morales, do you know if

14   the payments that were made came from an

15   income execution on Ms. Potter?

16         A.     A, I don't believe that there

17   were any moneys collected from Mr. Morales.

18   B -- that's it.  And my belief is that the

19   moneys collected from Ms. Potter were

20   pursuant to a wage garnishment.

21         Q.     And I might have asked the

22   question imprecisely.

23                Are all the moneys that were

24   paid towards the index number that was a

25   judgment for Ms. Potter and a non-judgment

```
 1                   G. KAVULICH
 2    for Mr. Morales, were all those payments
 3    made towards that index number come
 4    entirely from Ms. Potter?
 5         A.    Yes.
 6         Q.    None of them came from
 7    Mr. Morales?
 8         A.    Correct.
 9         Q.    And all the money from
10    Ms. Potter came from wage executions?
11         A.    I believe so, yes.
12         Q.    Do you know how much money was
13    restrained from Mr. Morales' TD Bank
14    account?
15         A.    My recollection is that it was
16    a little bit less than $1,100.
17         Q.    Do you know how long the money
18    in Mr. Morales' TD Bank account was
19    restrained for?
20         A.    About a month.
21         Q.    After a month it was released?
22         A.    Actually, about three weeks and
23    then it was released.
24         Q.    And what do you base this on?
25         A.    Our notes.
```

```
 1                    G. KAVULICH
 2        Q.    I'll go back to that in a
 3   second.
 4              Now, when a bank restraint is
 5   issued, the bank takes out a $75 processing
 6   fee, correct?
 7        A.    Different banks have different
 8   amounts.
 9        Q.    Usually about $75?
10        A.    Yes.
11        Q.    That money being taken out of
12   the TD Bank account was caused by the
13   improper bank restraint by your office
14   against Mr. Morales, correct?
15        A.    Correct.
16        Q.    Did your office ever refund
17   Mr. Morales --
18        A.    No.
19        Q.    Did your office ever return the
20   processing charges of $75 to Mr. Morales?
21        A.    No.
22        Q.    Why not?
23        A.    I don't know.
24        Q.    Did you actually collect any
25   money from the restraint of Mr. Morales' TD
```

1                         G. KAVULICH

2    Bank account?

3           A.    No.

4           Q.    When a bank account is

5    restrained and the bank takes out its

6    processing fee, the bank generally doesn't

7    return the processing fee when the account

8    is released, right?

9           A.    I don't know that.

10          Q.    You don't know one way or the

11   other?

12          A.    No.

13          Q.    Do you know if your office

14   restrained Mr. Morales' TD Bank account

15   more than once?

16          A.    No, just once.

17          Q.    Okay.

18                Now, where in your notes or

19   from any other document do you base the

20   statement that $1,100 in Mr. Morales' TD

21   Bank account was restrained?

22          A.    Where did I get that amount?

23          Q.    Yeah.

24          A.    Because he called the office.

25          Q.    What date entry?

1                          G. KAVULICH
2          A.    April 27th, 2015.
3          Q.    And you're looking on the
4    collection notes, Exhibit 10?
5          A.    Yes.
6          Q.    And can you read that entry?
7          A.    "James, TD Bank has $1,081.19
8    restrained.  Will PX.  No POB in TD."
9          Q.    Can you translate those
10   initials into words and reread that,
11   please?
12         A.    Property execution is PX.  POB
13   is place of business.
14         Q.    So, can you reread that
15   sentence as a sentence?  Just so it's clear
16   on the record.
17         A.    TD Bank has $1,081.19
18   restrained.  Will do a property execution,
19   but there's no job information.
20         Q.    And you believe that's based on
21   a call, those notes?
22         A.    That actually is probably from
23   the response from TD.
24         Q.    So, that entry is from TD Bank
25   itself?

```
 1                    G. KAVULICH
 2        A.    In other words, we got the
 3   response from -- to the restraining notice
 4   we sent.
 5        Q.    So, TD Bank told you that they
 6   restrained $1,081.19?
 7        A.    Correct.
 8        Q.    What is the entry above that
 9   for 4/27/15, what does that mean?
10        A.    That a property execution was
11   issued or printed, created.
12        Q.    For $4,352.74?
13        A.    Yes.
14        Q.    That's the face amount of the
15   judgment against Clara Potter?
16        A.    Correct.
17        Q.    That didn't credit for any
18   payments made by Clara Potter, correct?
19        A.    Repeat that.
20        Q.    That didn't credit for any
21   payments made --
22        A.    No, that would be up to the
23   marshall, because it went to the same
24   marshall who was collecting on the income
25   execution.
```

```
 1                    G. KAVULICH
 2        Q.    You have to let me finish the
 3   sentence.
 4              The document that you generated
 5   saying that there was an amount due of
 6   $4,352.74, that did not credit the payments
 7   from the garnishments from Ms. Potter,
 8   correct?
 9        A.    Correct.
10        Q.    And why not?
11        A.    Because the marshall would make
12   those credits that this property execution
13   was sent to, because that marshall was
14   collecting on the wage garnishment for
15   Ms. Potter.
16              MR. KESHAVARZ:  Off the record.
17              (Whereupon, an off-the-record
18          discussion was held at this time.)
19        Q.    What does the next entry
20   indicate to you?
21        A.    The response to a restraining
22   notice sent to JP Morgan Chase.
23        Q.    And what was the response?
24        A.    No deposit accounts.
25        Q.    Do you know if your office has
```

1                    G. KAVULICH

2    produced a document showing the information

3    subpoena to JP Morgan Chase?

4         A.    I don't remember, but I printed

5    everything and everything was given to you.

6         Q.    If you had --

7         A.    This actually shouldn't have

8    even been in there.  Because when we get

9    negatives back, we usually don't process

10   them.

11        Q.    You talked about this in the

12   prior deposition, but so this deposition is

13   clear, what do you mean by that?

14        A.    If we get a negative response

15   back that there's no account then we

16   discard it.

17        Q.    You toss the record?

18        A.    We shred it.

19        Q.    And why do you do that?

20        A.    Because we don't want people's

21   Socials and information to get out.

22        Q.    Why don't you scan that

23   document?

24        A.    You mean --

25        Q.    Why don't you just scan or save

```
 1                    G. KAVULICH
 2   that document into your file?
 3         A.    It's not very efficient.   We
 4   don't have a lot of people and it's
 5   irrelevant.
 6         Q.    So, the information subpoena to
 7   JP Morgan Chase, you'd agree that your
 8   office didn't have a legal right to issue
 9   that, given that there was no judgment
10   against Mr. Morales?
11         A.    Correct.
12         Q.    And because this is an
13   information subpoena only and not a bank
14   restraint to JP Morgan Chase, Mr. Morales
15   wouldn't be sent a copy of the information
16   subpoena, correct?
17         A.    Correct.
18         Q.    So, Mr. Morales wouldn't have
19   any knowledge of the information subpoena
20   being sent to JP Morgan Chase?
21         A.    Correct.
22         Q.    What's the next entry, what
23   does that indicate to you?
24         A.    The docket number for the
25   aforementioned property execution.
```

```
 1                    G. KAVULICH
 2        Q.    And this is 4/30/2015 entry?
 3        A.    Right.
 4        Q.    And that's for the property
 5   execution for 4,352 right?
 6        A.    Well, 3,500 -- yes, for the
 7   other amount.
 8        Q.    What is 3594?
 9        A.    The file number.
10        Q.    When you say docket number was
11   received, what document is that, is there a
12   document?
13        A.    Yeah, we get like -- you get it
14   in the mail from the marshall.
15        Q.    What is it?
16        A.    It's just a form and it has the
17   name of the case, our file number and the
18   docket number.
19        Q.    Do you keep that response?
20        A.    No.
21        Q.    Do you know why you obtain them
22   if you don't keep them?
23        A.    Do --
24        Q.    Do you know why they're sent to
25   you if --
```

1                    G. KAVULICH

2          A.     So we have the docket number.

3          Q.     So, you just make note of the

4     docket?

5          A.     Yes, that's all it's worth.

6          Q.     Before we go back, there was

7     something before -- I can't remember which

8     case -- about a 60-day extension?

9          A.     Right.

10         Q.     Tell me again what's that for.

11         A.     For the property execution --

12    in layman's terms -- to be renewed.

13         Q.     That's a document that the

14    marshall sends to your office?

15         A.     Yes.

16         Q.     And then what happens when you

17    get that document?

18         A.     We look to see if we still --

19    the status of the case.  And if we're still

20    seeking to collect, then we sign it and

21    send it back.

22         Q.     If you know the answer:  The

23    marshall's notes in, I forget which case,

24    says 60-day extension, 60-day extension,

25    60-day extension every couple of months.

1              G. KAVULICH

2              Does that mean that you sign

3       the form and send it back to continue it

4       and then they ask you again or do you know?

5              A.    I don't know.  I can't answer

6       for them.  But I know that when we get

7       those, that's what that means.

8              Q.    So, if you don't sign the

9       extension request, what happens then?

10             A.    I assume that they -- I don't

11      know on their end.  On our end it's because

12      we're not collecting -- we have no reason

13      or desire to collect anymore.

14             Q.    If you don't sign it and send

15      it back, then all continued attempts to

16      collect on that by the marshall cease?

17             A.    Well, they should.

18             Q.    What's the basis for the 60-day

19      rule?

20             A.    I don't know.  It's just

21      something they came up with.

22             Q.    Something in the CPLR?

23             A.    Yeah.

24             Q.    Thank you.

25             Now, the entry on 4/30 is the

```
 1                    G. KAVULICH
 2    call from the Claro attorney again saying
 3    that there wasn't a judgment, correct?
 4          A.    Correct.
 5          Q.    And then the entry on 5/20/2015
 6    you received the exemption claim form, what
 7    does that mean?
 8          A.    On April 29th?
 9          Q.    Or is that May 5th?
10          A.    Yes.
11          Q.    What does that entry say?
12          A.    "Received exemption claim.  Did
13    motion objecting to same.  Served via mail
14    and fax."
15          Q.    Okay.
16                Exemption claim from James,
17    who's James?
18          A.    I skipped one, sorry.
19    Mr. Morales, I'm assuming.
20          Q.    Gave to GK, and that's you, to
21    do an objection?
22          A.    Correct.
23          Q.    So, the guy in Laos, what's his
24    name again?
25          A.    Collin.
```

1                        G. KAVULICH

2          Q.    Collin would draft that for you

3    and then you would sign it?

4          A.    No.

5          Q.    How would that work?

6          A.    Either I would do it or an

7    associate.

8          Q.    What's the entry before that

9    say?

10         A.    "Received exemption from James,

11   gave to GK to do exemption."  That's what

12   you just read.

13         Q.    Yeah.

14               The entry one further up, what

15   is that?

16         A.    That's what I mistakenly read

17   the first time.  "Received exemption claim.

18   Did motion objecting to same.  Served via

19   mail and fax."

20         Q.    I meant the one above that.

21   I'm sorry.

22         A.    "Court date scheduled for L&T."

23         Q.    The initials are yours.

24               Do you know if you, in fact,

25   scheduled a court date for L&T?

1                    G. KAVULICH

2              Apparently not?

3        A.    Right.  But again, this is all

4   contemporaneous, if you see that we

5   received the exemption and did the motion a

6   minute later.  So, I must have did the

7   motion and then calendared inhouse.

8        Q.    So, 18:33 is the military time?

9        A.    Yes.

10        Q.    And then entry on 5/7 is the

11   Legal Aid attorney again calling saying

12   that there's no judgement?

13        A.    Correct.

14        Q.    And then you continued to do

15   the execution on the judgment despite the

16   call, correct?

17        A.    Well, the status quo, but we

18   didn't release it, yes.

19        Q.    Then the one before that is

20   regarding Ms. Potter.  The one before that,

21   May 18th, 2015, can you translate that,

22   please?

23        A.    Subpoena?

24        Q.    "Advised" --

25        A.    "Advised marshall to vacate

```
1                    G. KAVULICH
2    property execution versus Morales.  Final
3    judgment not against him, Collin to send
4    release."  Meaning the release to the bank.
5         Q.    And again, you don't know what
6    triggered the release of the judgment about
7    why your office suddenly found out there
8    was final judgement?
9         A.    We reviewed it again, but I
10   don't know what the -- why at that
11   particular moment.
12        Q.    Now, the 5/19 entries indicate
13   that the bank account for Morales at TD
14   Bank was released.  Or you tell me, I
15   guess.
16        A.    It doesn't mean that the
17   account physically was released.  It meant
18   that one was sent -- a release was sent.
19        Q.    By who to who?
20        A.    By Collin.
21        Q.    By your office to who?
22        A.    By my office to TD Bank.
23        Q.    And was that also sent to the
24   marshall?
25        A.    The release, no.
```

```
 1                    G. KAVULICH
 2          Q.    So, when was the first time --
 3          A.    We don't send a release to the
 4   marshall.  We just tell the marshall to
 5   release the property execution.  They don't
 6   need a formal document like a bank needs on
 7   our letterhead.
 8          Q.    A release to a bank is just a
 9   letter saying "release the account"?
10          A.    Right.
11          Q.    And does it say why?
12          A.    No.
13          Q.    And when was the first time
14   that you told the marshall to release the
15   account?
16          A.    May 18th.
17          Q.    And do you know how that
18   information was conveyed?
19          A.    I believe I e-mailed them.
20          Q.    So, then why is it not till
21   July 23rd, 2015 is there an indication that
22   you advised the marshall to vacate the
23   execution versus Mr. Morales?
24          A.    I don't know.  It may have been
25   one of those letters that you eluded to
```

278

1                        G. KAVULICH

2      earlier.  I don't know.

3            Q.    Well, is there any record, any

4      document that shows that your office told

5      the marshall to vacate the execution versus

6      Mr. Morales prior to July 23rd, 2015?

7            A.    I would have to review all of

8      the documents.

9            Q.    From the documents in front of

10     you today, is there any record that you

11     informed the marshall to vacate the

12     execution against Mr. Morales prior to

13     July 23rd, 2015?

14           A.    Yes.

15           Q.    And what is what?

16           A.    My contemporaneous note on

17     May 18th.

18           Q.    But you don't know if that's a

19     telephone call or if that's documented?

20           A.    I don't recall.

21           Q.    Nothing in your records

22     indicates whether there was a documentation

23     about letting the marshall know to release

24     the money on May 18th?

25           A.    Again, I just answered, I don't

```
 1                    G. KAVULICH
 2     know.
 3          Q.    Do you know how much money
 4     you've paid your attorney to defend you in
 5     this FDCPA action?
 6               MR. PASHKIN:  Objection as to
 7          relevance.
 8               MR. KESHAVARZ:  You can answer.
 9               MR. PASHKIN:  I'm not going to
10          allow him to --
11               MR. KESHAVARZ:  What's the
12          basis, on relevance?
13               MR. PASHKIN:  It's privileged.
14          There's absolutely no basis for him
15          to answer that question.
16               MR. KESHAVARZ:  Well, they're
17          two different things.  Privilege, the
18          amount paid is not a privileged
19          issue.
20               MR. PASHKIN:  That's an
21          irrelevant question.  That's just to
22          harass my client.  There's been no
23          basis to ask that question.
24               MR. KESHAVARZ:  Well, let me
25          tell you what the basis is.  There's
```

```
 1                    G. KAVULICH
 2          case law that says the amount paid to
 3          defense attorneys to defend an FDCPA
 4          action may, under some circumstances,
 5          be relevant to a reasonableness of a
 6          plaintiff's attorney's fees.
 7               MR. PASHKIN:  Well, I'm not
 8          aware of any case law.  So, we can
 9          mark it for a ruling.  I will look it
10          up or you can send me the case law.
11               MR. KESHAVARZ:  If you object
12          to the form you preserve the
13          objection.  So, what's the harm?
14      Q.    Do you have any problem telling
15  me how much you paid Mr. Pashkin?
16      A.    I'm not going to answer that.
17      Q.    But do you have any problem or
18  concern with doing that?
19      A.    I'm not going to answer that.
20      Q.    Have you paid Mr. Pashkin?
21      A.    Yes, I paid him some money.
22      Q.    Do you know what the hourly
23  rate Mr. Pashkin is charging you?
24      A.    I don't remember.
25      Q.    And you're going to follow your
```

```
 1                    G. KAVULICH
 2     attorney's advice not to disclose how much
 3     you paid him?
 4          A.    Say that --
 5          Q.    Are you going to follow your
 6     attorney's advice and not disclose how
 7     much --
 8          A.    Well, if a judge tells me I'm
 9     supposed to, I'll go out there with a
10     bullhorn.
11          Q.    Other than that, no?
12          A.    No.
13          Q.    Now, how do you communicate
14     with Rosewall regarding the collection
15     activities you have on their behalf?
16               MR. PASHKIN:  Objection.  It
17            was asked and answered during the
18            first part of the deposition.
19          A.    I'll answer it.
20          Q.    Is it just a ledger or is it
21     any other communication?
22          A.    As we did discuss once before
23     at length, I would go there when I did
24     their work -- I don't do their work
25     anymore -- but I would go there.
```

```
 1                    G. KAVULICH
 2              I don't remember exactly if
 3    they gave me breakdowns or they gave me a
 4    list.  I would then go to their files.  I
 5    would physically remove their files and,
 6    you know, within that would be a tenant
 7    file -- in these kinds of cases there would
 8    be a tenant file and it would have all the
 9    tenants that they could fit.
10              And I would take out the
11    relevant or former tenant and then take out
12    the necessary paperwork and copy it.
13         Q.    That I remember.
14         A.    Then I don't know what else
15    you're asking.
16         Q.    I meant during the course of
17    the collections.
18              Other than giving the payment
19    ledgers, during the course of your
20    collections, do you communicate back and
21    forth with Rosewall?
22         A.    As necessary.
23         Q.    Any particular reason that you
24    would do that, would that be unusual?
25         A.    I don't remember any particular
```

                        G. KAVULICH

1                        G. KAVULICH

2    circumstances, but let's just say, for

3    example, there was a dispute.  We served a

4    demand notice and there was a verification

5    request.  But -- or we had a trial

6    scheduled.

7          Q.    Something like that?

8          A.    Yes.

9          Q.    When you give the payment

10   ledger --

11         A.    To Rosewall.

12         Q.    -- do they give any accounting

13   back to you or is it only your accounting

14   to them?

15                Do they say this is what we

16   have as a balance?

17         A.    No.

18                MR. KESHAVARZ:  Let's go off

19          the record.

20                (Whereupon, an off-the-record

21          discussion was held at this time.)

22         Q.    Does your office keep copies of

23   complaints by consumers that you're

24   restraining an account based on an invalid

25   or nonexistent judgment?

1                    G. KAVULICH

2          A.    I can't recall one, but any

3     relevant document we usually do keep.

4          Q.    But if you got a complaint from

5     a consumer saying, "I don't have a

6     judgment, you're restraining my account,"

7     or a judgment has been vacated or so forth,

8     would you keep that document or would you

9     not keep that document?

10         A.    Generally we would keep it.

11         Q.    Why would you keep it?

12         A.    Because it's relevant to the

13    case.

14         Q.    Do you keep track of how many

15    such documents or complaints that you

16    receive?

17         A.    No.

18         Q.    Do you know how many documents

19    or complaints you've received?

20         A.    No.

21         Q.    I mean, other than Mr. Morales?

22         A.    Correct.

23              MR. KESHAVARZ:  Let's mark this

24         as an exhibit.

25              (Whereupon, a letter was marked

```
 1                    G. KAVULICH
 2          as Plaintiff's Exhibit 15 for
 3          identification as of this date by the
 4          Reporter.)
 5          Q.    I'm showing what's been marked
 6    as Exhibit 17, Bates stamped Morales 71.
 7    Can you identify what that document is?
 8          A.    It's a letter from James
 9    Morales, dated July 17th, stating that we
10    did an execution on his account at TD based
11    on a judgment that didn't exist
12    essentially.
13          Q.    And you received that document
14    on or about July 17th, 2015?
15          A.    I don't recall.
16          Q.    Do you have any record in your
17    collection notes or elsewhere indicating
18    that you've received the Exhibit 15, the
19    July 17th, 2015 letter from Mr. Morales,
20    indicating to you that you're restraining a
21    bank account based on a nonexistent
22    judgment?
23          A.    No.
24          Q.    So, your office has no record
25    of receiving Exhibit 15?
```

```
 1                    G. KAVULICH
 2        A.    Correct.  Especially in light
 3   that by that time, we had already advised
 4   the bank and the marshall to vacate.
 5        Q.    That's what I was going to get
 6   to, because we talked before about what the
 7   triggers could have been for taking certain
 8   actions.  So, let me talk about that
 9   trigger, if it's a trigger.
10              Exhibit 15, the July 17th
11   letter, according to your notes, your
12   collection notes on the 23rd, you then
13   contact the marshall to tell the marshall
14   to vacate the execution against
15   Mr. Morales, correct?
16        A.    On July 23rd?
17        Q.    On July 23rd.
18        A.    Right.  Well, that was the
19   second time we advised the marshall.  But
20   yes, on July 23rd it looks like we did.
21        Q.    Does it appear to you that you
22   received the July 17th letter from
23   Mr. Morales and that's what triggered your
24   office to contact the marshall six days
25   later to advise them to vacate the
```

```
 1                    G. KAVULICH
 2    execution against Mr. Morales?
 3         A.    That's conjecture, but there's
 4    a certain amount of common sense to that, I
 5    would guess.
 6         Q.    Assuming my client testifies
 7    that he, in fact, sent Exhibit 15 to your
 8    office, why didn't your office keep a copy
 9    note or at least note its receipt?
10         A.    It could be scanned into
11    another file as we discussed before.  I
12    don't know.
13         Q.    But you checked all your files
14    and you produced all your records regarding
15    Mr. Morales in this case, correct?
16         A.    Yeah, it's just one -- it's not
17    like we have multiple files.  It's just
18    one.
19         Q.    Putting aside the scanning
20    issue, if Exhibit 15 was, in fact, scanned,
21    you would have found it and produced it?
22         A.    Yeah, sure.
23              MR. KESHAVARZ:  Let me talk
24         about another trigger or possible
25         trigger and mark this.
```

```
 1                    G. KAVULICH
 2              (Whereupon, letter was marked
 3          as Plaintiff's Exhibit 16 for
 4          identification as of this date by the
 5          Reporter.)
 6         Q.    I'm showing you what's been
 7    marked as Exhibit 16, Bates stamped Morales
 8    69, a letter dated May 15th, 2015 from TD
 9    Bank to Mr. Morales.
10              Can you review that document
11    and let me know when you're done, please.
12         A.    Okay.
13         Q.    Now, we're trying to figure out
14    before what the trigger could have been for
15    your office on May 18th, 2015 to apparently
16    tell the marshall to release the restraint,
17    when just on May 7th you didn't do so in
18    response to a call from the Legal Aid
19    lawyer.
20              So, let me ask you this:  Did
21    you receive any correspondence from TD Bank
22    regarding a complaint that he filed against
23    TD Bank about improper restraint of his
24    bank account?
25         A.    No.
```

1                    G. KAVULICH

2          Q.     Given that you contacted the

3     marshall's office three days after the date

4     of May 15th, do you think it's possible

5     that the reason that you contacted the

6     marshall was that TD Bank contacted you

7     about Mr. Morales' complaint that his bank

8     was being restrained on a nonexistent

9     judgement?

10         A.     No.  As I mentioned earlier, I

11    think the most logical reason was the

12    review in preparation for court on the

13    motion.

14         Q.     Well, you didn't go to court on

15    the motion.

16         A.     Right.  The review for

17    preparation for court.  In other words,

18    looking at the cases before we go to court

19    and reviewing it and something could have

20    stood out.

21         Q.     But again, there was no actual

22    setting for May 18th, right?

23         A.     I'm sorry?

24         Q.     May 18th, the notice of motion

25    was never actually calendared with the

```
 1                  G. KAVULICH
 2    court for May 18th or any date, right?
 3          A.    I believe not, right.  I don't
 4    know that I've ever seen -- other than
 5    private reading Office -- I would remember
 6    something like this -- Office of the
 7    Comptroller of the Currency.
 8          Q.    So, when you get an exemption
 9    claim form, is it your understanding that
10    if you're going to file an objection you're
11    required to file that objection either 10
12    or 14 days after the date of the
13    objection -- of the exemption claim?
14          A.    Of the exemption claim, it's
15    eight days.
16          Q.    So, eight days from the date of
17    the exemption claim form you have to set a
18    hearing and the hearing has to happen eight
19    days -- or you tell me -- eight days from
20    the date of the exemption?
21          A.    Third time.  We get the
22    exemption claim form and we have eight days
23    from the date on it to file a motion
24    objecting to it.  But clearly that date
25    can't be, because we don't deliver them
```

291

1               G. KAVULICH

2   personally.  We mail them.  So, 13 days.

3               As long as we get something to

4   the bank, get the motion to the bank within

5   eight days of the date of the exemption.

6   It doesn't necessarily mean the day we get

7   it.  The date that the judgement

8   debtor/account holder fills it out.

9        Q.    But when does the hearing on

10   the objection to the exemption have to be

11   heard, within how many days?

12        A.    It doesn't.  There is no -- it

13   doesn't have to be within eight days.

14        Q.    Does the hearing on the

15   objection to exemption have to be within a

16   certain number of days?

17        A.    Not to my knowledge, no.  As

18   long as we file the objection within eight

19   days.

20        Q.    Got it.

21               We talked in the prior

22   deposition about you relying on the

23   marshall to do the accounting for the

24   amount due, correct?

25        A.    For the interest calculation,

1                    G. KAVULICH

2     the compoundage calculation, yes.

3          Q.     Do you have any system in place

4     to make sure that you're not sending one

5     punitive judgment account to two different

6     marshalls, do you have any system in place

7     to track that?

8          A.     Just manually.

9          Q.     So, the answer is no?

10          A.     No, that's a system.  We're not

11     Mill Harris, where I have thousands --

12               MR. PASHKIN:  Don't compare

13          yourself to them, please.

14               THE WITNESS:  I don't know many

15          other ones.  I meant only by volume.

16          Q.     And the point being, if it was

17     at two marshalls, then one marshall

18     wouldn't be able to credit the payments

19     that are made to the other?

20          A.     There would be a disconnect.

21               (Continued on next page to

22          include jurat.)

23

24

25

```
 1                    G. KAVULICH
 2       Q.    So, the numbers would be off?
 3       A.    Correct.
 4             MR. KESHAVARZ:  That's all I
 5        have.
 6             Anything else?
 7             No.
 8             Appreciate your time, sir.
 9             (Whereupon, at 1:58 P.M., the
10        examination of this witness was
11        concluded.)
12
13
14        _____
              GARY KAVULICH
15
16
17   Subscribed and sworn to before me
18   this _____ day of _____ 20___.
19
20   _____
         NOTARY PUBLIC
21
22
23
24
25
```

```
1                    G. KAVULICH
2                E X H I B I T S
3
4    PLAINTIFF'S EXHIBITS:
5
6    EXHIBIT    EXHIBIT                 PAGE
7    NUMBER     DESCRIPTION
8     9         Landlord's ledger       209
9    10         Collection notes        209
10   11         Bank restraint          240
11   12         Property execution      240
12   13         Motion                  245
13   14         Answer                  257
14   15         July 17th letter        284
15   16         May 15th letter         288
16
17        (Exhibits retained by Counsel.)
18
19
20                I N D E X
21
22   EXAMINATION BY                      PAGE
23   MR. KESHAVARZ                       209
24
25
```

1                    G. KAVULICH

2              C E R T I F I C A T E

3

4    STATE OF NEW YORK        )
                              :  SS.:
5    COUNTY OF RICHMOND       )

6

7          I, JAMIE WILLIS, a Notary Public for

8    and within the State of New York, do hereby

9    certify:

10         That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14         I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19         IN WITNESS WHEREOF, I have hereunto

20   set my hand this 23rd day of December 2016.

21

22                    _Jamie Willis_

23         _____

24                    JAMIE WILLIS

25

**$**

**$1,081.19** [3] - 265:7, 265:17, 266:6
**$1,100** [2] - 262:16, 264:20
**$4,352.74** [3] - 250:24, 266:12, 267:6
**$402** [1] - 227:8
**$5,000** [1] - 260:21
**$75** [3] - 263:5, 263:9, 263:20

**1**

**1** [1] - 208:17
**10** [3] - 209:4, 290:11, 294:9
**10573** [1] - 209:17
**10th** [1] - 237:8
**11** [2] - 240:6, 294:10
**11226** [1] - 207:10
**11241** [2] - 206:20, 207:6
**11743** [1] - 207:16
**11:48** [1] - 206:13
**12** [3] - 240:6, 246:11, 294:11
**13** [2] - 291:2, 294:12
**13th** [1] - 250:23
**14** [2] - 290:12, 294:13
**15** [2] - 255:20, 294:14
**15th** [3] - 288:8, 289:4, 294:15
**16** [3] - 206:20, 207:5, 294:15
**17th** [6] - 285:9, 285:14, 285:19, 286:10, 286:22, 294:14
**181** [1] - 209:16
**18:33** [1] - 275:8
**18th** [11] - 237:23, 248:23, 249:16, 275:21, 277:16, 278:17, 278:24, 288:15, 289:22, 289:24, 290:2
**1:16-CV-02134** [1] - 206:6
**1:58** [1] - 293:9

**2**

**2** [1] - 250:24
**20** [1] - 255:20
**2000s** [1] - 253:9
**2008** [1] - 250:23
**2013** [1] - 248:23
**2015** [11] - 236:16, 237:23, 265:2, 275:21, 277:21, 278:6, 278:13, 285:14, 285:19, 288:8,

288:15
**2016** [2] - 206:12, 295:20
**209** [3] - 294:8, 294:9, 294:23
**20___** [1] - 293:18
**2300** [2] - 221:18, 222:12
**23rd** [8] - 277:21, 278:6, 278:13, 286:12, 286:16, 286:17, 286:20, 295:20
**240** [2] - 294:10, 294:11
**245** [1] - 294:12
**255** [1] - 207:15
**257** [1] - 294:13
**26th** [1] - 207:5
**27th** [1] - 265:2
**284** [1] - 294:14
**288** [1] - 294:15
**29th** [1] - 273:8
**2:30** [1] - 233:11
**2:45** [1] - 233:14
**2nd** [3] - 236:14, 236:23, 236:25

**3**

**3,500** [2] - 260:22, 270:6
**3/18/2015** [1] - 238:3
**30** [1] - 208:16
**34H** [1] - 247:7
**3594** [1] - 270:8

**4**

**4,352** [1] - 270:5
**4/21** [1] - 236:24
**4/21/2015** [1] - 236:22
**4/27** [1] - 239:8
**4/27/15** [1] - 266:9
**4/27/2015** [1] - 237:10
**4/30** [2] - 240:25, 272:25
**4/30/2015** [2] - 240:20, 270:2

**5**

**5** [1] - 255:20
**5,000** [2] - 221:23, 221:25
**5/19** [1] - 276:12
**5/20/2015** [1] - 273:5
**5/7** [1] - 275:10
**5/7/2016** [1] - 242:21
**500** [1] - 222:2
**500C** [1] - 209:17
**51** [6] - 237:14, 237:19, 237:20, 238:17, 239:25, 240:9
**52** [6] - 237:14, 238:13, 238:18, 239:6, 239:16, 239:25

**53** [1] - 237:14
**57** [2] - 245:9, 246:13
**59** [1] - 250:17
**5th** [1] - 273:9

**6**

**6** [1] - 206:12
**60-day** [5] - 271:8, 271:24, 271:25, 272:18
**62** [5] - 251:11, 251:13, 255:6, 255:9, 256:25
**68** [3] - 245:9, 246:6, 246:13
**69** [1] - 288:8
**6th** [1] - 235:24

**7**

**71** [1] - 285:6
**775** [1] - 207:15
**7th** [1] - 288:17

**8**

**885** [1] - 207:9

**9**

**9** [2] - 209:3, 294:8

**A**

**A.M** [1] - 206:13
**ability** [1] - 228:14
**able** [4] - 229:19, 233:7, 236:9, 292:18
**above** [3] - 218:9, 266:8, 274:20
**absolute** [1] - 213:11
**absolutely** [1] - 279:14
**access** [1] - 216:21
**accidentally** [1] - 246:10
**according** [3] - 219:6, 219:11, 286:11
**account** [37] - 211:10, 211:17, 211:21, 213:3, 213:9, 216:5, 216:22, 217:2, 219:7, 221:16, 224:24, 225:14, 226:2, 236:12, 238:9, 246:17, 252:2, 256:5, 262:14, 262:18, 263:12, 264:2, 264:4, 264:7, 264:14, 264:21, 268:15, 276:13, 276:17, 277:9, 277:15, 283:24, 284:6, 285:10, 285:21, 288:24, 292:5
**accounting** [12] - 225:9, 225:10, 231:13, 234:12, 234:13, 235:3, 235:5,

235:9, 283:12, 283:13, 291:23
**accounts** [3] - 223:24, 260:25, 267:24
**action** [5] - 214:13, 257:21, 279:5, 280:4, 295:16
**actions** [1] - 286:8
**activities** [1] - 281:15
**actual** [2] - 247:25, 289:21
**address** [3] - 209:15, 220:21, 222:12
**adjudication** [1] - 254:19
**administer** [1] - 208:11
**adopted** [1] - 261:8
**advice** [2] - 281:2, 281:6
**advise** [1] - 286:25
**advised** [6] - 249:18, 275:24, 275:25, 277:22, 286:3, 286:19
**affirmation** [3] - 246:3, 256:8, 256:15
**affirmative** [6] - 257:19, 257:20, 258:10, 258:15, 258:18, 258:22
**aforementioned** [2] - 240:4, 269:25
**after** [10] - 208:16, 214:12, 215:3, 216:9, 218:4, 231:11, 238:16, 262:21, 289:3, 290:12
**again** [19] - 215:4, 216:8, 217:10, 225:5, 229:3, 244:16, 251:23, 255:9, 256:13, 271:10, 272:4, 273:2, 273:24, 275:3, 275:11, 276:5, 276:9, 278:25, 289:21
**against** [32] - 206:5, 211:2, 211:3, 212:24, 219:8, 219:21, 241:17, 244:3, 244:18, 249:13, 249:20, 249:24, 250:7, 250:23, 251:5, 251:6, 251:8, 251:14, 252:10, 252:19, 253:6, 253:11, 256:7, 261:12, 263:14, 266:15, 269:10, 276:3, 278:12, 286:14, 287:2, 288:22
**ago** [1] - 253:3
**agree** [1] - 269:7
**AGREED** [2] - 208:5, 208:20
**agreeing** [1] - 234:5
**agreement** [3] - 233:22, 255:13, 255:14
**ahead** [4] - 216:13, 238:23, 240:2, 260:3

G. KAVULICH

**AHMAD** [2] - 207:4, 207:6
**Aid** [4] - 243:4, 243:24, 275:11, 288:18
**alleged** [1] - 220:9
**allow** [1] - 279:10
**ALSO** [1] - 207:18
**always** [1] - 228:13
**amount** [12] - 228:22, 228:23, 232:4, 264:22, 266:14, 267:5, 270:7, 279:18, 280:2, 287:4, 291:24
**amounts** [2] - 229:13, 263:8
**AND** [2] - 208:5, 208:20
**and/or** [1] - 258:13
**another** [7] - 210:11, 227:25, 235:2, 242:23, 243:3, 287:11, 287:24
**Answer** [3] - 257:4, 257:10, 294:13
**answer** [11] - 216:12, 257:15, 258:21, 271:22, 272:5, 279:8, 279:15, 280:16, 280:19, 281:19, 292:9
**answered** [5] - 218:20, 228:13, 244:23, 278:25, 281:17
**answers** [1] - 258:7
**anymore** [2] - 272:13, 281:25
**anyone** [4] - 208:11, 214:5, 216:5, 248:20
**anything** [7] - 209:25, 216:15, 236:8, 242:15, 245:19, 250:2, 293:6
**anyway** [1] - 254:6
**anywhere** [1] - 229:11
**apartment** [1] - 220:21
**apartments** [1] - 222:18
**apparently** [3] - 212:23, 275:2, 288:15
**appear** [1] - 286:21
**appeared** [1] - 253:12
**applicable** [1] - 257:22
**apply** [1] - 224:22
**appreciate** [1] - 293:8
**appropriate** [1] - 228:12
**approximately** [1] - 214:9
**April** [6] - 236:14, 236:23, 236:25, 237:8, 265:2, 273:8
**are there** [4] - 210:11, 221:7, 235:10, 239:9
**aren't** [1] - 243:8
**arguing** [1] - 227:16

**argument's** [1] - 221:17
**argumentative** [1] - 230:5
**around** [2] - 214:10, 214:14
**ascertain** [1] - 224:2
**aside** [1] - 287:19
**ask** [16] - 218:17, 225:18, 225:21, 228:5, 232:22, 233:6, 252:17, 253:18, 255:23, 255:24, 255:25, 257:24, 258:16, 272:4, 279:23, 288:20
**asked** [3] - 259:16, 261:21, 281:17
**asking** [6] - 217:23, 229:9, 229:14, 230:4, 230:25, 282:15
**assertion** [1] - 259:17
**associate** [2] - 243:17, 274:7
**ASSOCIATES** [6] - 206:7, 206:7, 206:8, 207:13, 207:14, 207:15
**assume** [2] - 254:4, 272:10
**assuming** [4] - 247:23, 253:23, 273:19, 287:6
**attach** [2] - 251:22, 252:6
**attached** [4] - 250:13, 251:21, 252:5, 252:8
**attempts** [1] - 272:15
**attorney** [14] - 241:8, 241:17, 243:4, 243:22, 246:15, 251:25, 254:11, 256:3, 257:24, 258:16, 258:20, 273:2, 275:11, 279:4
**Attorney** [2] - 207:4, 207:13
**attorney's** [3] - 280:6, 281:2, 281:6
**Attorneys** [1] - 207:8
**attorneys** [2] - 243:24, 280:3
**August** [1] - 213:22
**authorized** [1] - 208:11
**Avenue** [3] - 207:9, 207:15, 209:16
**aware** [2] - 212:13, 280:8
**away** [1] - 252:18

**B**

**back** [15] - 209:18, 239:11, 240:17, 241:11, 249:2, 253:25, 263:2, 268:9, 268:15, 271:6, 271:21, 272:3, 272:15, 282:20, 283:13

**bad** [1] - 243:5
**balance** [8] - 223:13, 223:17, 223:23, 224:6, 224:10, 224:23, 227:8, 283:16
**bank** [45] - 211:10, 211:16, 211:21, 211:25, 212:11, 212:12, 213:3, 213:15, 213:17, 215:7, 215:18, 215:22, 216:2, 216:5, 216:10, 216:15, 216:20, 218:2, 218:8, 218:15, 218:16, 218:18, 236:11, 237:2, 237:6, 237:21, 238:9, 239:15, 263:4, 263:5, 263:13, 264:4, 264:5, 264:6, 269:13, 276:4, 276:13, 277:6, 277:8, 285:21, 286:4, 288:24, 289:7, 291:4
**Bank** [23] - 237:5, 237:7, 237:22, 240:10, 240:14, 245:16, 262:13, 262:18, 263:12, 264:2, 264:14, 264:21, 265:7, 265:17, 265:24, 266:5, 276:14, 276:22, 288:9, 288:21, 288:23, 289:6, 294:10
**banks** [1] - 263:7
**barred** [2] - 257:21, 258:11
**base** [2] - 262:24, 264:19
**based** [6] - 244:4, 244:10, 265:20, 283:24, 285:10, 285:21
**bases** [1] - 212:8
**basically** [1] - 229:4
**basis** [11] - 257:15, 257:20, 257:25, 258:14, 258:18, 260:23, 272:18, 279:12, 279:14, 279:23, 279:25
**Bates** [4] - 245:9, 250:17, 285:6, 288:7
**becomes** [1] - 259:19
**before** [26] - 206:21, 208:11, 208:13, 210:18, 210:21, 214:16, 219:10, 226:11, 232:12, 235:19, 237:13, 241:25, 249:10, 255:25, 259:20, 271:6, 271:7, 274:8, 275:19, 275:20, 281:22, 286:6, 287:11, 288:14, 289:18, 293:17
**behalf** [2] - 257:14, 281:15
**belief** [2] - 260:24, 261:18

**believe** [16] - 210:22, 213:25, 216:7, 218:6, 226:25, 228:11, 239:5, 244:4, 247:24, 252:12, 259:4, 261:16, 262:11, 265:20, 277:19, 290:3
**believed** [1] - 260:5
**bell** [1] - 211:4
**beside** [1] - 255:8
**best** [1] - 228:14
**better** [1] - 252:18
**between** [4] - 208:6, 225:24, 238:5, 238:17
**Biegel** [1] - 239:5
**bit** [3] - 211:8, 213:20, 262:16
**blood** [1] - 295:16
**both** [9] - 212:5, 212:7, 213:16, 214:3, 218:2, 218:5, 224:21, 232:9, 251:6
**bottom** [1] - 232:13
**break** [1] - 221:19
**breakdown** [2] - 229:16, 230:24
**breakdowns** [1] - 282:3
**Bronx** [4] - 246:21, 246:23, 247:4, 247:5
**brooklyn** [2] - 207:6, 207:10
**Brooklyn** [3] - 206:20, 260:13, 260:14
**bullhorn** [1] - 281:10
**business** [1] - 265:13
**BY** [4] - 207:6, 207:10, 209:10, 294:22

**C**

**calculate** [3] - 223:16, 224:9, 224:22
**calculation** [3] - 224:18, 291:25, 292:2
**calendar** [2] - 247:25, 248:6
**calendared** [6] - 247:13, 247:17, 247:21, 247:22, 275:7, 289:25
**call** [12] - 216:24, 224:14, 234:14, 235:8, 242:23, 243:3, 244:5, 265:21, 273:2, 275:16, 278:19, 288:18
**called** [6] - 209:6, 234:9, 241:9, 241:21, 246:15, 264:24
**calling** [4] - 244:6, 244:7, 244:22, 275:11
**calls** [3] - 243:23, 244:17, 256:10

G. KAVULICH

**CAMBA** [1] - 207:8
**came** [6] - 214:16,
235:11, 261:14, 262:6,
262:10, 272:21
**can you** [13] - 219:3,
224:13, 235:7, 237:13,
241:6, 242:25, 245:9,
265:6, 265:9, 265:14,
275:21, 285:7, 288:10
**can't** [15] - 217:20, 218:6,
227:2, 227:4, 227:10,
230:10, 238:21, 242:21,
250:9, 252:23, 253:19,
271:7, 272:5, 284:2,
290:25
**caption** [2] - 243:7,
246:19
**captioned** [2] - 246:20,
251:6
**case** [32] - 211:10,
212:14, 212:16, 212:18,
212:20, 212:22, 215:13,
218:25, 219:17, 220:10,
220:18, 241:22, 243:10,
246:16, 254:25, 255:15,
257:16, 259:3, 259:4,
259:24, 260:6, 260:9,
260:11, 270:17, 271:8,
271:19, 271:23, 280:2,
280:8, 280:10, 284:13,
287:15
**Case** [1] - 206:5
**cases** [8] - 221:18,
222:12, 236:6, 247:10,
254:15, 259:16, 282:7,
289:18
**cash** [2] - 225:15, 225:20
**Casper** [1] - 243:14
**Casper's** [1] - 243:15
**Castellan** [1] - 241:8
**castellan** [1] - 241:21
**cause** [1] - 217:14
**caused** [1] - 263:12
**CC** [3] - 215:23, 216:2
**cease** [1] - 272:16
**certain** [4] - 248:15,
286:7, 287:4, 291:16
**certification** [1] - 208:8
**certify** [2] - 295:9, 295:14
**cetera** [1] - 222:18
**change** [3] - 214:6,
214:8, 221:5
**changing** [1] - 214:18
**charge** [2] - 220:25,
254:17
**charges** [1] - 263:20
**charging** [1] - 280:23
**Chase** [6] - 237:3,
267:22, 268:3, 269:7,
269:14, 269:20

**check** [14] - 217:2,
220:13, 220:17, 221:20,
221:22, 222:7, 222:22,
224:24, 223:8, 223:10,
224:3, 241:15, 261:2
**checked** [6] - 243:25,
252:9, 256:18, 256:20,
256:22, 287:13
**checking** [2] - 256:21,
261:6
**Chester** [1] - 209:17
**cigarette** [1] - 239:19
**circumstances** [6] -
218:8, 251:18, 252:2,
256:4, 280:4, 283:2
**Civil** [7] - 206:18, 242:17,
246:22, 247:4, 247:5,
247:6, 260:16
**civil** [9] - 241:22, 242:3,
242:8, 242:14, 244:8,
244:22, 244:24, 246:17,
260:15
**claim** [13] - 213:8, 247:4,
248:14, 252:3, 273:6,
273:12, 273:16, 274:17,
290:9, 290:13, 290:14,
290:17, 290:22
**claimed** [1] - 245:12
**claims** [3] - 257:16,
258:11, 260:15
**Claims** [2] - 260:14,
261:8
**clara** [1] - 219:15
**Clara** [7] - 219:18,
219:25, 221:9, 232:9,
251:7, 266:15, 266:18
**clarify** [1] - 246:9
**Claro** [4] - 241:9, 241:12,
241:18, 273:2
**Claro's** [1] - 246:15
**clear** [3] - 245:25,
265:15, 268:13
**clearly** [1] - 290:24
**clerk** [1] - 255:21
**click** [2] - 234:19, 235:2
**client** [8] - 212:25,
228:23, 229:18, 233:25,
238:21, 238:25, 279:22,
287:6
**client's** [2] - 220:23,
222:19
**clients** [1] - 243:21
**clinic** [1] - 241:13
**collateral** [1] - 258:13
**collect** [7] - 221:11,
222:8, 230:21, 263:24,
271:20, 272:13, 272:16
**collected** [7] - 220:23,
221:13, 222:19, 229:17,
261:12, 261:17, 261:19

**collecting** [5] - 221:23,
222:2, 266:24, 267:14,
272:12
**collection** [21] - 215:17,
217:14, 223:5, 228:20,
228:24, 229:2, 230:17,
232:5, 232:8, 234:9,
234:24, 236:10, 240:18,
244:10, 247:19, 249:6,
250:3, 265:4, 281:14,
285:17, 286:12
**Collection** [1] - 294:9
**collections** [2] - 282:17,
282:20
**Collin** [4] - 215:5,
273:25, 276:3, 276:20
**collin** [1] - 274:2
**coming** [1] - 209:18
**commingled** [1] - 259:6
**commingling** [2] - 260:7,
260:24
**common** [2] - 239:3,
287:4
**communicate** [2] -
281:13, 282:20
**communication** [1] -
281:21
**company** [1] - 210:12
**compare** [2] - 229:5,
233:9, 292:12
**compel** [1] - 232:25
**competent** [1] - 227:24
**complaint** [3] - 284:4,
288:22, 289:7
**complaints** [3] - 283:23,
284:15, 284:19
**compoundage** [1] -
292:2
**Comptroller** [1] - 290:7
**computer** [6] - 223:3,
224:21, 230:3, 230:6,
230:10, 232:2
**concern** [2] - 227:22,
280:18
**concluded** [1] - 293:11
**conclusion** [1] - 256:10
**conjecture** [1] - 287:3
**consumer** [11] - 215:8,
215:19, 215:23, 215:24,
216:2, 216:3, 218:14,
239:14, 240:14, 252:25,
284:5
**consumers** [1] - 283:23
**contact** [2] - 286:13,
286:24
**contacted** [5] - 248:5,
248:8, 289:2, 289:5, 289:9
**contained** [2] - 213:4,
242:14

**contemporaneous** [2] -
275:4, 278:16
**contemporaneously** [1]
- 213:17
**contend** [2] - 213:14,
216:9
**contents** [1] - 227:2
**continue** [1] - 272:3
**CONTINUED** [1] - 206:15
**continued** [3] - 244:17,
272:15, 275:14
**Continued** [1] - 292:21
**contravene** [1] - 214:21
**control** [1] - 250:5
**conversation** [1] - 259:9
**conveyed** [1] - 277:18
**copies** [4] - 229:15,
229:21, 229:22, 283:22
**copy** [1] - 208:14,
208:17, 215:7, 215:17,
237:20, 242:3, 245:15,
250:25, 269:15, 282:12,
287:8
**corner** [1] - 247:2
**corners** [1] - 213:11
**correct** [58] - 211:13,
211:18, 211:19, 211:22,
213:4, 217:24, 218:3,
219:21, 219:23, 219:25,
220:2, 223:18, 224:8,
224:25, 225:4, 226:18,
232:6, 232:10, 232:11,
232:15, 239:6, 239:7,
240:15, 246:11, 246:23,
246:24, 247:4, 250:13,
251:3, 252:21, 252:22,
253:2, 255:3, 255:4,
262:8, 263:6, 263:14,
263:15, 266:7, 266:16,
266:18, 267:8, 267:9,
269:11, 269:16, 269:17,
269:21, 273:3, 273:4,
273:22, 275:13, 275:16,
284:22, 286:2, 286:15,
287:15, 291:24, 293:3
**correctly** [2] - 223:15,
224:20
**correspondence** [1] -
288:21
**Counsel** [1] - 294:17
**counsel** [2] - 208:6,
208:17
**County** [2] - 259:24,
260:6
**COUNTY** [1] - 295:5
**couple** [2] - 212:21,
271:25
**course** [1] - 256:17,
282:16, 282:19
**COURT** [1] - 206:2

G. KAVULICH

**court** [21] - 213:7,
214:21, 216:18, 241:25,
242:4, 242:8, 247:13,
247:25, 248:5, 248:8,
249:12, 254:5, 255:3,
261:9, 274:22, 274:25,
289:12, 289:14, 289:17,
289:18, 290:2
**Court** [22] - 206:17,
206:20, 207:5, 208:13,
242:17, 246:22, 247:4,
247:5, 247:6, 250:15,
252:13, 253:17, 254:10,
254:11, 254:14, 254:19,
255:11, 259:24, 260:14,
260:17, 261:8
  **courts** [2] - 243:6, 243:8
  **cover** [1] - 212:8
  **CPLR** [1] - 272:22
  **created** [2] - 228:2,
266:11
  **credit** [4] - 266:17,
266:20, 267:6, 292:18
  **creditor** [2] - 218:24,
220:4
  **credits** [1] - 267:12
  **Currency** [1] - 290:7
  **current** [2] - 223:23,
227:8
  **custody** [1] - 250:4

## D

  **date** [27] - 209:5, 236:10,
238:4, 238:8, 238:11,
240:7, 245:5, 248:13,
248:21, 249:11, 253:5,
254:24, 257:6, 264:25,
274:22, 274:25, 285:3,
288:4, 289:3, 290:2,
290:12, 290:16, 290:20,
290:23, 290:24, 291:5,
291:7
  **DATE** [1] - 206:12
  **dated** [3] - 237:22, 285:9,
288:8
  **dates** [2] - 229:12, 255:3
  **day** [5] - 233:19, 238:7,
291:6, 293:18, 295:20
  **days** [17] - 208:16, 253:3,
254:20, 286:24, 289:3,
290:12, 290:15, 290:16,
290:19, 290:22, 291:2,
291:5, 291:11, 291:13,
291:16, 291:19
  **deadlines** [2] - 236:3,
236:4
  **debt** [1] - 220:20
  **debtor** [3] - 216:16,
219:22, 219:23

  **debtor/account** [1] -
291:8
  **debtors** [3] - 219:18,
220:9
  **December** [2] - 206:12,
295:20
    **decision** [1] - 213:18
    **deeming** [1] - 217:15
    **defend** [2] - 279:4, 280:3
    **defendant** [2] - 216:16,
220:22
  **Defendant** [1] - 206:16
  **Defendants** [1] - 207:13
  **defendants** [1] - 220:22
  **DEFENDANTS** [1] -
206:9
  **defendants/**
**respondents** [1] - 253:12
    **defense** [7] - 257:19,
257:21, 258:11, 258:15,
258:18, 258:22, 280:3
    **defenses** [2] - 257:16,
257:18
    **deliver** [1] - 290:25
    **demand** [1] - 283:4
    **denied** [2] - 213:7
    **depends** [1] - 227:13
    **deposit** [1] - 267:24
  **DEPOSITION** [1] -
206:15
    **deposition** [9] - 208:8,
208:9, 208:14, 259:3,
259:15, 268:12, 281:18,
291:22
    **depositories** [1] - 235:14
    **described** [1] - 234:21
  **DESCRIPTION** [1] -
294:7
    **desire** [1] - 272:13
    **despite** [1] - 275:15
    **details** [1] - 260:11
    **determine** [2] - 209:20,
224:23
    **determined** [2] - 249:11,
256:6
  **Diamond** [1] - 206:19
  **did you** [8] - 211:23,
211:24, 214:2, 242:7,
245:13, 259:11, 263:24,
288:20
    **difference** [2] - 238:17,
239:9
    **different** [10] - 221:19,
232:16, 232:20, 234:18,
243:7, 243:10, 263:7,
279:17, 292:5
    **directed** [1] - 239:2
    **discard** [1] - 268:16
    **disclose** [2] - 281:2,

281:6
    **disconnect** [1] - 292:20
    **discontinuance** [1] -
242:12
    **discontinued** [1] -
241:23
    **discovery** [1] - 212:22
    **discuss** [2] - 258:20,
281:22
    **discussed** [2] - 241:23,
287:11
    **discussing** [1] - 259:20
    **discussion** [7] - 233:17,
236:20, 239:23, 250:9,
259:14, 267:18, 283:21
    **dispute** [1] - 283:3
  **DISTRICT** [2] - 206:2,
206:2
    **divide** [1] - 226:11
    **do they** [2] - 283:12,
283:15
    **do you** [62] - 209:19,
210:9, 210:12, 215:7,
215:12, 216:6, 220:3,
220:7, 220:10, 220:13,
221:16, 221:21, 223:12,
227:7, 231:14, 234:17,
238:4, 238:9, 239:10,
241:25, 244:11, 248:2,
248:4, 248:25, 249:21,
253:7, 253:13, 253:14,
257:25, 258:17, 259:8,
259:19, 259:25, 260:4,
260:10, 260:20, 261:13,
262:12, 262:17, 262:24,
264:13, 264:19, 267:25,
268:13, 268:19, 270:19,
270:21, 270:24, 272:4,
274:24, 277:17, 279:3,
280:14, 280:17, 280:22,
282:20, 284:14, 284:18,
285:16, 289:4, 292:3,
292:6
    **docket** [5] - 269:24,
270:10, 270:18, 271:2,
271:4
    **doctrine** [1] - 258:12
    **document** [28] - 210:23,
227:11, 227:25, 234:2,
234:4, 242:8, 245:10,
245:13, 245:19, 245:20,
250:4, 264:19, 267:4,
268:2, 268:23, 269:2,
270:11, 270:12, 271:13,
271:17, 277:6, 278:4,
284:3, 284:8, 284:9,
285:7, 285:13, 288:10
    **documentation** [1] -
278:22
    **documented** [1] - 278:19

    **documents** [13] - 209:2,
209:24, 210:25, 211:8,
226:21, 229:10, 232:25,
237:15, 240:5, 278:8,
278:9, 284:15, 284:18
  **Doe** [2] - 222:14
    **does it** [4] - 249:17,
250:20, 277:11, 286:21
    **does that** [10] - 211:4,
218:16, 233:12, 234:7,
234:17, 266:9, 269:23,
272:2, 273:7, 273:11
    **doesn't** [7] - 240:25,
248:24, 264:6, 276:16,
291:6, 291:12, 291:13
    **dollars** [1] - 238:20
    **down** [4] - 219:12,
221:19, 254:7, 260:3
    **draft** [2] - 243:21, 274:2
    **drafted** [2] - 248:16,
248:18
    **drill** [1] - 219:12
    **due** [8] - 221:2, 223:13,
223:17, 224:10, 227:8,
235:25, 267:5, 291:24
    **duly** [2] - 209:7, 295:11

## E

  **e-courts** [2] - 243:6,
243:8
  **e-mail** [1] - 233:8
  **e-mailed** [2] - 233:18,
277:19
    **earlier** [2] - 278:2, 289:10
    **effect** [2] - 208:12,
208:15
    **efficient** [1] - 269:3
    **eight** [9] - 257:18,
290:15, 290:16, 290:18,
290:19, 290:22, 291:5,
291:13, 291:18
    **else's** [1] - 227:11
    **elsewhere** [1] - 285:17
    **eluded** [1] - 277:25
    **end** [7] - 213:24, 228:16,
233:13, 233:19, 245:20,
272:11
    **enough** [1] - 222:3
    **enter** [1] - 255:2
    **entered** [5] - 210:17,
252:24, 253:6, 253:11,
255:18
    **entire** [1] - 259:19
    **entirely** [3] - 213:4,
219:9, 262:4
    **entity** [1] - 228:2
    **entries** [1] - 276:12
    **entry** [19] - 236:21,
240:19, 240:20, 242:20,

G. KAVULICH

249:14, 249:16, 264:25, 265:6, 265:24, 266:8, 267:19, 269:22, 270:2, 272:25, 273:5, 273:11, 274:8, 274:14, 275:10
**escrow** [1] - 220:17
**especially** [1] - 286:2
**ESQ** [3] - 207:4, 207:10, 207:12
**essentially** [1] - 285:12
**estoppel** [2] - 258:13, 258:14
**et** [1] - 222:18
**every** [3] - 253:16, 254:15, 271:25
**everything** [3] - 231:18, 268:5
**exact** [2] - 213:5, 213:6
**exactly** [2] - 260:12, 282:2
**EXAMINATION** [2] - 209:10, 294:22
**examination** [3] - 293:10, 295:10, 295:12
**examine** [1] - 234:3
**examined** [1] - 209:9
**example** [1] - 283:3
**except** [1] - 208:21
**excuse** [2] - 212:25, 241:4
**execute** [1] - 217:9
**executed** [2] - 210:16, 211:16
**executing** [3] - 209:21, 211:2, 219:7
**execution** [25] - 218:10, 238:14, 239:4, 239:12, 244:18, 249:19, 261:15, 265:12, 265:18, 266:10, 266:25, 267:12, 269:25, 270:5, 271:11, 275:15, 276:2, 277:5, 277:23, 278:5, 278:12, 285:10, 286:14, 287:2, 294:11
**executions** [3] - 223:19, 223:20, 262:10
**exempt** [4] - 213:4, 217:16, 259:6, 259:7
**exemption** [23] - 213:8, 218:9, 245:12, 247:3, 248:14, 252:3, 259:18, 273:6, 273:12, 273:16, 274:10, 274:11, 274:17, 275:5, 290:8, 290:13, 290:14, 290:17, 290:20, 290:22, 291:5, 291:10, 291:15
**EXHIBIT** [2] - 294:6
**exhibit** [4] - 230:23, 245:2, 247:16, 284:24

**Exhibit 1** [2] - 250:25, 251:2
**Exhibit 10** [6] - 232:7, 234:25, 235:8, 240:18, 249:9, 265:4
**Exhibit 11** [1] - 240:9
**Exhibit 12** [2] - 245:8, 245:16
**Exhibit 13** [5] - 245:4, 246:12, 247:12, 248:14, 248:22
**Exhibit 14** [2] - 257:5, 257:9
**Exhibit 15** [6] - 285:2, 285:18, 285:25, 286:10, 287:7, 287:20
**Exhibit 16** [2] - 288:3, 288:7
**Exhibit 17** [1] - 285:6
**Exhibit 9** [4] - 218:23, 225:4, 225:19, 229:5
**exhibits** [1] - 240:3
**Exhibits** [4] - 209:3, 240:6, 246:10, 294:17
**EXHIBITS** [1] - 294:4
**exist** [2] - 229:11, 285:11
**expenses** [2] - 226:10, 226:17
**experience** [1] - 253:9
**expiration** [1] - 257:22
**explained** [2] - 241:10, 243:7
**explanatory** [1] - 225:16
**extension** [5] - 271:8, 271:24, 271:25, 272:9

**F**

**f/k/a** [2] - 206:7, 207:14
**face** [1] - 266:14
**fact** [15] - 214:18, 215:18, 219:8, 241:16, 241:18, 244:2, 246:12, 247:20, 251:2, 251:20, 252:6, 256:6, 274:24, 287:7, 287:20
**facts** [3] - 251:18, 251:25, 256:4
**factual** [2] - 257:25, 258:17
**fair** [1] - 222:3
**fax** [2] - 273:14, 274:19
**faxed** [1] - 233:8
**FDCPA** [4] - 214:13, 257:10, 279:5, 280:3
**Federal** [1] - 206:18
**fee** [5] - 228:24, 232:5, 263:6, 264:6, 264:7
**fees** [2] - 223:12, 280:6
**few** [1] - 210:25

**fifth** [1] - 258:23
**figure** [2] - 246:14, 288:13
**file** [14] - 231:21, 231:24, 245:13, 245:14, 269:2, 270:9, 270:17, 282:7, 282:8, 287:11, 290:10, 290:11, 290:23, 291:18
**filed** [1] - 288:22
**files** [4] - 282:4, 282:5, 287:13, 287:17
**filing** [1] - 208:7
**fills** [1] - 291:8
**final** [3] - 249:19, 276:2, 276:8
**finally** [2] - 249:23, 250:6
**fine** [1] - 217:22
**finish** [1] - 267:2
**firm** [2] - 248:20, 257:14
**first** [8] - 209:7, 232:13, 246:19, 259:2, 274:17, 277:2, 277:13, 281:18
**fit** [1] - 282:9
**five** [6] - 221:18, 221:19, 222:12, 222:17, 222:22, 254:20
**Flatbush** [1] - 207:9
**Floor** [1] - 207:5
**folks** [1] - 222:13
**follow** [2] - 280:25, 281:5
**following** [1] - 220:16
**follows** [1] - 209:9
**force** [1] - 208:15
**forget** [1] - 271:23
**form** [17] - 208:21, 227:21, 228:4, 228:6, 247:4, 248:14, 252:4, 252:13, 252:16, 256:10, 270:16, 272:3, 273:6, 280:12, 290:9, 290:17, 290:22
**formal** [1] - 277:6
**formally** [1] - 240:2
**former** [1] - 282:11
**forth** [3] - 282:21, 284:7, 295:11
**forward** [6] - 220:3, 220:7, 220:10, 240:10, 240:14, 242:7
**forwarded** [2] - 228:22, 233:23
**found** [2] - 276:7, 287:21
**four** [2] - 213:11, 250:19
**fourth** [1] - 258:22
**front** [2] - 226:24, 278:9
**funds** [4] - 213:4, 217:16, 218:19, 259:7
**further** [3] - 261:6, 274:14, 295:14

**FURTHER** [1] - 208:20
**future** [3] - 236:3, 255:18, 255:19

**G**

**Gardens** [1] - 220:5
**GARDENS** [4] - 206:7, 206:8, 207:14, 207:14
**garnishment** [2] - 261:20, 267:14
**garnishments** [1] - 267:7
**gary** [1] - 209:14
**GARY** [4] - 206:7, 206:16, 207:14, 293:14
**gave** [6] - 221:10, 241:21, 273:20, 274:11, 282:3
**generally** [4] - 214:21, 255:7, 264:6, 284:10
**generate** [2] - 229:19, 230:10
**generated** [3] - 223:3, 233:7, 267:4
**generates** [2] - 230:3, 230:6
**gets** [3] - 228:22, 228:23, 233:22
**give** [10] - 217:25, 221:4, 221:12, 221:22, 222:7, 223:10, 230:24, 236:2, 283:9, 283:12
**given** [7] - 212:10, 229:17, 243:23, 268:5, 269:9, 289:2, 295:13
**gives** [1] - 254:3
**giving** [1] - 282:18
**GK** [2] - 273:20, 274:11
**goes** [6] - 222:24, 223:8, 223:11, 223:12, 232:4, 232:5
**got** [4] - 244:16, 266:2, 284:4, 291:20
**gotten** [1] - 216:4
**govern** [1] - 221:8
**guess** [5] - 225:21, 229:9, 234:15, 276:15, 287:5
**Gutman** [1] - 254:12
**guy** [1] - 273:23
**guys** [3] - 218:5, 238:19, 238:24

**H**

**hand** [2] - 247:2, 295:20
**handled** [1] - 214:25
**happen** [1] - 290:18
**happened** [4] - 210:18, 214:11, 244:5, 244:21

G. KAVULICH

**happening** [1] - 215:13
**happens** [2] - 271:16, 272:9
**harass** [1] - 279:22
**hardcopy** [1] - 230:12
**harm** [1] - 280:13
**Harris** [1] - 292:11
**hasn't** [1] - 209:22
**have you** [2] - 210:15, 280:20
**haven't** [2] - 234:2, 234:6
**he's** [1] - 227:24
**heard** [1] - 291:11
**hearing** [8] - 248:9, 248:13, 248:22, 254:24, 290:18, 291:9, 291:14
**heels** [1] - 241:11
**held** [8] - 206:18, 233:17, 236:20, 239:23, 259:14, 259:24, 267:18, 283:21
**help** [1] - 237:11
**helps** [1] - 249:9
**hereby** [1] - 295:8
**HEREBY** [1] - 208:5
**herein** [1] - 208:7
**hereinbefore** [1] - 295:11
**hereunto** [1] - 295:19
**higher** [1] - 241:4
**historical** [2] - 236:2, 236:5
**history** [3] - 228:21, 228:25, 235:9
**holder** [1] - 291:8
**holding** [1] - 213:3
**hourly** [1] - 280:22
**Housing** [8] - 252:13, 253:16, 254:10, 254:13, 254:14, 254:19, 255:10
**housing** [3] - 247:6, 247:7, 249:12
**how are** [1] - 216:19
**how do** [2] - 256:22, 281:13
**how many** [3] - 284:14, 284:18, 291:11
**how often** [2] - 220:7, 220:10
**huntington** [1] - 207:16

---

## I

**i've** [1] - 228:14
**I've** [6] - 218:20, 219:10, 225:5, 225:6, 228:13, 290:4
**identification** [6] - 209:4, 240:6, 245:5, 257:6, 285:3, 288:4
**identifier** [1] - 221:12
**identifiers** [1] - 222:17

**identify** [4] - 226:24, 237:14, 245:10, 285:7
**impetus** [1] - 214:18
**imprecisely** [1] - 261:22
**improper** [2] - 263:13, 288:23
**IN** [1] - 295:19
**INC** [2] - 206:8, 207:15
**Inc** [1] - 206:19
**include** [1] - 292:22
**income** [3] - 223:19, 261:15, 266:24
**independent** [1] - 244:12
**index** [20] - 221:21, 222:7, 222:8, 225:3, 232:8, 241:21, 242:4, 242:8, 242:14, 242:17, 243:6, 243:8, 243:10, 244:8, 244:22, 244:24, 246:17, 261:12, 261:24, 262:3
**indicate** [5] - 243:12, 247:2, 267:20, 269:23, 276:12
**indicated** [2] - 256:7, 259:22
**indicates** [1] - 278:22
**indicating** [2] - 285:17, 285:20
**indicating)** [3] - 230:20, 237:18, 256:24
**indication** [3] - 211:2, 248:11, 277:21
**informally** [1] - 234:14
**information** [16] - 218:15, 220:19, 221:13, 235:15, 236:11, 237:2, 237:6, 239:10, 265:19, 268:2, 268:21, 269:6, 269:13, 269:15, 269:19, 277:18
**informational** [1] - 235:13
**informed** [1] - 278:11
**informing** [2] - 211:23, 211:25
**inhouse** [4] - 210:5, 210:13, 210:14, 275:7
**initials** [2] - 265:10, 274:23
**insisting** [1] - 243:4
**instance** [1] - 213:13
**intend** [1] - 240:13
**intending** [1] - 227:20
**interest** [3] - 224:18, 224:22, 291:25
**interested** [2] - 237:5, 295:17
**invalid** [1] - 283:24

**involved** [1] - 212:6
**irrelevant** [2] - 269:5, 279:21
**IS** [2] - 208:5, 208:20
**is it your** [2] - 212:3, 290:9
**is that** [26] - 211:10, 214:25, 217:25, 222:9, 222:23, 223:2, 224:24, 232:16, 234:25, 235:20, 238:3, 240:20, 241:13, 241:20, 244:11, 247:20, 250:15, 253:19, 257:10, 258:21, 260:16, 260:23, 261:18, 262:15, 270:11, 273:9
**is there** [5] - 248:11, 270:11, 277:21, 278:3, 278:10
**is this** [3] - 233:2, 237:17, 255:5
**issue** [4] - 259:5, 269:8, 279:19, 287:20
**issued** [4] - 239:16, 254:5, 263:5, 266:11
**issues** [2] - 211:9, 252:13
**IT** [2] - 208:5, 208:20
**item** [1] - 250:15
**items** [1] - 235:21

---

## J

**JAMES** [3] - 206:3, 207:5, 207:9
**James** [7] - 232:10, 251:7, 265:7, 273:16, 273:17, 274:10, 285:8
**JAMIE** [2] - 295:7, 295:23
**Jamie** [1] - 206:21
**Jane** [1] - 222:14
**JESSICA** [1] - 207:19
**job** [1] - 265:19
**John** [2] - 222:14, 222:15
**JP** [6] - 237:3, 267:22, 268:3, 269:7, 269:14, 269:20
**judge** [1] - 281:8
**Judge** [1] - 208:13
**judge's** [1] - 255:7
**judgement** [16] - 211:3, 219:18, 219:21, 241:10, 241:19, 249:12, 251:14, 251:22, 252:21, 252:23, 255:16, 256:19, 275:12, 276:8, 289:9, 291:7
**judgements** [1] - 221:24
**judgment** [59] - 209:20, 210:16, 211:12, 211:17,

212:24, 216:16, 217:15, 218:24, 219:19, 219:23, 220:4, 220:8, 220:9, 221:3, 224:24, 226:2, 241:10, 241:16, 244:2, 249:20, 249:24, 250:7, 250:12, 250:22, 250:25, 251:3, 251:4, 251:8, 251:21, 252:6, 252:7, 252:10, 252:13, 252:19, 252:20, 253:6, 253:11, 253:20, 254:3, 255:13, 255:17, 255:22, 256:7, 256:17, 256:24, 261:25, 266:15, 269:9, 273:3, 275:15, 276:3, 276:6, 283:25, 284:6, 284:7, 285:11, 285:22, 292:5
**judgments** [2] - 221:25, 255:7
**judicata** [1] - 258:12
**judicial** [1] - 258:13
**July** [15] - 213:23, 213:24, 213:25, 277:21, 278:6, 278:13, 285:9, 285:14, 285:19, 286:10, 286:16, 286:17, 286:20, 286:22, 294:14
**jurat** [1] - 292:22
**jurisdictional** [1] - 260:19

---

## K

**kavulich** [1] - 241:2
**Kavulich** [2] - 209:14, 240:23
**KAVULICH** [6] - 206:7, 206:16, 207:13, 207:14, 293:14
**keep** [11] - 230:12, 270:19, 270:22, 283:22, 284:3, 284:8, 284:9, 284:10, 284:11, 284:14, 287:8
**keeping** [1] - 220:25
**kept** [1] - 228:23
**KESHAVARZ** [31] - 207:4, 207:6, 209:11, 217:22, 226:19, 227:4, 227:12, 227:19, 228:3, 228:11, 230:22, 231:22, 233:15, 233:21, 236:17, 239:20, 239:24, 244:25, 246:8, 257:3, 267:16, 279:8, 279:11, 279:16, 279:24, 280:11, 283:18, 284:23, 287:23, 293:4, 294:23
**kinds** [1] - 282:7

G. KAVULICH

**Kings** [2] - 259:24, 260:6
**know** [76] - 213:10,
216:19, 217:20, 217:21,
218:5, 218:18, 219:4,
219:11, 221:6, 222:11,
223:23, 225:5, 225:15,
225:16, 227:7, 227:19,
228:15, 231:14, 234:15,
237:9, 238:5, 238:10,
239:15, 240:13, 242:2,
248:2, 248:4, 248:25,
249:21, 252:18, 253:7,
253:13, 253:15, 253:16,
254:2, 254:5, 254:9,
256:11, 256:22, 258:17,
261:10, 261:13, 262:12,
262:17, 263:23, 264:9,
264:10, 264:13, 267:25,
270:21, 270:24, 271:22,
272:4, 272:5, 272:6,
272:11, 272:20, 274:24,
276:5, 276:10, 277:17,
277:24, 278:2, 278:18,
278:23, 279:2, 279:3,
280:22, 282:6, 282:14,
284:18, 287:12, 288:11,
290:4, 292:14
**knowing** [1] - 238:16
**knowledge** [3] - 261:9,
269:19, 291:17
**KOVEN** [1] - 207:10

## L

**L&T** [6] - 241:10, 243:5,
243:8, 249:12, 274:22,
274:25
**lag** [1] - 238:5
**landlord** [7] - 218:25,
220:20, 221:3, 221:8,
232:3, 232:18, 233:3
**Landlord's** [1] - 294:8
**landlord's** [3] - 219:6,
232:23, 233:9
**landlord/tenant** [4] -
242:3, 252:24, 253:2,
254:25
**Laos** [2] - 214:25, 273:23
**last** [3] - 216:12, 240:8,
241:23
**later** [5] - 215:3, 220:15,
233:10, 275:6, 286:25
**law** [4] - 254:19, 280:2,
280:8, 280:10
**lawsuit** [1] - 257:10
**lawyer** [1] - 288:19
**layman's** [1] - 271:12
**least** [3] - 220:19,
248:22, 287:9
**ledger** [16] - 218:25,

219:7, 221:7, 222:23,
223:13, 225:12, 225:19,
226:22, 229:6, 229:11,
230:11, 232:17, 233:7,
281:20, 283:10, 294:8
**ledgers** [2] - 223:6,
282:19
**left** [2] - 224:6, 247:2
**left-hand** [1] - 247:2
**LEGAL** [1] - 207:8
**legal** [5] - 225:20,
225:22, 241:13, 256:10,
269:8
**Legal** [4] - 243:4, 243:24,
275:11, 288:18
**length** [1] - 281:23
**let's** [10] - 219:12,
221:17, 222:11, 230:22,
235:8, 236:17, 239:25,
283:2, 283:18, 284:23
**letter** [14] - 215:18,
215:22, 215:25, 233:9,
277:9, 284:25, 285:8,
285:19, 286:11, 286:22,
288:2, 288:8, 294:14,
294:15
**letterhead** [1] - 277:7
**letters** [1] - 277:25
**letting** [1] - 278:23
**lifted** [1] - 217:12
**light** [1] - 286:2
**limit** [2] - 228:5, 260:20
**limitations** [1] - 257:23
**line** [1] - 250:18
**list** [6] - 232:2, 232:13,
235:20, 236:3, 236:5,
282:4
**listed** [1] - 248:22
**listing** [1] - 237:10
**little** [2] - 211:8, 262:16
**logical** [1] - 289:11
**long** [3] - 262:17, 291:3,
291:18
**look** [10] - 209:23, 210:3,
228:13, 245:17, 246:18,
249:3, 249:4, 249:8,
271:18, 280:9
**looked** [1] - 243:5
**looking** [6] - 236:21,
236:23, 246:25, 251:10,
265:3, 289:18
**looks** [3] - 237:8, 249:10,
286:20
**lot** [1] - 269:4
**LP** [2] - 206:7, 207:14

## M

**mail** [6] - 215:14, 233:8,
270:14, 273:13, 274:19,

291:2
**mailed** [3] - 233:18,
238:4, 277:19
**mailing** [1] - 242:11
**main** [2] - 243:16, 243:19
**manner** [1] - 231:9
**manually** [1] - 292:8
**March** [2] - 237:23,
250:22
**mark** [8] - 230:22,
237:13, 240:2, 245:2,
257:3, 280:9, 284:23,
287:25
**marked** [10] - 218:23,
240:5, 245:3, 245:8,
257:5, 257:9, 284:25,
285:5, 288:2, 288:7
**marriage** [1] - 295:16
**Marshall** [1] - 239:5
**marshall** [48] - 210:24,
211:24, 212:6, 212:11,
212:12, 213:15, 213:19,
213:22, 217:6, 217:8,
217:11, 217:13, 217:21,
218:3, 218:11, 218:12,
218:13, 218:17, 218:20,
223:17, 224:14, 239:12,
249:18, 266:23, 266:24,
267:11, 267:13, 270:14,
271:14, 272:16, 275:25,
276:24, 277:4, 277:14,
277:22, 278:5, 278:11,
278:23, 286:4, 286:13,
286:19, 286:24, 288:16,
289:6, 291:23, 292:17
**marshall's** [3] - 224:17,
271:23, 289:3
**marshalls** [2] - 292:6,
292:17
**match** [3] - 229:8,
229:12, 232:23
**matching** [1] - 228:17
**math** [1] - 224:17
**matter** [3] - 214:16,
214:17, 295:18
**matthew** [1] - 243:14
**Matthew** [1] - 243:15
**mean** [18] - 210:7, 210:9,
210:12, 221:22, 230:13,
234:24, 238:22, 238:24,
239:3, 255:19, 266:9,
268:13, 268:24, 272:2,
273:7, 276:16, 284:21,
291:6
**meaning** [1] - 276:4
**meaningful** [3] - 251:24,
254:18, 256:3
**meaningfully** [1] -
251:17
**means** [3] - 259:7,

259:18, 272:7
**meant** [5] - 225:22,
274:20, 276:17, 282:16,
292:15
**MELISSA** [1] - 207:10
**member** [1] - 214:24
**mentioned** [2] - 221:11,
289:10
**middle** [1] - 220:16
**military** [1] - 275:8
**Mill** [1] - 292:11
**mind** [1] - 217:4
**mine** [1] - 241:5
**mingling** [1] - 259:17
**Mintz** [1] - 254:13
**minute** [1] - 275:6
**minutes** [4] - 210:25,
255:20, 255:21
**mistaken** [1] - 231:17,
256:21
**mistakenly** [2] - 252:14,
274:16
**misunderstood** [1] -
216:11
**MITCHELL** [1] - 207:12
**Mitchell** [1] - 226:19
**moment** [1] - 276:11
**money** [21] - 216:20,
222:9, 224:4, 250:22,
252:21, 252:23, 253:10,
253:20, 256:7, 259:5,
259:6, 259:18, 262:9,
262:12, 262:17, 263:11,
263:25, 278:24, 279:3,
280:21
**moneys** [4] - 218:9,
261:17, 261:19, 261:23
**month** [9] - 220:15,
220:16, 221:14, 222:6,
222:8, 224:4, 229:18,
262:20, 262:21
**monthly** [1] - 220:12
**months** [1] - 271:25
**MOODY** [1] - 207:19
**morales** [4] - 240:15,
244:18, 250:7, 287:2
**MORALES** [3] - 206:3,
207:5, 207:9
**Morales** [56] - 210:15,
219:2, 219:8, 219:14,
219:20, 232:10, 237:14,
237:19, 237:20, 238:13,
239:6, 239:16, 239:25,
240:9, 241:17, 242:2,
242:7, 242:16, 244:3,
245:8, 246:5, 246:13,
249:13, 249:19, 249:24,
251:7, 251:10, 251:13,
252:11, 252:20, 253:6,
261:13, 261:17, 262:2,

G. KAVULICH

262:7, 263:14, 263:17,
263:20, 269:10, 269:14,
269:18, 273:19, 276:2,
276:13, 277:23, 278:6,
278:12, 284:21, 285:6,
285:9, 285:19, 286:15,
286:23, 287:15, 288:7,
288:9
**Morales'** [9] - 211:10,
236:12, 256:5, 262:13,
262:18, 263:25, 264:14,
264:20, 289:7
**Morgan** [6] - 237:3,
267:22, 268:3, 269:7,
269:14, 269:20
**Motion** [1] - 294:12
**motion** [22] - 213:7,
232:24, 245:3, 245:11,
247:3, 247:12, 247:23,
248:9, 248:16, 248:18,
250:11, 250:13, 251:19,
273:13, 274:18, 275:5,
275:7, 289:13, 289:15,
289:24, 290:23, 291:4
**moved** [1] - 214:25
**MR** [52] - 209:11, 217:19,
217:22, 226:3, 226:12,
226:19, 226:23, 227:4,
227:6, 227:9, 227:12,
227:15, 227:19, 227:23,
228:3, 228:8, 228:11,
230:22, 231:20, 231:22,
231:23, 233:13, 233:15,
233:21, 233:24, 236:17,
239:20, 239:24, 244:19,
244:25, 246:8, 256:9,
257:3, 259:12, 267:16,
279:6, 279:8, 279:9,
279:11, 279:13, 279:16,
279:20, 279:24, 280:7,
280:11, 281:16, 283:18,
284:23, 287:23, 292:12,
293:4, 294:23
**Mr** [54] - 210:15, 211:10,
212:18, 213:8, 219:2,
219:8, 219:14, 219:20,
236:12, 240:15, 241:17,
241:21, 242:2, 242:7,
242:16, 244:3, 244:18,
249:13, 249:24, 250:7,
252:11, 252:20, 253:6,
256:5, 261:13, 261:17,
262:2, 262:7, 262:13,
262:18, 263:14, 263:17,
263:20, 263:25, 264:14,
264:20, 269:10, 269:14,
269:18, 273:19, 277:23,
278:6, 278:12, 280:15,
280:20, 280:23, 284:21,
285:19, 286:15, 286:23,

287:2, 287:15, 288:9,
289:7
**Ms** [11] - 251:9, 251:14,
261:13, 261:15, 261:19,
261:25, 262:4, 262:10,
267:7, 267:15, 275:20
**multiple** [1] - 287:17

## N

**nail** [1] - 254:7
**name** [9] - 209:12, 215:4,
220:18, 234:7, 234:12,
254:4, 260:9, 270:17,
273:24
**named** [1] - 211:4
**necessarily** [1] - 291:6
**necessary** [2] - 282:12,
282:22
**need** [1] - 277:6
**needs** [1] - 277:6
**negative** [2] - 227:8,
268:14
**negatives** [1] - 268:9
**never** [9] - 210:17, 216:4,
218:11, 219:10, 225:6,
228:15, 247:17, 247:20,
289:25
**NEW** [2] - 206:2, 295:4
**next** [5] - 225:17, 250:24,
267:19, 269:22, 292:21
**non** [1] - 261:25
**non-judgment** [1] -
261:25
**none** [1] - 262:6
**nonexempt** [3] - 259:8,
259:18, 259:19
**nonexistent** [3] - 283:25,
285:21, 289:8
**normal** [1] - 212:3
**normally** [1] - 214:24
**NOTARY** [1] - 293:20
**Notary** [3] - 206:21,
209:8, 295:7
**notation** [1] - 215:16
**note** [4] - 271:3, 278:16,
287:9
**notes** [35] - 209:23,
210:4, 210:5, 210:7,
210:11, 210:13, 210:14,
215:17, 223:5, 228:20,
229:2, 230:18, 232:8,
234:10, 234:24, 235:2,
236:10, 236:13, 240:18,
243:12, 244:11, 245:18,
247:19, 249:5, 249:6,
250:3, 262:25, 264:18,
265:4, 265:21, 271:23,
285:17, 286:11, 286:12,
294:9

**nothing** [3] - 210:3,
230:4, 278:21
**notice** [13] - 212:10,
213:14, 215:6, 215:8,
216:4, 216:10, 218:7,
242:12, 250:11, 266:3,
267:22, 283:4, 289:24
**noticed** [3] - 251:19,
252:4, 257:14
**notified** [1] - 217:7
**notify** [1] - 218:14
**number** [28] - 220:21,
221:21, 222:7, 222:8,
225:3, 232:9, 241:22,
242:4, 242:9, 242:14,
242:17, 243:6, 244:8,
244:23, 244:24, 246:17,
250:16, 250:18, 261:12,
261:24, 262:3, 269:24,
270:9, 270:10, 270:17,
270:18, 271:2, 291:16
**NUMBER** [1] - 294:7
**numbers** [3] - 224:19,
243:8, 293:2

## O

**oath** [2] - 208:12, 252:5
**object** [2] - 217:20,
280:11
**objecting** [7] - 213:8,
245:11, 247:3, 252:3,
273:13, 274:18, 290:24
**objection** [23] - 226:3,
226:12, 227:9, 227:16,
227:17, 227:21, 227:24,
228:4, 228:6, 228:9,
244:19, 248:13, 256:9,
273:21, 279:6, 280:13,
281:16, 290:10, 290:11,
290:13, 291:10, 291:15,
291:18
   **objections** [1] - 208:21
   **Observing** [1] - 207:19
**obtain** [2] - 231:8,
270:21
**obtained** [2] - 242:2,
250:22
**obtuse** [1] - 217:17
**occur** [1] - 214:8
**OF** [3] - 206:2, 295:4,
295:5
**off-the-record** [6] -
233:16, 236:19, 239:22,
259:13, 267:17, 283:20
   **Office** [2] - 290:5, 290:6
**office** [31] - 214:3, 214:5,
215:10, 216:5, 219:24,
221:3, 221:4, 241:9,
243:25, 245:15, 249:23,

250:6, 263:13, 263:16,
263:19, 264:13, 264:24,
267:25, 269:8, 271:14,
276:7, 276:21, 276:22,
278:4, 283:22, 285:24,
286:24, 287:8, 288:15,
289:3
   **offices** [1] - 206:19
   **oftentimes** [1] - 253:8
**okay** [11] - 211:7, 233:5,
235:6, 244:25, 246:7,
247:11, 248:19, 258:25,
264:17, 273:15, 288:12
**once** [4] - 221:4, 264:15,
264:16, 281:22
**one-third** [3] - 226:5,
226:6, 226:15
**ones** [2] - 258:5, 292:15
**opinion** [1] - 261:8
**order** [8] - 212:24, 213:2,
213:21, 214:22, 217:7,
217:13, 217:15, 255:7
   **Order** [1] - 206:17
**ordered** [1] - 213:9
**original** [2] - 208:9,
208:17
**outcome** [1] - 295:17
**outline** [1] - 220:18

## P

**P.C** [2] - 206:7, 207:13
**P.M** [1] - 293:9
**page** [11] - 225:19,
232:13, 234:20, 237:17,
240:19, 246:5, 246:19,
250:16, 255:6, 257:18,
292:21
   **PAGE** [2] - 294:6, 294:22
**pages** [2] - 238:2, 246:13
**paid** [9] - 219:9, 261:24,
279:4, 279:18, 280:2,
280:15, 280:20, 280:21,
281:3
**paper** [5] - 222:25, 223:2,
229:24, 231:4, 231:7
**papers** [2] - 241:25,
243:21
**paperwork** [1] - 282:12
**paragraph** [2] - 250:19,
256:8
   **Park** [1] - 207:15
**part** [9] - 215:20, 231:13,
247:6, 247:7, 247:8,
258:12, 259:2, 260:18,
281:18
   **participate** [1] - 254:18
**particular** [5] - 222:6,
224:4, 276:11, 282:23,
282:25

G. KAVULICH

**particularly** [1] - 243:24
**parties** [4] - 208:7, 222:17, 251:7, 295:15
**party** [1] - 253:10
**pashkin** [3] - 280:15, 280:20, 280:23
**PASHKIN** [24] - 207:12, 217:19, 226:3, 226:12, 226:23, 227:6, 227:9, 227:15, 227:23, 228:8, 231:20, 231:23, 233:13, 233:24, 244:19, 256:9, 259:12, 279:6, 279:9, 279:13, 279:20, 280:7, 281:16, 292:12
**pass** [1] - 212:9
**passed** [1] - 235:21
**patrick** [1] - 241:8
**payment** [9] - 219:13, 220:14, 221:11, 225:25, 228:21, 228:25, 229:12, 282:18, 283:9
**payments** [26] - 219:2, 219:25, 220:4, 220:8, 221:9, 221:15, 221:20, 222:5, 224:23, 225:2, 225:11, 225:13, 228:17, 228:18, 229:7, 230:11, 232:3, 232:14, 232:18, 261:11, 261:14, 262:2, 266:18, 266:21, 267:6, 292:18
**PC** [1] - 257:15
**people** [1] - 269:4
**people's** [1] - 268:20
**period** [2] - 214:15, 224:5
**person** [2] - 211:4, 233:12
**personally** [1] - 291:2
**petitioner** [1] - 250:21
**phone** [1] - 244:16
**physical** [5] - 221:20, 222:23, 229:23, 231:4, 231:6
**physically** [2] - 276:17, 282:5
**piece** [3] - 222:25, 223:2, 229:23
**pieces** [2] - 231:4, 231:7
**place** [4] - 252:14, 265:13, 292:3, 292:6
**places** [1] - 235:14
**PLAINTIFF** [1] - 206:4
**Plaintiff** [3] - 206:17, 207:4, 207:8
**Plaintiff's** [12] - 209:3, 218:23, 240:5, 240:17, 245:4, 245:8, 246:10, 246:12, 257:5, 257:9,

285:2, 288:3
**PLAINTIFF'S** [1] - 294:4
**plaintiff's** [1] - 280:6
**Please** [1] - 209:12
**please** [10] - 219:4, 239:19, 239:20, 240:20, 243:2, 257:18, 265:11, 275:22, 288:11, 292:13
**POB** [2] - 265:8, 265:12
**point** [3] - 233:10, 248:15, 292:16
**pointed** [1] - 232:12
**policy** [1] - 215:10
**Port** [1] - 209:17
**portion** [2] - 237:21, 237:25
**possession** [1] - 250:4
**possessory** [2] - 252:20, 253:5
**possible** [2] - 287:24, 289:4
**pot** [1] - 259:19
**Potter** [17] - 219:15, 219:18, 219:25, 221:9, 232:9, 251:7, 251:9, 261:13, 261:15, 261:19, 261:25, 262:10, 266:15, 266:18, 267:7, 267:15, 275:20
**potter** [2] - 251:14, 262:4
**practice** [4] - 212:3, 253:22, 253:24, 254:3
**Prage** [4] - 213:2, 214:15, 214:17, 215:13
**Prage's** [2] - 212:18, 213:8
**premarked** [1] - 209:3
**preparation** [2] - 289:12, 289:17
**PRESENT** [1] - 207:18
**preserve** [1] - 280:12
**preserved** [1] - 228:4
**preserving** [1] - 228:7
**previously** [2] - 259:23, 260:5
**print** [2] - 223:7, 223:12
**printed** [2] - 266:11, 268:4
**prior** [8] - 223:16, 236:3, 256:19, 259:15, 268:12, 278:6, 278:12, 291:21
**private** [1] - 290:5
**privilege** [3] - 228:7, 234:4, 279:17
**privileged** [2] - 279:13, 279:18
**probably** [1] - 265:22
**problem** [2] - 280:14, 280:17

**Procedure** [1] - 206:18
**proceeding** [2] - 242:18, 253:2
**process** [1] - 268:9
**processing** [4] - 263:5, 263:20, 264:6, 264:7
**produce** [1] - 234:5
**produced** [7] - 218:24, 226:22, 226:25, 231:15, 268:2, 287:14, 287:21
**production** [1] - 210:24
**proof** [1] - 215:12
**proper** [1] - 253:13
**Property** [1] - 294:11
**property** [14] - 218:10, 223:20, 238:14, 239:4, 249:19, 265:12, 265:18, 266:10, 267:12, 269:25, 270:4, 271:11, 276:2, 277:5
**proposition** [1] - 260:7
**protect** [1] - 238:21
**provide** [3] - 215:7, 220:13, 231:2
**providing** [2] - 251:16, 255:14
**PUBLIC** [1] - 293:20
**Public** [3] - 206:21, 209:8, 295:7
**pull** [3] - 210:25, 211:7, 252:16
**punitive** [2] - 221:2, 292:5
**purpose** [1] - 224:2
**purposely** [2] - 214:21, 217:17
**pursuant** [2] - 206:17, 261:20
**putting** [2] - 227:17, 287:19
**PX** [2] - 265:8, 265:12

**Q**

**question** [10] - 217:18, 225:17, 233:2, 240:8, 244:24, 256:2, 261:22, 279:15, 279:21, 279:23
**questions** [1] - 228:14
**queue** [2] - 235:11, 235:17
**quo** [1] - 275:17

**R**

**rarely** [1] - 255:4
**rate** [1] - 280:23
**re** [1] - 217:9
**re-execute** [1] - 217:9
**read** [6] - 241:6, 242:21,

242:25, 265:6, 274:12, 274:16
**reading** [2] - 244:10, 290:5
**realize** [1] - 249:23
**realized** [1] - 250:6
**reason** [9] - 213:6, 213:7, 214:23, 216:6, 253:18, 272:12, 282:23, 289:5, 289:11
**reasonableness** [1] - 280:5
**recall** [11] - 212:2, 213:5, 213:6, 213:10, 231:15, 249:25, 260:10, 261:4, 278:20, 284:2, 285:15
**receipt** [3] - 213:18, 225:20, 287:9
**receipts** [1] - 225:15
**receive** [5] - 219:13, 220:8, 222:6, 284:16, 288:21
**received** [14] - 221:9, 225:14, 242:23, 243:3, 270:11, 273:6, 273:12, 274:10, 274:17, 275:5, 284:19, 285:13, 285:18, 286:22
**receiving** [2] - 219:24, 285:25
**recollect** [1] - 212:13
**recollection** [8] - 210:19, 241:20, 244:7, 244:9, 244:12, 244:13, 261:7, 262:15
**record** [27] - 209:13, 227:18, 228:9, 233:15, 233:16, 236:18, 236:19, 239:21, 239:22, 241:7, 243:2, 246:9, 246:11, 258:8, 259:12, 259:13, 265:16, 267:16, 267:17, 268:17, 278:3, 278:10, 283:19, 283:20, 285:16, 285:24, 295:12
**records** [6] - 229:6, 232:24, 233:4, 247:18, 249:21, 250:3, 278:21, 287:14
**refer** [1] - 258:19
**reference** [1] - 250:12
**referenced** [1] - 239:25
**referred** [1] - 234:15
**reflected** [3] - 223:6, 225:4, 228:25
**refund** [1] - 263:16
**regarding** [4] - 275:20, 281:14, 287:14, 288:22
**regular** [1] - 215:14
**related** [1] - 295:15

G. KAVULICH

**release** [17] - 211:23, 211:24, 211:25, 216:14, 275:18, 276:4, 276:6, 276:18, 276:25, 277:3, 277:5, 277:8, 277:9, 277:14, 278:23, 288:16
**released** [9] - 211:12, 211:20, 213:10, 216:6, 262:21, 262:23, 264:8, 276:14, 276:17
**releases** [1] - 216:20
**relevance** [6] - 226:4, 226:13, 234:4, 244:20, 279:7, 279:12
**relevant** [6] - 220:19, 247:9, 280:5, 282:11, 284:3, 284:12
**rely** [2] - 214:5, 223:17
**relying** [1] - 291:22
**remember** [17] - 210:21, 231:18, 238:22, 259:8, 259:20, 259:25, 260:3, 260:4, 260:9, 260:20, 268:4, 271:7, 280:24, 282:2, 282:13, 282:25, 290:5
**remit** [1] - 224:3
**remittance** [1] - 222:16
**remittances** [6] - 224:7, 229:15, 229:20, 229:24, 230:7, 231:7
**remittence** [2] - 220:17, 223:21
**remitting** [1] - 224:4
**remove** [2] - 216:10, 282:5
**removing** [1] - 217:7
**renewed** [1] - 271:12
**repeat** [1] - 266:19
**rephrase** [4] - 212:25, 216:8, 228:19, 242:6
**report** [1] - 229:20
**Reporter** [7] - 209:5, 240:7, 245:6, 250:16, 257:7, 285:4, 288:5
**Reporting** [1] - 206:19
**request** [2] - 272:9, 283:5
**required** [1] - 290:11
**reread** [2] - 265:10, 265:14
**res** [1] - 258:12
**reserve** [1] - 234:3
**reserved** [1] - 208:22
**respective** [1] - 208:6
**respondent** [1] - 250:23
**response** [7] - 265:23, 266:3, 267:21, 267:23, 268:14, 270:19, 288:18

**responsibilities** [2] - 243:16, 243:20
**restate** [1] - 216:12
**restrained** [13] - 211:11, 213:3, 238:9, 246:16, 262:13, 262:19, 264:5, 264:14, 264:21, 265:8, 265:18, 266:6, 289:8
**restraining** [6] - 218:7, 266:3, 267:21, 283:24, 284:6, 285:20
**restraint** [23] - 211:21, 216:10, 217:8, 217:9, 217:12, 217:25, 218:2, 218:11, 218:15, 218:18, 236:12, 237:2, 237:7, 237:22, 239:16, 243:5, 263:4, 263:13, 263:25, 269:14, 288:16, 288:23, 294:10
**retained** [1] - 294:17
**retrospect** [1] - 243:25
**return** [2] - 263:19, 264:7
**review** [8] - 219:3, 250:9, 251:25, 256:3, 278:7, 288:10, 289:12, 289:16
**reviewed** [2] - 251:18, 276:9
**reviewing** [1] - 289:19
**reviews** [1] - 214:19
**RICHMOND** [1] - 295:5
**right** [30] - 215:2, 217:4, 217:16, 219:9, 219:22, 224:24, 225:12, 229:15, 230:7, 230:25, 231:12, 234:3, 235:18, 240:11, 241:13, 244:11, 253:21, 257:11, 264:8, 269:8, 270:3, 270:5, 271:9, 275:3, 277:10, 286:18, 289:16, 289:22, 290:2, 290:3
**ring** [1] - 211:4
**rocket** [1] - 239:3
**ROSEWALL** [6] - 206:7, 206:8, 207:14, 207:14, 207:15
**Rosewall** [11] - 220:5, 220:11, 223:11, 223:22, 225:3, 225:25, 226:21, 226:22, 281:14, 282:21, 283:11
**Rosewall's** [3] - 225:9, 228:16, 229:5
**rule** [9] - 253:7, 253:17, 253:19, 253:21, 253:23, 253:25, 254:9, 254:10, 272:19
**Rules** [1] - 206:18
**rules** [1] - 253:14

**ruling** [1] - 280:9

## S

**sake** [1] - 221:18
**same** [13] - 208:12, 208:15, 208:17, 217:9, 238:6, 243:11, 256:15, 258:4, 258:21, 260:16, 266:23, 273:13, 274:18
**satisfied** [2] - 209:22, 210:17
**save** [1] - 268:25
**saw** [1] - 243:6
**saying** [12] - 222:5, 222:9, 222:10, 223:22, 223:25, 228:21, 228:24, 267:5, 273:2, 275:11, 277:9, 284:5
**scan** [2] - 268:22, 268:25
**scanned** [3] - 209:24, 287:10, 287:20
**scanning** [1] - 287:19
**scheduled** [3] - 274:22, 274:25, 283:6
**science** [1] - 239:3
**screen** [9] - 230:13, 231:10, 231:14, 231:16, 231:25, 234:7, 234:10, 234:13, 235:3
**screens** [2] - 235:7, 235:10
**sealing** [1] - 208:7
**second** [4] - 240:19, 257:19, 263:3, 286:19
**Sedgwick** [2] - 221:18, 222:13
**seeing** [2] - 231:16, 243:9
**seeking** [1] - 271:20
**seem** [1] - 248:24
**seemingly** [1] - 221:6
**seems** [3] - 225:15, 245:21, 248:15
**seen** [6] - 219:10, 225:6, 228:15, 234:2, 234:6, 290:4
**self** [1] - 225:16
**self-explanatory** [1] - 225:16
**send** [18] - 215:6, 216:14, 216:15, 218:2, 218:7, 218:10, 218:11, 218:18, 218:19, 220:15, 239:11, 245:15, 271:21, 272:3, 272:14, 276:3, 277:3, 280:10
**sending** [1] - 292:4
**sends** [1] - 271:14
**sense** [1] - 287:4

**sent** [28] - 213:14, 213:16, 213:17, 213:18, 213:22, 214:3, 215:18, 216:9, 229:22, 236:11, 237:3, 237:7, 237:21, 238:12, 239:4, 239:8, 242:11, 242:16, 266:4, 267:13, 267:22, 269:15, 269:20, 270:24, 276:18, 276:23, 287:7
**sentence** [3] - 265:15, 267:3
**sentences** [1] - 212:21
**separate** [3] - 221:15, 231:25, 237:16
**served** [4] - 242:10, 273:13, 274:18, 283:3
**service** [2] - 208:16, 246:4
**services** [1] - 241:13
**SERVICES** [1] - 207:8
**setting** [1] - 289:22
**share** [5] - 220:23, 220:24, 222:20, 226:14
**sheet** [1] - 222:16
**shot** [1] - 230:13
**show** [5] - 217:14, 218:22, 253:10
**showed** [1] - 212:23
**showing** [7] - 232:7, 245:7, 247:17, 257:8, 268:2, 285:5, 288:6
**shows** [4] - 222:17, 229:16, 252:25, 278:4
**shred** [1] - 268:18
**side** [2] - 229:7
**sign** [5] - 271:20, 272:2, 272:8, 272:14, 274:3
**signed** [5] - 208:10, 208:12, 208:15, 245:24, 246:3
**similar** [1] - 243:10
**single** [2] - 220:13, 221:22
**sir** [2] - 245:10, 293:8
**sit** [1] - 224:16
**sitting** [3] - 258:2, 261:3, 261:5
**six** [1] - 286:24
**sixth** [1] - 258:23
**skipped** [1] - 273:18
**Small** [2] - 260:14, 261:8
**small** [1] - 260:15
**Smith** [1] - 222:15
**Socials** [1] - 268:21
**software** [1] - 234:18
**solely** [1] - 244:5
**somebody** [1] - 254:3
**somebody's** [1] - 254:4

G. KAVULICH

**someone** [4] - 210:8, 210:9, 211:2, 227:11
**something** [10] - 214:19, 234:6, 255:15, 271:7, 272:21, 272:22, 283:7, 289:19, 290:6, 291:3
**sometime** [1] - 213:25
**somewhat** [1] - 225:15
**somewhere** [1] - 230:18
**sorry** [5] - 237:9, 260:2, 273:18, 274:21, 289:23
**Soto** [1] - 211:4
**source** [2] - 247:19, 249:22
**SOUTHERN** [1] - 206:2
**speak** [1] - 243:21
**specific** [1] - 228:9
**specifically** [1] - 255:24
**specifics** [1] - 213:11
**spending** [1] - 238:19
**split** [1] - 225:24
**spoken** [1] - 235:18
**spreadsheet** [1] - 234:22
**SS** [1] - 295:4
**staff** [5] - 214:24, 248:4, 248:7, 248:10, 248:12
**stamp** [1] - 250:17
**stamped** [3] - 245:9, 285:6, 288:7
**standard** [1] - 217:23
**State** [3] - 206:22, 209:8, 295:8
**STATE** [1] - 295:4
**state** [1] - 209:12
**stated** [2] - 224:7, 241:9
**statement** [1] - 264:20
**statements** [2] - 211:15, 221:7
**STATES** [1] - 206:2
**stating** [1] - 285:9
**status** [2] - 271:19, 275:17
**statute** [1] - 257:22
**steps** [2] - 209:19, 214:2
**stipulate** [2] - 226:20, 227:5
**STIPULATED** [2] - 208:5, 208:20
**stipulation** [4] - 251:4, 251:15, 255:10, 255:12
**stipulations** [3] - 254:14, 254:17, 255:2
**stood** [2] - 260:6, 289:20
**stop** [1] - 217:14
**straight** [1] - 252:17
**Street** [2] - 206:20, 207:5
**stuff** [1] - 252:18
**subpoena** [11] - 218:15, 236:11, 237:2, 237:6,

239:11, 268:3, 269:6, 269:13, 269:16, 269:19, 275:23
**Subscribed** [1] - 293:17
**substantive** [1] - 235:13
**subtotal** [1] - 222:21
**suddenly** [1] - 276:7
**sue** [1] - 238:20
**sued** [3] - 210:20, 214:13, 214:16
**sufficient** [1] - 218:19
**suggests** [1] - 250:5
**suing** [1] - 212:17
**Suite** [2] - 207:15, 209:16
**sum** [1] - 250:24
**summons** [3] - 235:12, 235:24, 242:11
**support** [2] - 258:2, 259:17
**supposed** [3] - 216:19, 218:13, 281:9
**sure** [8] - 214:3, 215:9, 229:25, 233:20, 237:9, 258:3, 287:22, 292:4
**surely** [1] - 260:8
**sworn** [4] - 208:10, 209:7, 293:17, 295:11
**system** [14] - 220:14, 223:3, 223:9, 224:17, 224:21, 229:10, 230:10, 230:15, 232:2, 243:13, 247:22, 292:3, 292:6, 292:10

---

# T

**tab** [3] - 234:19, 234:25, 235:2
**tabs** [1] - 234:18, 234:22
**take** [8] - 209:19, 214:2, 214:6, 238:21, 246:18, 249:8, 282:10, 282:11
**taken** [2] - 206:16, 263:11
**takes** [2] - 263:5, 264:5
**taking** [1] - 286:7
**talk** [4] - 228:7, 233:24, 286:8, 287:23
**talked** [4] - 259:4, 268:11, 286:6, 291:21
**talking** [1] - 232:17
**talks** [1] - 225:20
**TD** [25] - 237:5, 237:7, 237:22, 240:10, 240:14, 245:16, 262:13, 262:18, 263:12, 263:25, 264:14, 264:20, 265:7, 265:8, 265:17, 265:23, 265:24, 266:5, 276:13, 276:22, 285:10, 288:8, 288:21,

288:23, 289:6
**telephone** [1] - 278:19
**tell** [12] - 217:11, 236:9, 237:15, 245:20, 250:9, 271:10, 276:14, 277:4, 279:25, 286:13, 288:16, 290:19
**telling** [1] - 280:14
**tells** [1] - 281:8
**ten** [1] - 218:20
**tenant** [3] - 282:6, 282:8, 282:11
**tenants** [1] - 282:9
**tens** [1] - 238:19
**tenuated** [2] - 213:20, 214:15
**terms** [4] - 228:22, 232:17, 260:11, 271:12
**testified** [2] - 209:9, 216:3
**testifies** [1] - 287:6
**testify** [3] - 227:2, 227:10, 227:25
**testifying** [1] - 260:4
**testimony** [2] - 223:16, 295:13
**thank** [3] - 219:16, 246:7, 272:24
**thanks** [1] - 209:18
**THE** [2] - 239:18, 292:14
**there's** [20] - 210:3, 217:13, 217:14, 218:19, 221:5, 222:21, 222:22, 227:22, 234:12, 238:5, 246:16, 251:20, 252:7, 255:19, 268:15, 275:12, 279:14, 279:22, 279:25, 287:3
**thereafter** [1] - 250:21
**they'd** [1] - 216:4
**they're** [5] - 223:7, 237:16, 253:20, 270:24, 279:16
**things** [4] - 235:12, 238:22, 257:13, 279:17
**think** [11] - 213:19, 213:23, 229:14, 230:25, 231:10, 234:8, 234:11, 247:14, 260:21, 289:4, 289:11
**third** [5] - 226:5, 226:6, 226:15, 258:10, 290:21
**thirds** [4] - 226:5, 226:6, 226:16
**thousands** [2] - 238:20, 292:11
**three** [2] - 256:8, 262:22, 289:3
**through** [6] - 241:24,

245:9, 246:13, 250:8, 257:17, 258:6
**tickled** [2] - 235:20, 236:6
**tickler** [1] - 235:19
**till** [1] - 277:20
**time** [32] - 208:22, 213:19, 214:10, 214:12, 214:14, 214:15, 233:17, 236:20, 238:16, 238:22, 239:23, 241:23, 243:16, 243:18, 244:14, 248:21, 249:8, 253:14, 254:23, 255:18, 258:6, 259:14, 267:18, 274:17, 275:8, 277:2, 277:13, 283:21, 286:3, 286:19, 290:21, 293:8
**TIME** [1] - 206:13
**times** [2] - 218:21, 239:9
**today** [1] - 233:11, 235:25, 236:6, 258:2, 261:3, 278:10
**today's** [1] - 235:23
**together** [1] - 237:15
**toss** [1] - 268:17
**total** [1] - 222:21
**touch** [1] - 255:6
**towards** [3] - 239:2, 261:24, 262:3
**track** [3] - 221:2, 284:14, 292:7
**translate** [2] - 265:9, 275:21
**trial** [2] - 208:22, 283:5
**tried** [2] - 248:12, 255:24
**trigger** [5] - 286:9, 287:24, 287:25, 288:14
**triggered** [3] - 249:22, 276:6, 286:23
**triggers** [1] - 286:7
**true** [3] - 247:20, 253:4, 295:12
**trust** [1] - 224:18
**try** [3] - 229:6, 232:23, 232:25
**trying** [5] - 229:4, 232:22, 246:14, 254:7, 288:13
**two-thirds** [4] - 226:5, 226:6, 226:16
**type** [2] - 220:20, 255:22
**types** [1] - 247:9

---

# U

**ultimately** [2] - 211:12, 211:20
**under** [3] - 252:5, 253:14, 280:4

G. KAVULICH

**understand** [3] - 217:18, 223:15, 224:20
**understanding** [1] - 290:9
**UNITED** [1] - 206:2
**unsigned** [1] - 208:14
**unusual** [1] - 282:24
**user** [1] - 240:24
**usually** [6] - 212:5, 238:6, 254:21, 263:9, 268:9, 284:3

## V

**vacate** [8] - 249:18, 275:25, 277:22, 278:5, 278:11, 286:4, 286:14, 286:25
**vacated** [3] - 209:22, 210:17, 284:7
**vacating** [2] - 212:24, 217:15
**vague** [1] - 244:13
**vaguely** [2] - 259:10, 259:21
**valid** [2] - 209:21, 254:5
**verification** [1] - 283:4
**versus** [4] - 249:19, 276:2, 277:23, 278:5
**via** [2] - 273:13, 274:18
**volume** [1] - 292:15
**volunteer** [1] - 241:12

## W

**wage** [3] - 261:20, 262:10, 267:14
**waived** [1] - 208:9
**want** [2] - 228:6, 268:20
**was it** [3] - 213:21, 214:19, 247:20
**was that** [8] - 212:15, 214:17, 214:20, 214:23, 253:24, 261:7, 276:23, 289:6
**was there** [1] - 250:2
**we'd** [2] - 221:19, 259:16
**we'll** [1] - 211:7
**we're** [7] - 224:3, 227:16, 246:14, 271:19, 272:12, 288:13, 292:10
**we've** [2] - 232:24, 234:15
**week** [1] - 254:20
**weeks** [1] - 262:22
**Westchester** [1] - 209:16
**What is** [11] - 209:15, 225:24, 227:10, 238:13, 255:9, 258:14, 266:8, 270:8, 270:15, 274:14,

278:15
**what was** [6] - 215:4, 229:16, 229:17, 231:22, 237:21, 267:23
**what were** [2] - 243:15, 243:19
**what's** [16] - 218:22, 238:17, 242:22, 245:7, 257:8, 257:20, 260:19, 269:22, 271:10, 272:18, 273:23, 274:8, 279:11, 280:13, 285:5, 288:6
**when did** [1] - 214:8
**when you** [14] - 215:6, 217:25, 219:13, 223:10, 223:21, 224:9, 235:16, 237:24, 251:20, 252:4, 270:10, 271:16, 283:9, 290:8
**where is** [1] - 246:19
**WHEREOF** [1] - 295:19
**Whereupon** [13] - 209:2, 233:16, 236:19, 239:22, 240:4, 245:3, 257:4, 259:13, 267:17, 283:20, 284:25, 288:2, 293:9
**who was** [1] - 266:24
**who's** [2] - 220:25, 273:17
**whole** [1] - 258:11
**why** [23] - 212:7, 216:17, 217:8, 227:7, 239:8, 241:15, 246:15, 248:2, 248:25, 250:5, 263:22, 267:10, 268:19, 268:22, 268:25, 270:21, 270:24, 276:7, 276:10, 277:11, 277:20, 284:11, 287:8
**WILLIS** [2] - 295:7, 295:23
**Willis** [1] - 206:21
**wish** [1] - 226:8
**within** [9] - 208:8, 255:19, 282:6, 291:4, 291:11, 291:13, 291:15, 291:18, 295:8
**without** [1] - 261:5
**WITNESS** [3] - 239:18, 292:14, 295:19
**witness** [7] - 208:10, 208:16, 208:18, 209:7, 293:10, 295:10, 295:13
**wondering** [2] - 222:4, 230:9
**words** [3] - 265:10, 266:2, 289:17
**work** [7] - 220:14, 225:7, 234:17, 243:22, 274:5, 281:24
**worked** [2] - 254:12,

254:20
**works** [1] - 217:24
**worth** [1] - 271:5
**wouldn't** [8] - 217:8, 230:19, 239:14, 239:15, 255:6, 269:15, 269:18, 292:18
**write** [2] - 254:16, 255:21
**writing** [1] - 260:2
**wrong** [1] - 217:25

## Y

**yeah** [14] - 222:25, 225:13, 226:8, 229:25, 230:14, 230:16, 235:23, 253:22, 264:23, 270:13, 272:23, 274:13, 287:16, 287:22
**year** [1] - 236:15
**years** [3] - 225:6, 253:3, 254:13
**yell** [1] - 238:15
**yes** [48] - 210:6, 210:22, 212:19, 214:7, 215:11, 220:6, 223:4, 223:20, 230:8, 232:19, 232:21, 237:4, 239:13, 240:12, 240:16, 241:5, 241:14, 242:24, 245:21, 247:10, 249:7, 250:14, 251:12, 255:20, 257:2, 257:12, 258:24, 259:21, 260:8, 260:15, 261:6, 262:5, 262:11, 263:10, 265:5, 266:13, 270:6, 271:5, 271:15, 273:10, 275:9, 275:18, 278:14, 280:21, 283:8, 286:20, 292:2
**yesterday** [1] - 236:7
**YORK** [2] - 206:2, 295:4
**York** [8] - 206:20, 206:22, 207:6, 207:10, 207:16, 209:8, 209:17, 295:8
**you'd** [8] - 210:21, 235:4, 252:17, 256:3, 257:24, 258:16, 259:16, 269:17
**you've** [4] - 212:10, 279:4, 284:19, 285:18
**yours** [2] - 232:24, 274:23
**yourself** [1] - 292:13