UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

JAMES MORALES,

                            Plaintiff,

           -against-                                    Case No. 1:16-cv-02134-ALC-JLC

KAVULICH & ASSOCIATES, P.C.,
GARY KAVULICH,
ROSEWALL GARDENS ASSOCIATES, LP
f/k/a ROSEWALL GARDENS ASSOCIATES,
and ROSEWALL, INC.

                            Defendants.

-------------------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT [DE 85]**

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ...................................................................................1

II. BACKGROUND ........................................................................................................2

III. STATEMENT OF UNDISPUTED FACTS ................................................................3

   A. No money judgment was entered against Mr. Morales ................................3

   B. Kavulich froze Mr. Morales' bank account based on a
      non-existent judgment........................................................................................4

   C. Kavulich greatly inflated the amount of the judgment by
      failing to credit payments..................................................................................4

   D. Kavulich continued to hold Mr. Morales' money, despite
      Repeated warnings that there was no judgment against
      Mr. Morales.......................................................................................................5

   E. Kavulich does not meaningfully review bank restraints or
      Income executions before issuing them............................................................7

   F. Kavulich's practice is designed to produce information
      subpoenas and bank restraints that greatly inflate the
      amount owed .....................................................................................................8

   G. Kavulich has a pattern and practice of executing on
      non-existent judgments .....................................................................................9

   H. Defendants' misconduct inflicted injury on Mr. Morales...........................10

IV. RULE 56 STANDARD FOR SUMMARY JUDGMENT ..........................................11

V. ARGUMENT.............................................................................................................11

   A. Kavulich violated the FDCPA .....................................................................11

      1. Kavulich admits he violated the FDCPA........................................11

      2. Kavulich violated the FDCPA by misrepresenting the
         existence and amount of a judgment, and in attempting
         to execute on the same .....................................................................12

      3. Kavulich violated the FDCPA by failing to perform a
         meaningful attorney review on the bank restraints and
         other documents ...............................................................................13

   B. Kavulich violated New York's Deceptive Acts and Practices Act,
      GBL § 349, by systematically failing to credit consumers for
      payments on judgments and seeking to collect more money than to
      which it is entitled, and Rosewall is liable for those acts ...........................14

      1. Kavulich violated GBL § 349........................................................14

      2. Kavulich's conduct was "consumer oriented" ................................15

      3. Kavulich's conduct was materially misleading ..............................18

i

       4.   Kavulich's conduct caused injury to Mr. Morales ...........................................19

       5.   Morales has a right to punitive damages under GBL § 349 ...........................20

C.  Kavulich and Rosewall committed conversion when they froze
     Mr. Morales' bank account and caused bank fees to be withdrawn
     when there was no judgment against Morales ................................................................20

D.  Morales is entitled to punitive damages as a matter of law under
     GBL 349 and for conversion.......................................................................................21

E.  The Rosewall Defendants are jointly liable ................................................................23

F.  Rosewall, the principle, is vicariously liable for the GBL § 349
     and conversion violations committed by Kavulich, its agent,
     acting within the course and scope of agency.............................................................24

VI.    CONCLUSION................................................................................................................25

## TABLE OF AUTHORITIES

*Aghaeepour v. N. Leasing Sys., Inc.*, No. 14-CV-5449, 2015 WL 7758894 (S.D.N.Y. Dec. 1, 2015) ........................................................................................................................................16, 18

*Ashare v. Mirkin, Barre, Saltzstein & Gordon, P.C.*, 106 Misc.2d 866, 435 N.Y.S.2d 438 (Sup.Ct., Suffolk County, 1980) ................................................................................................22

*Avila v. Rubin, 84 F.3d 222 (7th Cir. 1996)* .............................................................................14

*Barkley v. Olympia Mortg. Co.*, 557 Fed.Appx. 22 (2d Cir. 2014) ...........................................20

*Chase Manhattan Bank, N.A. v. Perla*, 65 A.D.2d 207 (App.Div.1978)....................................23

*Clients' Sec. Fund of State v. Grandeau*, 72 N.Y.2d 62 (Ct. App. 1988) ...................................25

*Colavito v. New York Organ Donor Network, Inc.*, 827 NYS 2d 96 (Ct. App. 2006) .................21

*Consumer Fin. Prot. Bureau v. Frederick J. Hanna & Associates, P.C.,* 114 F. Supp. 3d 1342 (N.D. Ga. 2015).  ......................................................................................................................14

*Diaz v. Portfolio Recovery Assocs., LLC*, No. 10 CV 3920 MKB CLP, 2012 WL 1882976 (E.D.N.Y. May 24, 2012) ..........................................................................................................14

*First National Bank v. Wall Street Leasing Corp.,* 80 Misc.2d 707 (N.Y. Civ. Ct. 1974)....................

*Fox v. Citicorp Credit Services, Inc.*, 15 F.3d 1507 (9th Cir. 1994) ...........................................13

*Fritz v. Resurgent Capital Servs.*, LP, 955 F. Supp. 2d 163 (E.D.N.Y. 2013) .................13, 17, 20

*Giblin v. Murphy*, 73 N.Y.2d 769(1988) ....................................................................................21

*Gomez v. Resurgent Capital Servs.*, LP, 129 F. Supp. 3d 147 (S.D.N.Y. 2015) ..........................25

*JD & K Assoc., LLC v Selective Ins. Group, Inc.*, 118 AD3d 1402 (4th Dept 2014)...................20

*Johnson v. Home Savers Consulting Corp.*, No. 04–CV–5427, 2007 WL 925518 (E.D.N.Y. March 23, 2007)........................................................................................................................23

*Jordan v. Tucker, Albin and Associates, Inc.*, No. 13-cv-6863(JMA)(SIL), 2017 WL 2223918 (E.D.N.Y. May 19, 2017) ..........................................................................................................17

*Karlin v. IVF America, Inc.*, 93 N.Y.2d 282 (1999) ...................................................................15

*Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940 (2012) ....................................................15

*Lee v. Kucker & Bruh, LLP*, 958 F. Supp. 2d 524 (S.D.N.Y. 2013) ...........................................13

*Link v. Wabash R. Co.*, 370 U.S. 626 (1962)..............................................................................25

*Manekas v. Allied Discount Co.*, 6 Misc. 2d 1079, 166 N.Y.S.2d 366 (Sup. Ct. Kings County 1957) ..........................................................................................................................................22, 23

*Martinez v. LVNV Funding*, LLC, No. 14CV00677RRMST, 2016 WL 5719718 (E.D.N.Y. Sept. 30, 2016) .................................................................................................................................17, 19

*Mateer v. Ross, Suchoff, Egert, Hankin, Maidenbaum & Mazel,P.C.*, No. 96 CIV. 1756 (LAP), 1997 WL 171011 (S.D.N.Y. Apr. 10, 1997).............................................................................13

*Maurizio v. Goldsmith*, 230 F.3d 518 (2d Cir. 2000) ................................................................15

*Mayfield v. Asta Funding, Inc.*, 95 F.Supp.3d 685 (S.D.N.Y. 2015)..............................................18

*Midland Funding, LLC v. Giraldo*, 39 Misc.3d 936, 961 N.Y.S.2d 743 (Dist. Ct. 2013)..............17

*Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292 (2d Cir.2003)...............................................14

*Musah v. Houslanger & Associates, PLLC*, 962 F. Supp. 2d 636 (S.D.N.Y. 2013) .....................14

*Okyere v. Palisades Collection, LLC*, 12 CIV 1453 GWG, 961 F. Supp. 2d 522 (S.D.N.Y. Sept. 16, 2013) ......................................................................................................................................13

*Orlander v. Staples, Inc.*, 802 F.3d 289 (2d Cir. 2015) ................................................................15

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25, 647 N.E.2d 741 (1995)..........................................................................................................16, 20

*Park Ave. Realty, LLC v Schindler El. Corp.*, 129 AD3d 598 (1st Dept 2015)..............................20

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993)..........................25

*Polanco v. NCO Portfolio Mgmt., Inc.*, 132 F. Supp. 3d 567 (S.D.N.Y. 2015) ...........................25

*Ressa Family LLC v. Dorfman*, 193 Misc. 2d 315 (Dist. Ct. 2002) ......................................................

*Rozier v. Fin. Recovery Sys., Inc.*, No. 10-CV-3273 (DLI)(JO), 2011 WL 2295116 (E.D.N.Y. June 7, 2011)..................................................................................................................18, 19

*Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385 (4th Cir. 2014)...................................13

*Samms v. Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, & Wolf, LLP*, 163 F.Supp.3d 109 (S.D.N.Y. 2016)......................................................................................17, 19

*Schaffner v. Pierce*, 75 Misc. 2d 21, 347 N.Y.S.2d 411 (Dist. Ct. Nassau County 1973).............23

*Scott v. Greenberg*, No. 15-CV-05527 (MKB), 2017 WL 1214441 (E.D.N.Y. Mar. 31, 2017)...17

*Security Pac. Mortg. & Real Estate Servs., Inc. v. Herald Ctr., Ltd.*, 891 F.2d 447   (2d Cir.1989) ..........................................................................................................................25

*Sledge v. Kooi*, 564 F.3d 105 (2d Cir. 2009) ...............................................................................11

*Stutman v. Chem. Bank*, 95 N.Y.2d 24 (2000)............................................................................15

*Swegan v. Svenson*, 960 N.Y.S.2d 768 (App. Div. 4th Dep't. 2013) ................................................

*Warner v. Village of Chatham*, 194 A.D.2d 980 (App. Div. 3d Dep't 1993) ...............................22

*Wilner v. Allstate Ins. Co.*, 71 A.D.3d 155 (App. Div, 2nd Dep't 2010).....................................20

## STATUTES

NY R.P.A.P.L. §735...........................................................................................................................3

Fed.R.Civ.P. 56(a) ..........................................................................................................................11

15 U.S.C. § 1692................................................................................................................... *passim*

N.Y. C.P.L.R. 5222-a.......................................................................................................................12

N.Y. G.B.L. § 349.................................................................................................................. *passim*

C.P.L.R. § 5222(a) ....................................................................................................................24

**SECONDARY AUTHORITY**

John M. Leventhal & Thomas A. Dickerson, *Punitive Damages: Public Wrong or Egregious Conduct? A Survey of New York Law*, 76 Alb. L. Rev. 961 (2013) .............................................22

14 *N.Y.Prac.*, *New York Law of Torts* § 2:14 ...............................................................................22

23 *N.Y. Jur. 2d Conversion, Etc.* § 75 ..........................................................................................22

## I.     PRELIMINARY STATEMENT

This case began with an act of charity. In 2006, James Morales ("Mr. Morales") co-signed on an apartment lease for his friend's girlfriend, Clara Potter ("Ms. Potter").  Mr. Morales never lived in the apartment he co-signed for and after co-signing the original lease, he never saw Ms. Potter again and never signed any renewal leases. In 2015, out of nowhere, Mr. Morales had his bank account frozen by Defendant Kavulich and Associates, P.C. based on a restraining notice and execution signed by the law firm's principal, Gary Kavulich (together "Kavulich"). The restraining notice issued by Kavulich stated that Morales owed a judgment in the amount of $4,342.47 from a New York City Housing Court action, *Rosewall Gardens Associates v. James Morales and Clara Potter*, Index No. LT-67049-07/BX (the "LT Action"). But this was not true. No judgment had ever been issued against Mr. Morales and most, if not all, of the judgment amount had already been collected from Ms. Potter, the actual judgment debtor. Moreover, Mr. Morales had not signed the renewal lease that covered the time period relevant to the judgment and did not owe any money. In other words, Kavulich froze Mr. Morales' bank account based on a judgment that never existed and sought thousands of dollars that Kavulich was not entitled to and that had already been paid.

Kavulich's misconduct towards Mr. Morales is not unique: it is engrained in Kavulich's business model. From 2007 through 2015, Kavulich's computer system automatically sent out information subpoenas that listed the full amount of the judgment as the amount due without crediting the debtor for any payments received. Kavulich was aware of this issue but chose not to correct the computer system because, he says, it would have been too expensive. This means that every restraining notice Kavulich sent over this nine-year period failed to credit any money paid toward the judgment and likely resulted in the collection of thousands of additional dollars

debtors did not owe. Along those same lines, the discovery process has revealed that Kavulich repeatedly collected on or continued to enforce judgments that were either vacated or non-existent. For example, thus far, Plaintiff has identified 7 other cases in which Kavulich enforced on a non-existent judgment and 17 cases in which Kavulich held money after a judgment was vacated, when it had no right to do so. Put simply, the actions of Kavulich are not just one-off mistakes, they are part and parcel of its business model and have allowed Kavulich to collect or improperly restrain thousands of dollars in unowed money from consumers.

Mr. Morales' Amended Complaint alleges that the acts of Kavulich violate the Fair Debt Collection Practices Act, the acts of Kavulich and Rosewall constitute conversion and that Kavulich violated New York's deceptive acts and practices act, General Business Law § 349. In large part Kavulich and Rosewall agree. Kavulich admits it is liable for violating numerous sections of the FDCPA and that Kavulich and Rosewall committed conversion. The only remaining issues are whether the repeated enforcement of non-existent judgments is willful or egregious, allowing a jury question on the issue of punitive damages, and whether Kavulich and Rosewall's actions, including systematically misrepresenting how much money is owed on information subpoenas and account restraints, violate GBL § 349.

## II.    BACKGROUND

In New York City, if a landlord is owed rent and the tenant is still living in the apartment, the lawsuit to recover that money is typically filed in Housing Court, where the landlord can get a judgment for possession of the apartment – termed a possessory judgment – and, potentially, a money judgment. If a tenant is no longer living in the apartment, the Housing Court lacks jurisdiction and an action for back rent must be brought in Civil Court. *First National Bank v. Wall Street Leasing Corp.,* 80 Misc.2d 707 (N.Y. Civ. Ct. 1974) New York City Housing Court actions

are summary proceedings and are governed by unique procedural rules. For instance, the rules with respect to service of process are more relaxed than those in the C.P.L.R., but this relaxation comes with a price, as using this less strict form of service will not allow a petitioner to obtain a money judgment if the respondent fails to appear. R.P.A.P.L. §735; *Ressa Family LLC v. Dorfman*, 193 Misc. 2d 315 (Dist. Ct. 2002)

### III.    STATEMENT OF UNDISPUTED FACTS

The following facts correspond to Plaintiff's Local Rule 56.1 Statement ("Pl. 56.1"), based on exhibits attached to the corresponding August 18, 2017 Declaration of Melissa Koven ("Koven Decl."). Both documents are filed in support of Plaintiff's motion for summary judgment.

#### A.    No money judgment was entered against Mr. Morales.

Mr. Morales is a low income New Yorker who, at the time of Kavulich's violations, was barely making ends meet by working as a mover. ¶ 134-135. In 2006, Mr. Morales was trying to assist a friend by helping his girlfriend, Ms. Potter, secure an apartment. ¶ 12. Mr. Morales co-signed on a lease with Ms. Potter for 2300 Sedgwick Avenue, Apartment 4K, Bronx, New York 10468 ("2300 Sedgwick"). Mr. Morales does not believe he ever saw Ms. Potter after signing the lease and did not co-sign any renewal leases. ¶ 12-14.

On October 5, 2007, Rosewall filed a petition in Bronx Housing Court captioned *Rosewall Gardens Associates v. James Morales and Clara Potter*, Index No. LT-67049-07/BX (the "LT Action"). ¶ 15. The petition alleged Ms. Potter and Mr. Morales had defaulted on the rental agreement for 2300 Sedgwick and owed Rosewall back rent in the amount of $2,550.00. ¶ 16. Mr. Morales was allegedly served at 2300 Sedgwick. ¶ 17. However, Mr. Morales never lived at 2300 Sedgwick and did not receive notice of the LT Action. ¶ 18.

Mr. Morales did not know about any litigation concerning the lease until 2015, when

Kavulich froze his bank account pursuant to an alleged Housing Court judgment. ¶ 32. But, as discussed above, Kavulich never had a judgment against Mr. Morales. ¶ 30. Because Mr. Morales did not receive service of the lawsuit, he did not appear in the LT Action. ¶ 19-21. And because he was served via conspicuous service, under the Real Property and Procedure Law, it was not possible for Rosewall to obtain a money judgment against him. R.P.A.P.L. § 735; *Ressa Family, LLC v. Dorfman*, 193 Misc. 2d 315 (Dist. Ct. 2002). Indeed, no money judgment was entered against him; the Housing Court file shows the judgment against Morales is for possession of the apartment and a money judgment in the amount of zero dollars. ¶ 30-31. The only money judgment was against Ms. Potter, the tenant and sole signatory to the renewal lease that covered the time period relevant to the judgment. ¶ 26-28. In other words, Mr. Morales also did not owe Rosewall any money. ¶ 27-28. The stipulation signed by Ms. Potter and the judgment against Ms. Potter were based on a renewal lease that Mr. Morales did not sign and was not responsible for. ¶ 27-28. Ms. Potter had already paid Rosewall for all the monies owed under the lease Mr. Morales co-signed on. ¶ 23-26

**B.   Kavulich froze Mr. Morales' bank account based on a non-existent judgment.**

In March of 2015, Kavulich sought to collect on the non-existent judgment in the LT Action by signing and later issuing an Information Subpoena and Restraining Notice ("Restraining Notice") on TD Bank, where Mr. Morales had accounts. ¶ 44. On or about April 16, 2015, in response to the executions of Kavulich, TD Bank froze Mr. Morales' bank accounts. ¶ 72. TD charged Mr. Morales a $125 bank fee levy fee as a result of the restraint, and transferred $1,081.19 from his account to pay the non-existent judgment. ¶ 74. Prior to these deductions, there was $1,486.32 in Mr. Morales' savings account.

**C.   Kavulich greatly inflated the amount of the judgment by failing to credit payments.**

The Restraining Notice cited the index number for the LT Action and incorrectly alleged

that a judgment had been entered against Mr. Morales and that the full judgment amount of $4,352.74 plus interest was still due. ¶ 45-46. Documents produced in this case by Kavulich, Rosewall, and the marshal who had been executing on the putative judgment disclosed that Kavulich had already collected most, if not all, of the judgment from Clara Potter, the co-Defendant in the LT Action and the only judgment debtor for the case. ¶ 47. In fact, the ledger from Rosewall appears to show that Ms. Potter had actually been garnished for more that the amount of the judgment, leaving a balance of $-402.66. ¶ 49-53. Mr. Morales did not know and could not have reasonably known that the judgment had been paid off in whole or in part by Ms. Potter. ¶ 54.

On or about April 27, 2015, Kavulich issued an Execution With Notice to Garnishee to TD Bank ("the Execution"). ¶ 59. As with the restraining notice, the Execution falsely represented that a judgment had been entered against Mr. Morales. ¶ 58. Oddly, the Execution represented that zero dollars was due on the judgment. ¶ 59. Kavulich admits to making a mistake in signing and sending the Execution to TD Bank. ¶ 60. On or about April 27, 2015, New York City Marshal Stephen W. Biegel ("the Marshal") issued a Levy and Demand on TD Bank seeking to collect $7,595.73, an amount of principal and interest consistent with the amounts Kavulich listed in his Restraining Notice, plus additional fees. ¶ 61. Kavulich admits that he did not perform a meaningful attorney review prior to signing and serving the Restraining Notice and Execution. ¶ 67.

**D.  Kavulich continued to hold Mr. Morales' money, despite repeated warnings that there was no judgment against Mr. Morales.**

Mr. Morales was devastated when his account was frozen. ¶ 130-146. Upon learning that his bank account was frozen, Mr. Morales promptly went to the bank in an attempt to find out what was going on. ¶ 73. Confused, Mr. Morales went to the Civil Legal Advice Resources Office ("CLARO"), a free legal services program that provides help to New Yorkers with consumer law issues. ¶ 77. With CLARO's assistance, Mr. Morales requested the Housing Court file, which was

in archives and did not arrive until weeks later. ¶ 102-103. Mr. Morales learned that Kavulich had also sued him and Ms. Potter in civil court (the "CC Action") for money allegedly due pursuant to the lease, but that Kavulich never took action in the case. ¶¶ 33-35.

With CLARO's help, Mr. Morales filed an exemption claim form, a form that allows New Yorkers with restrained accounts to alert banks that money in their account is exempt. ¶¶ 78, 82. Mr. Morales had exempt funds because his account contained wages earned in the last 60 days, 90% of which are exempt. Desperate, Mr. Morales kept going back to CLARO, where one of the volunteer attorneys called Kavulich directly on April 30, 2015. ¶¶ 79-81. The CLARO attorney told a Kavulich employee there was no judgment against Mr. Morales but the Kavulich employee ignored the attorney's dispute because he contends the attorney was referencing the CC Action. ¶¶ 80-81.

In response to Mr. Morales' exemption claim form, Kavulich filed a motion (the "Objection") challenging Mr. Morales' assertion that the money in his account was partially exempt as wages. ¶ 86. Kavulich's Objection affirmed certain facts "under the penalty of perjury" and sought to challenge a claim exemption for a non-existent judgment. ¶¶ 87-88. The Objection contends it attaches as Exhibit 1 a copy of a putative March 13, 2008 money judgment against Mr. Morales. ¶ 89. However, Defendants admit that the document attached to Kavulich's motion is not a judgment, but rather the March 13, 2008 stipulation signed by Ms. Potter. ¶ 90. Kavulich also swears in the Objection that no monies had been received since December 28, 2011, and further states that Ms. Potter had been previously garnished, but there was still a balance remaining of $1,811.08. ¶ 92. Yet, in its Restraining Notice, Kavulich did not disclose that most of the judgment was satisfied, and instead falsely stated that $4,353.74 remained due. ¶ 94.

While the motion was pending, on May 7, a CLARO attorney again called Kavulich to alert them that there was no judgment against Mr. Morales. ¶¶ 97-98. Because the attorney purportedly

only referenced the index number for the CC Action, the Kavulich employee again said the attorney was wrong and refused to investigate the legitimacy of the judgment. ¶ 98.

When the Housing Court file finally arrived from archives, Mr. Morales was frustrated and confused by the paperwork. ¶ 103. Mr. Morales again went to CLARO in early July 2015, and CLARO approached Community Development Project ("CDP") at the Urban Justice Center and asked if CDP was able to take Mr. Morales' case. ¶ 104-105.

After a review of the file in the CC Action, on or about July 17, 2015, Mr. Morales sent a letter to Kavulich demanding that they immediately release the unlawful restraint of his bank account. ¶ 108. It was not until around the end of July 2015 that Mr. Morales learned his bank account was unfrozen. ¶ 109. Kavulich never returned to Mr. Morales the processing charge assessed by TD Bank as a result of the bank restraint. ¶ 110.

**E.    Kavulich does not meaningfully review bank restraints or income executions before issuing them.**

Kavulich specializes in Civil Court rental arrears cases filed after the tenant is out of the apartment and in the enforcement of money judgments obtained in Housing Court. ¶ 4. Kavulich has approximately 5,000 judgments and at any one time, is actively collecting on approximately 500 of them. ¶ 5. To this end, Kavulich signs an average of 80 information subpoenas and 15 income executions per week, and files an average of 20 collection lawsuits per week. ¶ 6-8. This process involves a Kavulich employee printing out a stack of documents, such as bank restraints, information subpoenas, and income executions. ¶ 9. Kavulich does not review the information in the documents, but instead just mechanically signs what is in front of him. ¶ 10.

Kavulich admits he failed to perform a meaningful review of this case before restraining Mr. Morales' bank account. ¶ 111. Had Kavulich performed a meaningful review, he would have known

there was no judgment against Mr. Morales and that Kavulich had already collected most, if not all, of the judgment from Ms. Potter. ¶ 112.

**F.   Kavulich's practice is designed to produce information subpoenas and bank restraints that greatly inflate the amount owed.**

The misrepresentation as to the amount due on the judgment is also not unique to this case. ¶ 113. From 2007 through 2015, whenever there was an execution involved in any of its cases, Kavulich did not keep track of the amount that was still owed on a judgment. ¶ 114. For example, Kavulich did not know the actual amount due on the judgment on the date he signed the information subpoena with restraining notice against Mr. Morales on March 18, 2015. ¶ 115. Kavulich indicated that although the amount collected was greater than the judgment amount, he did not think the judgment was paid in full due to interest that had accrued, but that he would have to ask the marshal for the exact amount still owed. ¶ 116.

This is representative of Kavulich's general practice. After doing a property execution or income execution, Kavulich relied on the marshal to keep track of the payments made and the interest accruing and to inform Kavulich of when a judgment was satisfied. ¶ 117. If a consumer calls and asks how much they owe, Kavulich would need to check with the marshal and call the consumer back. ¶ 118. However, Kavulich has used at least three different marshals since 2007. ¶ 119. Kavulich admits that if, as here, Kavulich used more than one marshal for one case and did not itself keep track of the amount currently due, then the two marshals could both attempt to collect the full judgment amount, essentially doubling the amount to which Kavulich is entitled. ¶ 120. There have been multiple prior instances where one putative judgment account was sent to more than one marshal or there was confusion as to which marshal was collecting. ¶ 121-124.

From 2007 through 2015, when issuing information subpoenas, Kavulich's computer system automatically entered the amount due as the full judgment amount without crediting the

debtor for any payments already received. ¶ 125. As a result, as was the case here, both the bank and the consumer were misinformed as to the amount due and the bank was instructed to restrain more than the amount to which Kavulich was entitled. ¶ 126. Kavulich was aware of this fault in his document processing system and knew that the computer-generated amount entered on information subpoenas would not reflect any payments already made on the judgment. ¶ 127. Kavulich chose not to correct this flaw in his computer system because he would have had to pay someone to set up software to keep track of the balance, and he did not want to pay the cost of doing so. ¶ 128. In other words, Kavulich made the conscious decision that he would save more money issuing restraints and executions falsely stating that the full amount of the judgment (and interest) was due than to have his office keep track of all of the payments and the balance. ¶ 129.

### G.   Kavulich has a pattern and practice of executing on non-existent judgments.

This is not the first FDCPA action against Kavulich for intentionally executing on a non-existent judgment. ¶151-152. In *Ormsby v. Kavulich*, Case No. 1:10-cv-03400-SJ-JO, EDNY ¶ 20, the complaint alleged that the "defendants violated the FDCPA in seeking to collect on a non-existent judgment against plaintiff for a debt plaintiff has never owed." ¶ 153. Kavulich systemically executes or seeks to execute on non-existent or vacated judgments. A partial review of court files[1] reveals seven instances in which Kavulich enforced non-existent money judgments. ¶¶ 155-192. In seventeen other cases, Kavulich enforced judgments that had already been vacated, sometimes holding on to defendants' money for up to one year after the judgment had been vacated. ¶¶ 193-302. In *Gasparro*, Kavulich directed the marshal to hold the money pending a court date four months away, despite the fact that the judgment had already been vacated. ¶¶ 224-236. Even

---

1 Because of the delay in retrieving court files from civil and housing court, Plaintiff's counsel has not reviewed all potentially-relevant cases in advance of filing this motion for summary judgment and the cases referenced herein represent only the cases identified thus far. *See* Koven Decl. ¶ 69.

after the court date passed, Kavulich again directed the marshal to hold the money while it moved to reinstate the judgment. As of more than one year after the judgment was vacated, Kavulich still had not instructed the marshal to return the money.

In *Rauda-Rodriguez*, Kavulich expressly instructed the Marshal to withhold funds pending final disposition, even though the judgment had already been vacated. A year and a half after the judgment had been vacated, Kavulich still had not directed the marshal to release the improperly held funds. ¶ 192-197. In *Semakula*, a judgment was entered against one of the Defendants, but the case against another Defendant, George, was discontinued. However, Kavulich issued a property execution against George, even though there was never a judgment against him. ¶ 170-173. And identical to the case here, in *Soto*, *Gonzales*, and *Grandison*, Kavulich enforced $0.00 money judgments. ¶¶ 181–192.

**H.  Defendants' misconduct inflicted injury on Mr. Morales.**

Defendants' actions turned Mr. Morales' life upside down. ¶ 130. Mr. Morales' blood pressure skyrocketed due to the stress of the bank restraint. ¶ 131. The Defendants' conduct caused Mr. Morales to sustain actual damages including monies improperly frozen, bank fees, out-of-pocket expenses to investigate his case and the loss of countless days of work shuffling back and forth to CLARO, Civil and Housing Courts, TD Bank, and meetings and consultations with attorneys. ¶ 132. Defendants' conduct also caused Mr. Morales to experience severe emotional and mental pain and anguish, embarrassment and humiliation. ¶ 133. Mr. Morales had been saving money in his savings account to visit his parents in Puerto Rico, whom he had not seen since 1990. ¶ 137. When his account was frozen, he was unable to buy a plane ticket. ¶ 138. Mr. Morales often could not sleep and he felt extremely stressed. ¶ 141. Although Mr. Morales was ultimately able to get all of his funds returned, minus fees incurred, it has taken him significant time to get his life

back together and get back on track with his bills and various other commitments. ¶ 146.

## IV.   RULE 56 STANDARD FOR SUMMARY JUDGMENT

"Summary judgment is warranted when, after construing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor, there is no genuine issue as to any material fact." *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009); *see* Fed.R.Civ.P. 56(a).

## V.   ARGUMENT

### A.   Kavulich violated the FDCPA.

#### 1.   Kavulich admits he violated the FDCPA.

Kavulich admits he is a debt collector, it was attempting to collect a debt, Mr. Morales is a consumer, and its actions were taken in connection with an attempt to collect a debt as defined by the FDCPA. ¶¶ 147-148. Kavulich admits that he violated the FDCPA, specifically sections 1692e, 1692e(2)(A), 1692e(5), 1692f(1), by enforcing a judgment that did not exist and continuing to enforce the judgment in the face of notice that it was improper. ¶ 148.

#### 2.   Kavulich violated the FDCPA by misrepresenting the existence and amount of a judgment, and in attempting to execute on the same.

Kavulich communicated to Mr. Morales in two ways that he had an enforceable judgment against Mr. Morales. Most powerfully and directly, Kavulich communicated the representation by freezing Mr. Morales' bank account, preventing him from accessing his money. 15 U.S.C. § 1692a(2). (Defining "communication" as "the conveying of information regarding a debt directly *or indirectly* to any person t*hrough any medium.*") (emphasis added).  Second, Kavulich served the Restraint on the bank and the Execution on the marshal knowing and intending those documents would be forwarded to Morales, ¶ 64, as required by N.Y. C.P.L.R. 5222-a and 5232, respectively.

11

Kavulich violated the FDCPA by seeking to collect on a non-existent judgment. Restraining a bank account based on a vacated judgment "would certainly fall within the scope of the FDCPA's prohibitions." *Mateer v. Ross, Suchoff, Egert, Hankin, Maidenbaum & Mazel, . P.C.*, No. 96 CIV. 1756 (LAP), 1997 WL 171011, at *4 (S.D.N.Y. Apr. 10, 1997); *see also Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 395 (4th Cir. 2014) (collecting on a satisfied debt misrepresents character and status of debt in violation of 1692e(2).

Kavulich violated the FDCPA not only by making "representations" that were false, deceptive, or misleading, but also used "means" that were false, deceptive, or misleading, as well as unconscionable. Congress drafted three provisions of the FDCPA prohibit certain debt collection *means*, not just debt collector *representations*.[2] Therefore, Kavulich's *conduct* in seeking to execute on a non-existent judgment, in grossly inflating the amount of the judgment, and (as discussed below) executing Restraints and Executions without performing a reasonable attorney review also violates the FDCPA. *See Dina v. Cuda & Assocs.*, 950 F. Supp. 2d 396 (D. Conn. 2013) ("Cuda not only sent a misleading communication: it used a "deceptive means" to collect a debt from Dina" by sending an invalid execution to his bank.).

In addition to executing on a non-existent judgment, Kavulich also violated the FDCPA by grossly inflating the amount of the judgment, which may have been satisfied in whole or in part by Ms. Potter, the actual judgment debtor. Debt collectors cannot lie to people about how much money they owe. A least sophisticated or even reasonable consumer, faced with a putative debt of $7,595.73 (as stated in the marshal's Levy and Demand) will believe that they owe $7,595.73 and pay it, or in this case, have it taken from them. The actual remaining amount of the judgment, given the payments by Ms. Potter, is **negative** $402.66 (that is, an overpayment) according to Rosewall's ledger, $2,004.44 (with $4,321.30 having been paid) according to

Marshal Moses, or an unknown balance according to Kavulich's records (with $4,505.47 having been collected). Misrepresenting the amount of a putative debt violates the FDCPA. *See e.g. Lee v. Kucker & Bruh, LLP*, 958 F. Supp. 2d 524, 529 (S.D.N.Y. 2013) (Eviction lawsuit contending tenant was delinquent for rent when he was current violates 1692e(2)(A)); *Fritz v. Resurgent Capital Servs.*, LP, 955 F. Supp. 2d 163, 171–72 (E.D.N.Y. 2013).

Kavulich used unfair or unconscionable means by restraining and attempting to levy a bank account based on a non-existent judgment. Undertaking judgment enforcement without the right to is a straightforward violation of 1692f, the FDCPA's prohibition on unfair and unconscionable acts. *Fox v. Citicorp Credit Services, Inc.*, 15 F.3d 1507, 1517 (9th Cir. 1994) (filing application for writ of garnishment when consumer was current on payments states a 1692f claim); *Okyere v. Palisades Collection, LLC*, 12 CIV. 1453 GWG, 961 F. Supp. 2d 522, 531 (S.D.N.Y. Sept. 16, 2013). Taking money from Mr. Morales without the legal right to was unfair in the same way that stealing or other illegal deprivations of property are unfair.

### 3.   Kavulich violated the FDCPA by failing to perform a meaningful attorney review of the bank restraint and other documents.

Kavulich testified that generally he does not review any of the documents he signs: his (non-attorney) staff prints out the documents and he blindly signs them. This is the very epitome of an attorney failing to perform a meaningful (indeed any) review of the facts and circumstances of a consumer's account before affixing his name to a document in connection with the collection of a debt. Filing or serving of legal papers, including post-judgment collection papers, without meaningful attorney review violates the FDCPA. *Diaz v. Portfolio Recovery Assocs., LLC*, 2012 WL 1882976, at *5 (E.D.N.Y. May 24, 2012) An "attorney's examination of the case file was adequate to permit determination of "whether [the debtor] was or was not obligated to

pay the debt…" *Musah v. Houslanger & Associates, PLLC*, 962 F. Supp. 2d 636, 640–41 (S.D.N.Y. 2013). *Id*. at 640, 641 *quoting Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 301 (2d Cir.2003). "The least sophisticated consumer is likely to believe when served with a debt collection complaint that a lawyer has reviewed his account and determined that the creditor has a valid claim." *Consumer Fin. Prot. Bureau v. Frederick J. Hanna & Associates, P.C.,* 114 F. Supp. 3d 1342, 1365 (N.D. Ga. 2015). "The least sophisticated consumer—who generally lacks legal counsel—may decide not to raise a defense, wrongly assuming that "a real lawyer, acting like a lawyer usually acts" has apparently "made a considered, professional judgment that the debtor . . . is a candidate for legal action." *Avila v. Rubin*, 84 F.3d 222, 229 (7th Cir. 1996). The deception could lead the least sophisticated consumer to abandon valid defenses and pay invalid claim. The harm to Mr. Morales by the lack of review is even greater than in those examples because here the collection papers have the ability to take Mr. Morales' money without any action on his part. For this reason, the lack of review in this case is even more insidious; it does not just intimate consumers but it active causes their property to be taken from them.

**B. Kavulich violated New York's Deceptive Acts and Practices Act, GBL § 349, by systematically failing to credit consumers for payments on judgment and seeking to collect more money than to which it is entitled, and Rosewall is liable for those acts.**

**1. Kavulich violated GBL 349.**

N.Y. G.B.L. § 349 ("GBL 349") is a broadly protective consumer protection measure that bars "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service," and provides a cause of action for violations. *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 28 (2000). The statute applies to "virtually all economic activity" and its "application has been correspondingly broad." *Karlin v. IVF America, Inc.*, 93 N.Y.2d 282, 290 (1999). To assert a claim under GBL 349, "a plaintiff must allege that a defendant has engaged

in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc., 802 F.3d 289, 300* (2d Cir. 2015) *(citing Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940 (2012)); *see Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000).

Kavulich violated GBL 349 by 1) enforcing non-existent judgments, 2) sending out Restraints and Executions that systematically fail to credit money paid on those judgments, and 3) falsely implying he had performed a meaningful review in signing and serving the Restraint and Execution. These deceptive practices result in bank restraints, levies, and garnishments for moneys consumers are not liable for in any amount, or for amounts far greater than actually owed. Rosewall, the principal, is vicariously liable for the GBL 349 violations committed on its behalf by Kavulich, its agent, acting within the course and scope of his agency.

### 2.   Kavulich's conduct was "consumer-oriented."

In order to meet the GBL 349 requirement that the materially misleading conduct be consumer-oriented, the plaintiff must demonstrate "that the acts or practices have a broader impact on consumers at large," but the statute does "not require a repetition or pattern of deceptive behavior." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25, 647 N.E.2d 741 (1995). The test is whether the actions complained of "**potentially** affect similarly situated consumers." *Oswego*, 85 N.Y.2d at 26–27 (emphasis added). *See Aghaeepour v. N. Leasing Sys., Inc.*, No. 14-CV-5449, 2015 WL 7758894, at *14 (S.D.N.Y. Dec. 1, 2015) (noting the requirement has been broadly construed).

Kavulich's conduct is consumer-oriented and affects consumers broadly because it is a part of Kavulich's debt collection business to execute and issue inaccurate information subpoenas and restraints. *See* Statement of Undisputed Facts §§ C - E.   Kavulich has

15

approximately 5,000 judgments and collects on approximately 500 of them at any one time. On average, Kavulich signs 80 information subpoenas and 15 income executions each week. The information subpoena and restraining notice against Mr. Morales – in addition to inaccurately stating that there was a judgment against him – also stated that the full judgment was still due, despite the fact that Ms. Potter had already paid all or most of the judgment. This was not unique to Mr. Morales. In fact, Kavulich admits that from 2007 through 2015, when issuing information subpoenas, Kavulich's computer system automatically entered the amount due as the full judgment amount without crediting the debtor for any payments already received. Kavulich was aware of this fault in his document processing system and knew that the computer-generated amount entered on information subpoenas would not reflect any payments already made on the judgment.

Kavulich chose not to correct his computer system to accurately calculate and credit consumers for the amount already paid because he would have to pay someone to set up the software to keep track of the balance and he did not want to pay the cost of doing so. As a result, the bank and the consumer were misinformed as to the amount due and the bank was instructed to restrain more than the amount to which Kavulich was entitled.

Because Kavulich's misconduct is part of his standard business practice, it is consumer oriented. For example, in *Fritz v. Resurgent Capital Services., LP* the court concluded that the defendants' deceptive practices had a broad impact on consumers at large because the defendant's practices were a normal part of its business, which involved hundreds of thousands of dollars in consumer debt. 955 F.Supp.2d 163, 173–74 (E.D.N.Y. 2013). Along the same lines, the court in *Jordan v. Tucker, Albin and Associates*, *Inc.* adopted the *Fritz* analysis, holding that debt collection practices that are part of an entity's business practices are consumer oriented and

could have a broad impact on consumers at large. No. 13-cv-6863(JMA)(SIL), 2017 WL 2223918, at *8 (E.D.N.Y. May 19, 2017) (internal quotations omitted). *See also Martinez v. LVNV Funding*, LLC, No. 14CV00677RRMST, 2016 WL 5719718, at *1 fn. 2 (E.D.N.Y. Sept. 30, 2016) (systematically collecting on vacated judgments is consumer oriented).

Numerous other debt collection violations have been deemed consumer oriented and sufficient to state a valid GBL 349 claim: the routine filing of lawsuits despite lacking crucial and admissible information or sufficiently inquiring into whether their claims had any merit, regularly including a request for attorney's fees in collection lawsuits where there is no contract expressly authorizing the award of attorney's fees, and the repeated filing of fraudulent debt collection lawsuits have all satisfied the consumer-oriented requirement of GBL 349. *See Midland Funding, LLC v. Giraldo*, 39 Misc.3d 936, 961 N.Y.S.2d 743, 752 (Dist. Ct. 2013); *Samms v. Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, & Wolf, LLP*, 163 F.Supp.3d 109, 115 (S.D.N.Y. 2016) (noting that defendant filed approximately 147 collection lawsuits demanding attorney's fees where no fees were permitted by contract or law); *Scott v. Greenberg*, No. 15-CV-05527 (MKB), 2017 WL 1214441, at *16 (E.D.N.Y. Mar. 31, 2017) ("Greenberg's failure to serve Plaintiff, the subsequent misrepresentation about her obligation to appear in court and the pursuit of default judgment reflect the type of generic misconduct likely to affect future consumers whose debts Greenberg seeks to collect."); *Aghaeepour v. N. Leasing Sys., Inc.*, 14 CV 5449 (NSR), 2015 WL 7758894, at *15 (S.D.N.Y. Dec. 1, 2015); *Mayfield v. Asta Funding, Inc.*, 95 F.Supp.3d 685, 700 (S.D.N.Y. 2015).

Kavulich admits it is engaging in consumer debt collection and that, as part of its business practice, it employs a computer system that fails to credit consumers with money paid towards their judgments. This wrongdoing is not unique to Mr. Morales; every information subpoena is issued in

17

the same manner and without regard to any money already paid. As a result, Kavulich's conduct has a broad impact on consumers at large and is consumer oriented.

### 3.    Kavulich's conduct was materially misleading.

Mr. Kavulich's conduct was "deceptive or misleading" conduct for the same reasons it violates the FDCPA. The courts determine whether an act was materially misleading by using an objective standard that considers whether the act would likely mislead a reasonable consumer acting reasonably under the circumstances. *Rozier v. Fin. Recovery Sys., Inc.*, No. 10-CV-3273 (DLI)(JO), 2011 WL 2295116, at *3 (E.D.N.Y. June 7, 2011) (quotations omitted); *see also Koch v. Greenberg*, 626 Fed.Appx. 335, 340 (2d Cir. 2015). GBL 349 does not require the plaintiff to show that the plaintiff relied on the deception. *Fritz,* 955 F.Supp.2d at 174.

Kavulich is not only representing to consumers that they owe money they do not, but then it is enforcing on this incorrect amount and freezing bank accounts and taking money.  This is misleading and GBL 349 case law concerning debt collection activity has found conduct similar to Kavulich's meets the materially misleading requirement. In *Rozier v. Financial Recovery Systems, Inc*., the court held that collection letter stating the consumer owed a certain amount but that interest and fees may or may not accrue was likely to mislead a reasonable consumer because it would cause the consumer to be unclear about the amount of the debt and whether the consumer would incur additional charges. No. 10-CV-3273 (DLI)(JO), 2011 WL 2295116, at *5 (E.D.N.Y. June 7, 2011). And in *Samms*, the court held the defendant's acts were materially misleading because a reasonable consumer reading the complaint would likely be misled into thinking there was some basis for the demand for attorney's fees, which in turn could coerce a reasonable consumer into paying the debt. 163 F.Supp.3d at 115. In *Martinez, supra* at * 3, the court stated that the practice of issuing collection notices in an attempt to collect on vacated

judgments is deceptive on its face. 14-CV-00677 (RRM) (ST), 2016 WL 5719718 at *3 (E.D.N.Y. Sept. 30, 2016). Specifically, the court noted that a reasonable consumer reading this type of collection notice would likely be misled into believing that there was a valid judgment, which in turn could coerce a reasonable consumer to pay the judgment. *Id.*

Kavulich's act of sending information subpoenas and restraints that did not accurately reflect the amount that was due on a judgment is deceptive on its face. After receiving a copy of the information subpoena or notice of the restraint, a reasonable consumer would likely be misled into believing that the amount stated as owed on these documents was accurate and this could coerce a reasonable consumer to pay the alleged debt. This is particularly true in scenarios such as Mr. Morales', where one defendant has no knowledge and no reason to know of any monies already paid by or collected from a co-defendant.

**4.    Kavulich's conduct caused injury to Mr. Morales.**

While an individual asserting a GBL 349 claim must allege that the materially misleading act caused actual injury. The individual does not need to claim that the act caused pecuniary harm and claims of emotional distress are sufficient.. *Rozier supra* at *3   (holding alleged damages associated with humiliation, anger, anxiety, emotional distress, fear frustration, and embarrassment sufficient to meet injury element). Here, Mr. Morales suffered substantial emotional distress damages. *See* Statement of Undisputed Facts § H.  Mr. Morales also suffered substantial financial injury of being unable to access his full bank account, paying bank fees for the restraint, and spending time and paying expenses in attempting to fight the wrongful bank restraint. *Id. See Oswego Laborers' Local 214 Pension Fund supra at* 26 (individual asserting a GBL 349 claim must allege actual injury and need not claim pecuniary harm); *Fritz, supra* at 174 (alleged damages included time spent and costs incurred to defend against meritless collection

lawsuit that should not have been filed constitutes injury).

      **5.**    **Morales has a right to punitive damages under GBL 349.**

   "[P]unitive damages may be awarded for a violation of GBL § 349." *Barkley v. Olympia Mortg. Co.*, 557 Fed.Appx. 22, note 1 (2d Cir. 2014), *as amended* (Jan. 30, 2014), (*citing Wilner v. Allstate Ins. Co.*, 71 A.D.3d 155, 167 (App. Div, 2nd Dep't 2010).. Accord *JD & K Assoc., LLC v Selective Ins. Group, Inc.*, 118 AD3d 1402, 1403–04 [4th Dept 2014], and *Park Ave. Realty, LLC v Schindler El. Corp.*, 129 AD3d 598, 598–99 [1st Dept 2015].   A plaintiff may recover punitive damages where the defendant's violation of GBL § 349 "evidences a high degree of moral culpability, or where the conduct is so flagrant as to transcend mere carelessness, or where the conduct constitutes willful or wanton negligence or recklessness." *Wilner*, 71 A.D.3d at 167 (internal quotations omitted). In *Wilner*, the court held the defendant's intentional failure to reach a timely decision on an insurance claim, in violation of GBL 349, could support the imposition of punitive damages because a jury could determine that the defendant's conduct was "so flagrant as to transcend mere carelessness." *Id.*   Morales is entitled to punitive damages under GBL 349 as a matter of law for the reasons stated in § E, below.

    Mr. Kavulich knew of the flaw in his computer system. He knew his execution documents did not credit consumers for any payments already made on the judgments. And he knew that by issuing these documents with the incorrect amount due, he was seeking to collect more than the amount to which he was entitled. Despite this knowledge, Kavulich did absolutely nothing to address this problem. He could have manually calculated the amount owed, he could have contacted the marshals to find out the amount still due, or he could have paid to update his computer system to calculate the amount for him. Instead, he chose to do nothing. Kavulich's misconduct is so extreme that it transcends mere carelessness and rises to the level of willful or

wanton negligence or recklessness. As a result, this Court should hold Mr. Morales is entitled to punitive damages as a matter of law, with the jury to decide the amount, if any, of punitive damages.

### C. Defendants committed conversion when they froze Morales' bank account and caused bank fees to be withdrawn when there was no judgment against Morales.

A person commits the tort of conversion when she "intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. New York Organ Donor Network, Inc.*, 827 NYS 2d 96, 100 (Ct. App. 2006). A plaintiff claiming conversion must establish a) her legal ownership of a specific, identifiable piece of property, and b) the defendant's interference with her property interest in defiance of her rights. *Id.* Kavulich and Rosewall admit in their answers that they committed conversion. ¶¶ 149-150. Specifically they admit that funds in Mr. Morales' account were readily identifiable property, that they intentionally and without authority assumed and exercised control over Mr. Morales' money, interfering with his right to possession of that money by a) having his account restrained and b) causing money to be withdrawn for garnishment and bank fees, and that their improper restraint of Mr. Morales' money harmfully interfered with his right to control his property, constituting conversion. ¶¶ 149-150. Rosewall, the principal, is vicariously liable for the conversion committed on its behalf by Kavulich, its agent acting within the course and scope of his agency. In their answer, Defendants seem to concede joint and several liability for conversion by all admitting they committed conversion.

### 1.    Morales is entitled to punitive damages for conversion.

New York courts have repeatedly stated that tort actions, unlike breach of contract actions, may warrant punitive damages even in the absence of a public harm. *Giblin v. Murphy*, 73 N.Y.2d 769(1988); John M. Leventhal & Thomas A. Dickerson, *Punitive Damages: Public*

*Wrong or Egregious Conduct? A Survey of New York Law*, 76 Alb. L. Rev. 961, 1005 (2013). For the tort of conversion, and other intentional torts, punitive damages can be recovered if the conversion was accomplished by malice, recklessness, or willful disregard for the plaintiff's rights. 14 *N.Y.Prac.*, *New York Law of Torts* § 2:14; 23 *N.Y. Jur. 2d Conversion, Etc.* § 75; *See Ashare v. Mirkin, Barre, Saltzstein & Gordon, P.C.*, 106 Misc.2d 866 (Sup.Ct., Suffolk County, 1980), modified, 81 A.D.2d 650 (App. Div 2d Dep't 1981), aff'd, 54 N.Y.2d 891, 444 N.Y.S.2d 918, (1981); *Warner v. Village of Chatham*, 194 A.D.2d 980 (App. Div. 3d Dep't 1993).

The purpose of punitive damages for conversion is to deter the tortfeasor from future bad conduct and there is no public-harm requirement. *Manekas v. Allied Discount Co.*, 6 Misc. 2d at 1080, 166 N.YS.2d at 1081. When a conversion is part of a consumer transaction, it is especially important that punitive damages be available. These scams often involve small dollar amounts that are cost-prohibitive to sue to recover, and without punitive damages, no deterrence mechanism would exist. *Schaffner v. Pierce*, 75 Misc. 2d 21 (Dist. Ct. Nassau Co. 1973). Along the same lines, attorneys are held to a high standard, and when they commit conversion, abuse of their professional status is a factor in support of punitive damages. *Johnson v. Home Savers Consulting Corp.*, No. 04–CV–5427, 2007 WL 925518, at *8 (E.D.N.Y. March 23, 2007) *citing Chase Manhattan Bank, N.A. v. Perla*, 65 A.D.2d 207, 212 (App.Div.1978).

Kavulich and Rosewall's restraint and levy against Mr. Morales' bank account based on a non-existent judgment for an amount that was entirely or mostly already paid was willful, wanton, reckless, or done with malice. The acts of conversion against Mr. Morales were not one-off occurrences or the result of an accident. It is a systemic part of Mr. Kavulich's business to willfully or recklessly execute on non-existent judgments, the amounts of which are sometimes significantly inflated. *See* Statement of Undisputed Facts ¶¶ E – G.

Not only has Kavulich repeatedly enforced judgments that were either non-existent or vacated. ¶¶ 191-302. He knows this occurs but has not altered his business practices to prevent it. Kavulich's emails are rife with instances where he improperly enforced on a judgment. And when it comes time to sign information subpoenas - something he does as an officer of the court - Kavulich just mechanically signs what is in front of him without bothering to check whether he has a judgment. C.P.L.R. § 5222(a); ¶ 10. And checking would be easy. Any attorney enforcing a judgment surely has a copy of the judgment. All Kavulich would have to do is take a trip to the file cabinet and look inside or check a computer, a task that would take only a few minutes.

Kavulich combines this failure to review with a refusal to credit debtors with money paid towards their judgments, choosing to send out information subpoenas that fail to credit payments on the judgment, resulting in larger account restraints and the ability to collect un-owed monies. Kavulich's actions are the definition of willfulness. Kavulich knows of the problem, he knows he pursues money that he is not entitled to-- both though collecting on non-existent or vacated judgments and sending information subpoenas for the wrong amount -- but he does not fix these problems because he does not want to spend the money or take the time to review what he is signing. In other words, he is making conscious decisions not to follow the law, and these decisions allow him to collect extra money. The point of punitive damages is to put an end to this sort of tortious behavior. This is especially important when the tortious conduct is being done by an attorney who is directing it towards consumers. Based on the type and severity of this conduct, the Court should grant Mr. Morales' request for punitive damages.

### D.   The Rosewall defendants are jointly liable.

The Rosewall Defendants consist of two entities, Rosewall Gardens, Associates, LP and Rosewall Inc. Rosewall Inc. is the general partner of Rosewall Gardens, Associates, LP.

Rosewall, Inc. is liable for the debt collection violations of Rosewall Gardens, Associates, LP. *Fritz, supra,* at 177 (general partner of limited partnership liable for the FDCPA and GBL 349 violations of the limited partnership).

**E. Rosewall, the principal, is vicariously liable for GBL 349 and conversion violations committed by Kavulich, its agent, acting within the course and scope of its agency.**

The "established rule of agency law is that a principal is liable to third parties for the acts of an agent operating within the scope of the agent's real or apparent authority." *Gomez v. Resurgent Capital Servs.*, LP, 129 F. Supp. 3d 147, 157 (S.D.N.Y. 2015) (plaintiff in collection lawsuit vicariously liable for the acts of its attorney) q*uoting Security Pac. Mortg. & Real Estate Servs., Inc. v. Herald Ctr., Ltd.*, 891 F.2d 447, 448 (2d Cir.1989). Vicarious liability applies to torts in general, including conversion. *See Clients' Sec. Fund of State v. Grandeau*, 72 N.Y.2d 62, 67 (Ct. App. 1988) (law partners, who are agents of one another, are liable for conversion committed by any other partner, even if they had no knowledge of it).

The U.S. Supreme Court "has made clear that 'clients must be held accountable for the acts and omissions of their attorneys.'" *Polanco v. NCO Portfolio Mgmt., Inc.*, 132 F. Supp. 3d 567, 584 (S.D.N.Y. 2015) (Polanco II), *quoting Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396–97 (1993) (*quoting Link v. Wabash R. Co.*, 370 U.S. 626, 633–34 (1962)). In Polanco II, the plaintiff alleged that the debt collector, through its debt collection law firm, had refused to return restrained funds after the underlying judgment was vacated. 132 F. Supp. 3d at 570-75. The court observed that because the defendant had voluntarily chosen its attorney as its representative in the action, it could not "now avoid the consequences of the acts or omissions of this freely selected agent." *Id.* at 584. "Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by

the acts of his lawyer-agent and is considered to have 'notice of all facts'....' " *Id.*, quoting *Link*, 370 U.S. at 633–34 (internal citation omitted). Here, Rosewall voluntarily retained Kavulich, a debt collection law firm, for the express purpose of collecting on Mr. Morales' alleged account and the alleged judgment. When Kavulich restrained Mr. Morales' bank account pursuant to a non-existent judgment, Kavulich did so within the scope of its authority. *See Okyere I*, 961 F. Supp. 2d at 517 ("the facts alleged in the complaint easily lead to the conclusion that [the debt collection law firm was] acting within their authority from Palisades" when they continued executing on a judgment after it was vacated).

Additional facts also support the presence of a principal-agent relationship between Rosewall and Kavulich. First, because Kavulich was contracted to collect on Mr. Morales' account and the alleged judgment, Kavulich's wrongful actions were actually necessary to further the purpose entrusted to them by Rosewall. *Cf. Swegan v. Svenson*, 960 N.Y.S.2d 768, 769 (App. Div. 4th Dep't. 2013) (holding defendants liable for physical trespass and resulting conversion if they "directed the trespass or such trespass was necessary to complete the contract" between defendants and the purported agent.)

In sum, Kavulich was acting on behalf of Rosewall and within the scope of its agency as the debt collection law firm for Rosewall when it intentionally restrained and garnished Mr. Morales' bank account. As a result, Rosewall is vicariously liable for the conversion committed by Kavulich.

## VI.   CONCLUSION

For these reasons, Plaintiff prays for the court to enter summary judgment as to liability and as to the entitlement to punitive damages, and to allow the case to proceed to trial solely on the issue of the amount of actual, statutory, and punitive damages.

DATED: Brooklyn, New York
          August 18, 2017

                    Respectfully submitted,

                    By: *Ahmad Keshavarz*

                    Ahmad Keshavarz
                    One of Plaintiffs' Attorneys
                    The Law Office of Ahmad Keshavarz
                    16 Court St., 26th Floor
                    Brooklyn, NY 11241-1026
                    Phone: (718) 522-7900
                    Fax:    (877) 496-7809
                    Email: ahmad@NewYorkConsumerAttorney.com

                    By: *Melissa Koven*

                    CAMBA LEGAL SERVICES, INC.
                    Melissa Koven, Of Counsel
                    Elizabeth Miller, General Counsel
                    885 Flatbush Ave.  2nd Fl.
                    Brooklyn, NY  11226
                    Phone: (718) 940-6311
                    MelissaK@camba.org

                    By: *Matthew Schedler*

                    CAMBA LEGAL SERVICES, INC.
                    Matthew Schedler, Of Counsel (MS-3774)
                    Elizabeth Miller, General Counsel
                    885 Flatbush Ave.  2nd Fl.
                    Brooklyn, NY  11226
                    Phone: (718) 940-6311
                    MatthewSc@camba.org

## CERTIFICATE OF SERVICE

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

          Mitchell L. Pashkin
          Attorney for Defendants

775 Park Avenue, Suite 255
Huntington, NY 11743
(631) 6 29-7709
mpash@verizon.net


DATED: Brooklyn, New York

August 18, 2017

/s/

By: Ahmad Keshavarz
The Law Office of Ahmad Keshavarz